## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

I.A., A MINOR CHILD, BY
NEXT FRIEND, IBRAHIM ALZANDANI,          Case No.
N.A., A MINOR CHILD BY                   Hon.
NEXT FRIEND NADHEM ALNAJAR,
AND A.M., A MINOR CHILD BY
NEXT FRIEND ABRAHAM MUZIB,

      Personally and on behalf of all similarly situated persons,

      Plaintiffs,

v.

HAMTRAMCK PUBLIC SCHOOLS,
WAYNE COUNTY REGIONAL
EDUCATIONAL SERVICE AGENCY,
AND MICHIGAN DEPARTMENT OF
EDUCATION,

      Defendants.

_____/

## CLASS ACTION COMPLAINT

Plaintiffs I.A., N.A., and A.M. ("Plaintiffs"), on behalf of themselves and all

other similarly situated persons, state as follows in their Class Action Complaint

against Defendants Hamtramck Public Schools ("HPS"), Wayne County Regional

Educational Service Agency ("WRESA"), and Michigan Department of Education

("MDE") (collectively, "Defendants"):

**INTRODUCTION**

1. On Hamtramck Public School's website, under "Special Services," HPS maintains, "The Hamtramck Department of Special Services is responsible for providing services to children with disabilities aged 0-26 years of age. If appropriate, interventions and supports can occur as early as birth and last throughout a child's educational career."[1] Yet, there are over 100 children with disabilities enrolled in Hamtramck Public Schools who have not been receiving the services HPS claims to provide. This class action civil lawsuit seeks to remedy that failure.

2. For the 2022-2023 school year, there were 8 public schools serving 3,062 students in the Hamtramck Public School District. Children with disabilities make up 6.2% of the student body. 86% of HPS students are economically disadvantaged. 8.7% of HPS students met the college readiness benchmark. HPS' average testing ranking is 2/10, which is in the bottom 50% of public schools in Michigan. Schools in the Hamtramck School District have an average math proficiency score of 12% (versus the Michigan public school average of 35%), and reading proficiency score of 19% (versus the 48%

---

[1] *Special Services*, Hamtramck Public School District, Special Services - Departments - Home (hamtramckschools.org) (last visited Sep. 26, 2023).

statewide average). Minority enrollment is 42% of the HPS student body (majority Asian).[2]

3. Disability refers to the state of being disabled, which can be physical or mental.  Special needs refer to specific needs that someone has as a result of their disability, which may relate to extra accommodations at school or extra learning support. Special needs are about education, while a disability is a physical or mental condition that limits a person's movements, senses, or activities.[3]

4. Congress enacted the Education for All Handicapped Children Act (Public Law 94-142), also known as the EHA, in 1975 to support states and localities in protecting the rights of, meeting the individual needs of, and improving education results and opportunities for infants, toddlers, children, and youth with disabilities and their families. This landmark law's name changed to the Individuals with Disabilities Education Act, or IDEA, in a 1990 reauthorization. The law was last reauthorized in 2004, and the department has periodically issued new or revised regulations to address the implementation and interpretation of the IDEA.[4]

---

[2] *Hamtramck, School District the City of (82060)*, MI School Data,  District - Entity View Page (mischooldata.org) (last visited Sep 12, 2023).
[3] *Special Needs vs Disability: What Are the Differences?*, Pulchra Magazine (Aug. 5, 2022), *Special Needs vs Disability: What Are the Differences? | Pulchra*.
[4] *A History of the Individuals with Disabilities Education Act*, Individuals with Disabilities Education Act, A History of the Individuals With Disabilities Education Act  (last updated Jan. 11, 2023).

5. Before EHA, many children were denied access to education and opportunities to learn. In 1970, U.S. schools educated only one in five children with disabilities, and many states had laws excluding certain students, including children who were deaf, blind, emotionally disturbed, or had an intellectual disability.

6. Since the passage of EHA in 1975, significant progress has been made toward meeting major national goals for developing and implementing effective programs and services for early intervention, special education, and related services. The U.S. has progressed from excluding nearly 1.8 million children with disabilities from public schools prior to EHA implementation to providing more than 7.5 million children with disabilities with special education and related services designed to meet their individual needs in the 2020-21 school year.[5]

7. Within Hamtramck Public Schools, this progression has halted. Hamtramck's special education services, or lack thereof, are reminiscent of special education in the U.S. prior to the EHA implementation. For example, as recently as 2023, children with disabilities were excluded from or offered reduced time in HPS because of a "lack of resources."

---

[5] *Id.*

8. "Special education provides students with disabilities with the support and accommodations they need to succeed in school and in life, promotes diversity and inclusion in education, and can have a significant impact on the long-term outcomes for students with disabilities."[6]

9. When special education services are lacking or not properly implemented, the child is at a greater risk of developmental delays. Moreover, the child's long-term outcome will be affected.

10. Hamtramck Public Schools must remedy their special services, or their children with disabilities will continue to be at a greater risk of developmental delays.

## SUMMARY OF LEGAL CLAIMS

11. This is a class action civil rights lawsuit for declaratory and injunctive relief, brought pursuant to federal and state law, to vindicate the rights of all HPS children with disabilities who have received inadequate special services. These children require special services that comply with the mandates of the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), 20 U.S. § 1400 et seq.; § 504 of the Rehabilitation Act of

---

[6] *Special Education: Definition, Concept, Benefits, Importance of Special Education: Strategies, Challenges in It,* MRM (Mar. 8, 2023), Special Education: Definition, Concept, Benefits, Importance of Special Education: Strategies, Challenges in It (mizanur mizan.info).

1973 ("Section 504"), 29 U.S.C. § 794; Title II of the Americans with

Disabilities Act ("Title II"), 42 U.S.C. § 12131 et seq.; and Michigan law.

12. HPS has an ongoing pattern and practice of systemically failing to provide

special education and related services compliant with students'

individualized education programs in the least restrictive environment, as

required by IDEA.

13. HPS has an ongoing pattern and practice of systematically failing to

provide a free and appropriate education in accordance with IDEA.

14. HPS has a pattern and practice of systemically failing to provide screening

and timely referrals for evaluations to identify students eligible for special

education services pursuant to IDEA's child find mandate.

15. HPS also has an ongoing pattern and practice of systemically failing to

provide students with disabilities with procedural safeguards as required by

IDEA in the administration of disciplinary practices, as well as a pattern and

practice of using unduly harsh disciplinary measures with students with

disabilities, including physical restraints and seclusion techniques, contrary

to IDEA.

16. MDE, the State agency charged with conducting oversight and ensuring

HPS' compliance with IDEA in the provision of special education services,

has engaged in an ongoing pattern and practice of systemically failing to

provide HPS with sufficient funding for identifying children at risk of a disability in fulfillment of the child find mandate.

17.  MDE has engaged in an ongoing pattern and practice of systemically failing to provide HPS with sufficient funding for special education services compliant with students' individualized education programs in the least restrictive environment.

18.  MDE has engaged in an ongoing pattern and practice of systematically failing to ensure compliance with IDEA.

19.  MDE has engaged in an ongoing pattern and practice of systemically failing to address state complaints regarding HPS' ongoing violation of IDEA, Section 504, Title II, and Michigan law.

20.  The named plaintiffs bring this action on behalf of all similarly situated children with disabilities at HPS.  Plaintiffs seek to remedy the ongoing violations of IDEA, Section 504, Title II, and Michigan law by seeking the identification and evaluation of all children with, or at risk of, disabilities who are attending, or who may attend, HPS school and are entitled to special education services compliant with students' individualized education programs in the least restrictive environment in HPS schools.

**JURISDICTION AND VENUE**

21.  This Court has subject matter jurisdiction over this case pursuant to 28

U.S.C. § 1331, given the federal questions raised, and 28 U.S.C. § 1343(a),

given the civil rights claims raised. This Court also has jurisdiction over the

claims raised herein under 20 U.S.C. § 1415(i)(3)(A) and 29 U.S.C. § 794,

which provide the district courts of the United States with jurisdiction over

any action pursuant to those sections regardless of the amount in

controversy. This Court has supplemental jurisdiction over the state-law

claim pursuant to 28 U.S.C. § 1367.

22.  Venue is proper under 28 U.S.C. § 1391(b)(2) because the events giving

rise to the claims asserted occurred within Wayne County, which is located

in the Eastern District of Michigan.

## PARTIES

**Representative Plaintiffs**

23.  Plaintiff I.A. is a seven-year-old male with autism spectrum disorder. I.A.

attends Dickinson West Elementary, part of Hamtramck Public Schools. I.A.

attended Dickinson West Elementary through the 2022-2023 academic year.

Previously, I.A. attended New York Public Schools where he was found

eligible for special education services as a student with autism spectrum

disorder. I.A. was put on a reduced day schedule in violation of his IEP

throughout the 2022-2023 school year at Dickinson West Elementary. He

was also provided with inadequate special services that were in violation of his IEP.  For these reasons, I.A.'s family enrolled him in Dearborn Public Schools for the 2023-2024 school year. He brings this case through his parent and next of friend, Ibrahim Alzandani.

24.  Plaintiff N.A. is a nine-year-old male with autism spectrum disorder. N.A. attended Dickinson East Elementary, Hamtramck Public Schools. N.A. has been diagnosed with autism spectrum disorder since one and half years old and was found eligible for special education services as a student with autism spectrum disorder. He attended Hamtramck Public Schools until the 2023-2024 school year, when the family decided to enroll him in Dearborn Public Schools. N.A. left HPS because he was being placed on reduced days in violation of his IEP and was provided with inadequate special services. He brings this case through his parent and next of friend, Nadhem Alnajar.

25.  Plaintiff A.M. is a five-year-old female with down's syndrome and autism spectrum disorder. A.M. attends Early Childhood Education (ECE), which is Pre-K to 2nd grade. The ECE facility is undergoing renovations, so all learning is virtual. Virtual learning is not working for A.M. As a result, HPS suggested Dickinson-East Elementary (DE) for A.M., as DE has in person special education services. However, the in person learning that was offered takes place in the lower level/basement of DE and is severely lacking in

facilities. She brings this case through her parent and next of friend, Abraham Muzib.

**Defendants**

26. Defendant MICHIGAN DEPARTMENT OF EDUCATION ("MDE") is the department of the State of Michigan government responsible for administering and enforcing laws related to public education. Mich. Comp. Laws §§ 16.400-16.402. As Michigan's state educational agency ("SEA"), MDE bears the ultimate responsibility for ensuring that all public schools in Michigan— including public school academies or charter schools—comply with the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 1412(a)(11)(A). MDE is also a "program or activity" covered by Section 504, 20 U.S.C. § 794(b), and a "public entity" under Title II, 42 U.S.C. § 12131(1)(A).

27. Defendant WAYNE COUNTY REGIONAL EDUCATIONAL SERVICE AGENCY ("WRESA") is the intermediate school district ("ISD") responsible for overseeing special education services for students who attend public schools in Hamtramck. As such, WRESA provides federal, state and local funds to HPS and public school academies for special education; (2) coordinates the delivery of special education services; and (3) investigates

special education programs and services it or a local district has been contracted to provide. Mich. Comp. Laws § 380.1711(1)(h).

28.  Defendant HAMTRAMCK PUBLIC SCHOOLS ("HPS") is a public school district in Hamtramck, Michigan required under Michigan law to provide "special education programs and services designed to develop the maximum potential of each student with a disability in its district on record under section 1711 for whom an appropriate educational or training program can be provided in accordance with the intermediate school district special education plan." Mich. Comp. Laws §380.1751(1). HPS is a local educational agency ("LEA") under IDEA, responsible for ensuring that its special education policies, procedures, and programs are consistent with those of the SEA under IDEA. 20 U.S.C. §1414(a)(1). HPS is also a "program or activity" covered by Section 504, 20 U.S.C. §794(b), and a "public entity" under Title II, 42 U.S.C. §12131(1)(A).

## DESCRIPTION OF PLAINTIFF CLASS

29.  Plaintiffs bring this suit as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on their own behalf and on behalf of all present and future children, ages 3 through age 26, and the parents of such children, residing within Hamtramck, Michigan, who are or may be eligible for special education and related services pursuant to the IDEA and its

11

federal implementing regulations, Section 504, and Title II, but who have
not been timely identified, located, referred, evaluated, or provided with
special education and related services.

30.  This action satisfies the numerosity, commonality, typicality, adequacy,
predominance, and superiority requirements of those provisions.

31.  Under Fed. R. Civ. P. 23(b)(2) and (b)(3), Plaintiff seeks certification of the
following classes:

Two subgroups as follows: 1) children who have not been provided special
education and related services in accordance with their individualized
education programs in the least restrictive environment ; 2) children who
attend or may attend HPS schools and whose disabilities have not been
timely identified and evaluated to determine their eligibility for special
education and related services and who do not have completed
individualized education programs in accordance with IDEA. The class
consists of dozens of current children, as well as numerous future unknown
children, so numerous as to make joinder of all members impractical.

32.  Material questions of fact and law are common to the class, including:

    a.  Whether Defendants violated Plaintiffs' rights under the IDEA,
        Section 504, Title II, and Michigan law by: i) failing timely to identify

and evaluate all children with disabilities who attend or who may

attend HPS schools who require or who may require special education

services; ii) failing to provide timely and adequate special education

and related services to children determined eligible; and iii) failing to

provide compensatory education to all children determined eligible for

special education who were not timely identified, evaluated, or

provided with legally mandated special education and related services.

b.   Whether Defendants MDE and WRESA additionally violated

Plaintiffs' rights under the IDEA, Section 504, and Title II by failing

appropriately to monitor and enforce Defendant HPS's timely

identification of, evaluation of, and provision of, legally mandated

special education and related services to, children with known or

suspected disabilities who require or may require such services.

33.   The claims of the representative Plaintiffs are typical of the claims of the

class. The representative Plaintiffs, like all class members, claim that

Defendants have violated their rights under the IDEA, its federal

implementing regulations, Section 504, Title II, and Michigan law, to be

identified, evaluated, and, if eligible, provided with special education and

related services. The representative Plaintiffs, like all class members, also

assert that Defendants MDE and WRESA have failed appropriately to monitor the provision of special education and related services by HPS.

34. The representative Plaintiffs will fairly and adequately protect the interests of the class as they have no interests antagonistic to those of the class.

35. The representative Plaintiffs' counsel, attorneys from Hammoud, Dakhlallah & Associates PLLC and Fagan McManus PC, are experienced in civil rights litigation, disability law, education law, and class actions. The representative Plaintiffs' attorneys will vigorously prosecute this action on behalf of the entire class.

36. Defendants are acting or refusing to act on grounds generally applicable to the Plaintiff class, making appropriate injunctive relief and declaratory relief with respect to the Plaintiff class as a whole. The Plaintiff class seeks to enjoin Defendants from continuing to violate their federal and state rights to receive a free and appropriate public education free of discrimination based on their disabilities.

## LEGAL STANDARDS

**FEDERAL LAW**

**IDEA REQUIREMENTS**

37. The Individuals with Disabilities Education Improvement Act of 2004 ("IDEA") requires that eligible children with disabilities, including children

with disabilities who have been suspended or expelled from school, receive a "free appropriate public education." 20 U.S.C. § 1412(a)(1)(A); 34 C.F.R. § 300.101(a). The IDEA establishes a system of procedural and substantive requirements to which the Defendants must adhere to ensure that each child with a disability receives a free appropriate public education. 20 U.S.C. § 1401 et seq.

38. A "child with a disability" is defined as a child with intellectual disabilities, mental retardation, a hearing impairment (including deafness), a speech or language impairment, visual impairment (including blindness), a serious emotional disturbance, an orthopedic impairment, autism, traumatic brain injury, another health impairment, a specific learning disability, deaf-blindness, or multiple disabilities, and who, by reason thereof, needs special education and related services. 20 U.S.C. § 1401(3); 34 C.F.R. § 300.8(a)(1).

39. Autism means a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age three, that adversely affects a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences. 20 U.S.C § 300.8(c)(1)(i).

40.  Intellectual disability means significantly subaverage general intellectual functioning, existing concurrently with deficits in adaptive behavior and manifested during the developmental period, that adversely affects a child's educational performance. The term "intellectual disability" was formerly termed "mental retardation." 20 U.S.C § 300.8(c)(6).

41.  A "free appropriate public education" is defined as special education and related services that (a) are provided at public expense, under public supervision and direction, and without charge; (b) meet the standards of the state educational agency ("SEA"); (c) include an appropriate preschool, elementary school, or secondary school education; and (d) conform with the student's individualized education program ("IEP"). 20 U.S.C. § 1401(9); 34 C.F.R. §300.17.

42.  Local educational agencies ("LEAs"), such as Defendants HPS and WRESA, must have in effect policies, procedures, and programs that are consistent with the State policies and procedures established under the IDEA in providing for the education of children with disabilities within their respective jurisdictions. 20 U.S.C. § 1413(a)(1); 34 C.F.R. § 300.201. The State of Michigan has set forth the policies and procedures as required by the IDEA in Mich. Admin. Code R. 340.1701 et seq.

43.  The state educational agency ("SEA") bears the ultimate responsibility for ensuring that all public schools in the state of Michigan comply with the IDEA. 20 U.S.C. § 1412(a)(11)(A). Accordingly, Defendant MDE is responsible for ensuring that the LEAs – Defendants HPS and WRESA – are monitored for implementation of, and compliance with, the IDEA. 34 C.F.R. § 300.600(a)(1). If the state determines that the LEA is not in compliance, the state must take necessary action to enforce compliance. C.F.R. §§ 300.600(a)(3), 300.608(a), 300.222(a). An assurance of compliance with this law is required by Mich. Admin. Code R. 340.1701a.

44.  In addition to its general supervisory responsibilities, Defendant MDE has responsibility to ensure that all LEAs in Michigan, including Defendants HPS and WRESA, implement and comply with the following specific provisions of the IDEA.

45.  The IDEA mandates that Defendants must have in effect policies and procedures to ensure that all children with disabilities who are in need of special education and related services, including those attending private schools, are identified, located, and evaluated. 20 U.S.C. §§ 1412(a)(3), (a)(7), 1414(a)-(c); 34 C.F.R. §§ 300.111, 300.301, 300.304-300.306. With respect to children aged 3-4, the child find mandate, requiring proactive identification, location, and evaluation of children with disabilities, is not

likely to be discharged unless children in this age range are provided early

intervention services, or enrolled in universal preschool, which would allow

suspected disabilities among this population to be observed and assessed.

The initial evaluation of the child must be conducted within sixty days of

receiving parental consent for the evaluation or within the timeframe that is

established by the State. 20 U.S.C. § 1414(a)(1)(C)(i)(I); 34 C.F.R. §

300.301(c)(1). Under Michigan law, the time from receipt of parental

consent for an evaluation to the notice of an offer of a free appropriate

public education or the determination of ineligibility shall not be more than

30 school days. Mich. Admin. Code R. 340.1721b(1).

46.  Defendants must also ensure that an individualized education program

("IEP") is developed, reviewed, and revised for each child with a disability

to enable the child to receive a free appropriate public education. 20 U.S.C.

§§ 1412(a)(4), 1414(d); 34 C.F.R. §§ 300.112, 300.320-300.324. The IEP is

defined as a written statement which must include, inter alia, a statement of

the student's present levels of academic achievement and functional

performance, measurable annual goals, and the special education and related

services that will be provided. 20 U.S.C. §1414(d)(1)(A)(i); 34 C.F.R. §

300.320(a). A meeting to develop an IEP must be conducted within 30 days

of a determination that the child needs special education and related

services. 34 C.F.R. § 300.323(c)(1). The IEP Team consists of a) the parents of the child; b) the child, where appropriate; c) at least one regular education teacher; d) at least one special education teacher, or if appropriate, at least one special education provider; e) a representative of the LEA who is qualified to provide or supervise the provision of specially designed instruction for children with disabilities and is knowledgeable about the general curriculum and the availability of LEA resources; f) an individual who can interpret the instructional implications of evaluation results, who may already be a member of the team; and g) at the discretion of the parent or agency, other individuals with knowledge or special expertise regarding the child, including related services personnel. 20 U.S.C. §1414(d)(1)(B); 34 C.F.R. §300.321(a). As soon as possible following the development of the IEP, the SEA and LEAs must ensure that special education and related services are made available to the child in accordance with the IEP. 34 C.F.R. § 300.323(c)(2). Under Michigan law, within seven school days from the date of the IEP team meeting, the public agency shall provide the parent with the notice of the offer of a free appropriate public education, and shall initiate the IEP as soon as possible and not more than 15 school days after the parent's receipt of the written notice. Mich. Admin. Code R. 340.1721b(3).

47. Defendants must ensure that each SEA ensures that each public agency establishes, maintains, and implements procedural safeguards that meet the requirements of §§300.500 through 300.536. 20 U.S.C. §300.500.

48. Defendants must ensure that children with disabilities are afforded the procedural safeguards required by the IDEA when disciplinary action is contemplated. 20 U.S.C. §§ 1412(a)(6)(A), 1415(k); 34 C.F.R. §§ 300.150, 300.500, 300.530-300.536. Pursuant to the IDEA, the SEA must examine data to determine if significant discrepancies exist in the rates of long-term suspensions and expulsions of children with disabilities, either between different LEAs or between disabled and nondisabled students within the same LEA. 20 U.S.C. 26 §1412(a)(22)(A); 34 C.F.R. § 300.170(a). If such discrepancies exist, the SEA must review and, if appropriate, revise (or require the affected LEA to revise) its policies, procedures and practices relating to the development and implementation of IEPs, the use of positive behavioral interventions and supports, and procedural safeguards, to ensure compliance with the IDEA. 20 U.S.C. § 1412(a)(22)(B); 34 C.F.R. § 300.170(b).

49. Defendant MDE must ensure that each LEA in Michigan, including Defendants HPS and WRESA, takes steps to ensure that children with disabilities within its jurisdiction have available to them the variety of

educational programs and services available to nondisabled children, including art, music, industrial arts, consumer and homemaking education, and vocational education. 20 U.S.C. §§1412(a)(2), 1413(a)(1); 34 C.F.R. § 300.110.

50. When facilitating the transfer of a child with disabilities, defendants must take reasonable steps to promptly obtain the child's records, including the IEP and supporting documents and any other records relating to the provision of special education or related services to the child, from the previous school in which the child was enrolled. 20 U.S.C. § 1414(c)(i)(ii); CFR § 300.323(g) and 34 CFR § 99.31(a)(1)(i)(A).

## SECTION 504 AND TITLE II REQUIREMENTS

51. Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act prohibit public entities such as SEAs and LEAs from discriminating against individuals with disabilities. Pursuant to Section 504 and Title II, public schools are prohibited from excluding students with disabilities from participating in or receiving the benefits of a school's services, programs, or activities, and such exclusion constitutes disability discrimination. 29 U.S.C. § 794(a); 42 U.S.C. § 12132. Accordingly, each student with a disability must be provided access to all programs provided to non-disabled students. 29 U.S.C. § 794; 42 U.S.C. § 12132; 34 C.F.R. §

104.21. Furthermore, Section 504 and Title II require that each disabled student be provided reasonable accommodations and modifications designed to provide meaningful access to educational benefits, or as necessary to avoid discrimination on the basis of disability. 34 C.F.R. § 104.12; 34 C.F.R. § 104.44; 28 C.F.R. § 35.130(b)(7).

52.  The nearly identical anti-discrimination mandates in Section 504 and Title II apply to qualified individuals with disabilities. 29 U.S.C. § 794(a); 42 U.S.C. § 12132. In the preschool, elementary and secondary education context, the term "qualified individual" refers to

> a handicapped person (i) of an age during which non handicapped persons are provided [public preschool, elementary, or secondary educational] services (ii) of any age during which it is mandatory under state law to provide such services to handicapped persons, or (iii) to whom a state is required to provide a free appropriate public education under [the IDEA]. 34 C.F.R. § 104.3(l)(2).

53.  Section 504 and Title II define "disability" as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A); 29 U.S.C. § 705(9)(A).

54.  Section 504 defines a physical or mental impairment as (A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs;

cardiovascular; reproductive, digestive, genito-urinary; hemic and

lymphatic; skin; and endocrine; or (B) any mental or psychological disorder,

such as mental retardation, organic brain syndrome, emotional or mental

illness, and specific learning disabilities. 34 C.F.R. § 104.3(j)(2)(i).

55.  Major life activities means functions such as caring for one's self,

performing manual tasks, walking, seeing, hearing, speaking, breathing,

learning, and working. 34 C.F.R. § 104.3(j)(2)(ii).

56.  Qualified students with disabilities can demonstrate that their SEA

discriminated against them pursuant to the following analysis:

1. The plaintiff-student is disabled, according to the common definition;

2. The plaintiff-student is otherwise qualified to participate in school

activities;

3. The SEA receives federal financial assistance; and

4. The plaintiff-student was excluded from participation in, denied the

benefits of, or subject to discrimination at the school.

57.  Section 504 also mandates that each child with a disability in Hamtramck

receive a free appropriate public education including the provision of regular

or special education and related aides and services to meet the needs of the

student. 29 U.S.C. § 794; 34 C.F.R. § 104.33.

**MICHIGAN LAW**

**MICHIGAN MANDATORY SPECIAL EDUCATION ACT**

58.  Under Michigan law, defendants must ensure each child with a disability shall be provided with programs and services designed to develop his or her maximum potential. Mich. Comp. Laws § 380.1711(1)(a).

59.  Defendants must ensure that curriculum, eligibility of specific persons for special education programs and services and for each particular program or service, review procedures regarding the placement of persons in the programs or services, size of classes, size of programs, quantity and quality of equipment, supplies and housing, adequacy of methods of instruction, and length and content of school day shall be in accordance with rules promulgated by the state board relative to special education programs and services. Mich. Comp. Laws § 380.1703(2).

60.  The rules promulgated by the state board relative to special education programs and services are known as the Michigan Administrative Rules for Special Education (MARSE).

**MARSE REQUIREMENTS**

61.  The Michigan Administrative Rules for Special Education (MARSE) With Related IDEA Federal Regulations includes the full Michigan rules and pairs

each rule with any of the relevant regulations from the Individuals with Disabilities Education Act (IDEA).

62.  "Student with a disability" means a person who has been evaluated according to the individuals with disabilities education act and these rules, and is determined by an individualized education program team, an individualized family service plan team, or an administrative law judge to have 1 or more of the impairments specified in this part that necessitates special education or related services, or both, who is not more than 25 years of age as of September 1 of the school year of enrollment, and who has not graduated from high school. A student who reaches the age of 26 years after September 1 is a "student with a disability" and entitled to continue a special education program or service until the end of that school year.  MARSE R 340.1702 "Student with a disability" defined. Rule 2.

63.  Defendants must ensure that each public agency shall provide special education and related services to a student in accordance with the student's individualized education program. MARSE R 340.1722 District responsibilities. Rule 22.

64.  Defendants must ensure that an intermediate school district, local school district, public school academy, and any other agency shall adhere to all of the following general requirements for all programs and services for students

with disabilities: (a) Special education classrooms or areas where related services are provided shall have at least the same average number of square feet per student, light, ventilation, and heat conditions as provided for general education students in the school district. (b) Programs for students with severe cognitive impairment and severe multiple impairments which have students under 16 years of age shall not exceed a 6-year age span at any 1 time. (c) All other special education programs which have students under 16 years of age and which are operated in separate facilities shall not exceed a 4-year age span at any 1 time. (d) The age span for students who are assigned to special education programs, except for programs for students with severe cognitive impairment and severe multiple impairments, operated in elementary buildings attended by children who are nondisabled, shall not exceed, at any 1 time, a 6-year age span or the age span of the students who are nondisabled in the building, whichever is less. (e) The age span for students who are assigned to special education programs, except for programs for students with severe cognitive impairment and severe multiple impairments, operated in secondary buildings attended by students who are nondisabled, shall not exceed, at any 1 time, the age span of the students who are nondisabled in the building, except in high school buildings where students up to 26 years of age may be served. The term "nondisabled" Page

96 Michigan Administrative Rules for Special Education With Related

IDEA Federal Regulations shall not include persons participating in adult

education programs. (f) Programs for students with severe cognitive

impairment, severe multiple impairments, and moderate cognitive

impairment shall comply with subdivisions (b), (c), (d), and (e) of this rule

unless a program is operated in accordance with an approved intermediate

school district plan where, due to the low incidence of eligible students,

expanded age ranges may be necessary for programmatic feasibility and

meeting the needs of students. (g) Students with disabilities qualifying for

special education programs and services shall be provided with supplies and

equipment at least equal to those provided to other students in general

education programs, in addition to those supplies and equipment necessary

to implement a student's individualized education program. (h) Intermediate

school districts, local school districts, public school academies, or a

combination of such agencies in cooperation with public and private entities,

shall provide or contract for the provision of transition services. Special

education teachers shall be assigned to supervise such services. Professional

special education personnel, a transition coordinator, or both, shall

coordinate transition services.  MARSE R 340.1733 Program and service

requirements. Rule 33.

## STATEMENT OF FACTS

65.  Hamtramck Public School District contains 8 schools and 3,062 students. Children with disabilities make up 6.2% of the student population. That totals to at least 189 HPS children with identified disabilities.[7] The number does not include the children with disabilities who have not yet been identified.

66.  On October 12th, 2022, there was a Hamtramck Public Schools Board of Education meeting.

67.  During this meeting Special Education Director, Menham Aouad, admitted to the Hamtramck Board of Education that many children with disabilities were placed on reduced day schedules by at least one individual and in violation of their standing Individualized Education Plans. This Board meeting was broadcasted, including the admission by Menham Aouad.[8]

68.  The reason given for the widespread reduction in days in violation of IEPs was critical shortages (in funds, teachers, etc.).[9]

69.  Menham Aouad also admitted to the Hamtramck School Board that HPS was behind in the completion of over one hundred IEPs.[10]

---

[7] MI School Data, *supra*.
[8] Hamtramck Public Schools, *Hamtramck Public Schools Regular Meeting 10/12/2022*, Youtube (Oct. 12, 2022), Hamtramck Public Schools Regular Meeting 10/12/2022 - YouTube.
[9] *Id.*
[10] *Id.*

70.  Aouad compared how far HPS was behind in IEP evaluations in 2021 to 2022, stating, "Enrollment trends, I would like to provide you with a comparison. At this time last year when the Board asked me to provide a presentation following the departure of the school psychologist and how far behind we were in evaluations, we had 45 evaluations by November. The number for this year is 114 initial evaluations. When I stated in my opening statements that we are busy, that was an underestimation."[11]

71.  During the public comment period of the broadcast, the administrator of Hamtramck's Early Childhood Center, Vicki Smith, made the following statement during the comment period of the publicly broadcast and recorded Board meeting:

Today I received an email from two individuals in the district office who questioned me as to why students are half time, do you know why they are on half, because there is nobody there for those kids to service them. The day we opened school we were not in compliance and the folks in this district office knew that and they put us in positions at ECE for breaking the law. So I took kids into the school and I am not going to change that because we are here for all children. I took kids into this school and I got chastised for that. I got phone calls about that, and I didn't deserve that because if

---

[11] *Id.*

there is anyone here, there is not one person here who will say, Vickie Smith lies, Vickie Smith does not tell the truth because I am brutally honest whether people what to hear that or not and I will fight for my building and I will fight for these kids and I am not going to go away and I am not going to be quietly fired. I am here.

72. The admission of placing students on reduced schedules as a result of lack of staffing is an admission of a violation of IDEA and the Michigan Administrative Rules of Special Education. The statement indicates not an ignorance of this fact, but an acknowledgement that Smith knows this is "not in compliance" and rather deflects the blame of placement of these kids on to the district instead. Her statement "the day we opened school we were not in compliance" also foreshadowed a material fact unknown at the beginning of the investigation, but later discovered upon review of an analysis conducted by Wayne County's Regional Educational Service Agency (RESA) of the prior school year.

73. The admission made here was that Smith had been reducing hours for students with special needs since at least 2021/2022; even prior to the commencement of the 2022/2023 school year. Smith therefore knew the district was not in compliance with this practice when she knowingly commenced and continued it on the first day of school, as declared in her

statement that day. The admission made here was that Smith had been reducing hours for students with special needs since at least 2021/2022; even prior to the commencement of the 2022/2023 school year.

74. An analysis of the special education students and those placed on reduced days was made by a Wayne County RESA Representative and was received by the Interim Superintendent, Nabil Nagi, on October 12, 2022. In it, WRESA details "systemic concerns" stemming from a concentration of students at Early Childhood Elementary (ECE)  that were being placed on reduced day schedules in the 2021-2022 school year. Although occurring at two other schools, the report is indicative of a systemic or embedded practice that was adopted for at least two school years with a higher pervasiveness and incidence at ECE than at all the other schools in the district combined.

75. For the 2021-2022 school year, the following was determined:

    a. At Dickinson-East (DE), 5 were on a reduced-day schedule out of a total of 13 Autism Spectrum Disorder (ASD) students.

    b. At Dickinson-West (DW), 3 out of 4 ASD students were on a reduced-day schedule.

    c. At ECE, 6 out of 7 ASD students were on a reduced-day schedule.

76. For the 2022-2023 school year, the following was determined:

    a. Holbrook had 1 student on a reduced-day schedule.

    b. DE had 1 student on a reduced-day schedule.

    c. DW had 1 student on a reduced-day schedule.

    d. ECE had 6 students on a reduced-day schedule.

77. The report also outlined that there were 3 nonreporting students at Dickinson-East and 10 nonreporting at ECE in the 2021/2022 school year, although no records of which students were documented or discussed in the interviews. The rationale behind all of these was essentially the same: lack of staffing. Specifically, RESA's report indicated 5 reasons that were provided by staff and administrators for placing students on reduced days:

    a. Parent did not want the child in an "unsafe environment, due to lack of paras"

    b. Staff told the parents that the district could not provide adequate supports for safety or toileting

    c. The student is not potty-trained

    d. Behaviors were too severe

    e. The student elopes

It's important to note that all of these issues could have been alleviated with adequate one-on-one supports in place for the vast majority of the students during the 2021/2022 school year.[12] Of all of the students on a reduced day schedule, only 2 students across the district were recommended for center-based placement; the rest were all in their least-restrictive environment and should have started on a full day schedule after Winter break of 2021. According to the representative's notes, however, the practice continued even after the recommendations were made.

78. On December 20th, 2022, Samraa Luqman, an advocate for students with special needs, met with Hamtramck Public Schools Special Education Director Menhem Aouad, Interim Superintendent Nabil Nagi, Wayne County RESA Consultant Wanda Ajrouche, Wayne County RESA Representative Patti Silveri, and Heather Dorogi. Luqman made an oral complaint regarding allegations of discrimination by HPS District employee Vicki Smith.

---

[12]*One-to-One Support in the Classroom,* Autism Empowerment (Sep. 16, 2023), https://www.spectrumlife.org/blog/one-to-one-support-in-the-classroom-678.

79.  On January 13, 2023, Luqman followed up with a more detailed email

pronouncing more specific allegations, investigation requests, and

resolutions and remedies sought. Luqman's email said:

"I'm writing to follow up on the oral complaint I made on December 20, 2022. I was very much appalled by the fact that at a Board meeting in October, the Special Education Director admitted that there were a large number of students on reduced school days. An administrator followed up with some statements during the public comment period that essentially admitted that the Hamtramck School District was engaging in blatant discrimination against students with disabilities. I was further appalled by the fact that neither the board, nor anyone in the administration had initiated an investigation into the claims made during that meeting. I had therefore requested a formal investigation into the assertion that the Hamtramck Public Schools has discriminated against students with disabilities. Specifically, I am alleging that students were placed on reduced day schedules by at least one individual and in violation of their standing Individualized Education Plans. Since my complaint was formally made on December 20, 2022, I am asking that the district ensure its adherence to the timelines determined by Board Policy."

80.  On January 26, 2023, Luqman sent another email further expanding the

investigation request to include allegations of discrimination by HPS Special

Education Director Menham Aouad. The email stated:

"I'm writing to follow up and amend the complaint I've filed.  As you all may recollect, on December 20, 2022, we met and discussed several special education complaints I had received and discussed the multiple students and families I was representing.  During that meeting, I specifically asked three questions in terms of compliance:

-If there were any students in the district that remained on reduced days due to staffing concerns. I was reassured that all students had been returned to a full school day. I was told in the discussion regarding reduced school days that the issue was limited to ECE.
-Whether all IEPs were in compliance. I was reassured that they were.

-I also asked if all students that required the support of a paraprofessional or Instructional aide had the proper supports in place. I was reassured that was the case.

So you can imagine my surprise when I received the complaint that I am pasting below this email regarding [I.A.] I'm attached the release of information for this family to this email as well. Wanda, please send me the cumulative special education file for the student. Considering that the special education department itself has been illegally and unethically denying special needs students from their rights to a "free and appropriate public education" in accordance with IDEA, MARSE, Section 504 of the ADA, and several other statutes I can go on forever naming, and in light of this new complaint, I'm asking for the investigation to be expanded to all students in the Hamtramck Public Schools district, and I'm further naming Menham Aouad as another party to the ongoing discrimination against students with disabilities. In accordance with Board policy, I'm requesting the same respective outcomes as indicated in my prior email and an expanded investigation as aforementioned."

81. The following is a statement of facts and a summary of the allegations received from Luqman.

- Luqman represented A.M. and family

- Luqman represented I.A. and family

- Luqman requested the verification of attendance records, transportation changes, a review of IEPs, and confirmation of parental notifications and/or consent.

Allegation 1: Luqman alleges that Smith inappropriately and illegally targeted and discriminated against students with special needs by unilaterally placing them on reduced day schedules.

Allegation 2: Luqman alleges that Smith unilaterally implemented said reduction in school hours specifically as a result of staffing and personnel issues and not based on the individualized needs of the students.

Allegation 3: Luqman alleges that Smith violated timeline and procedural rules in that said reduction was not conducted through IEP team meetings or via appropriate channels. Inclusively, the Complainant thus alleges that Smith did not provide adequate noticing or procedural safeguards to families of students with special needs.

Allegation 4: Luqman alleges that the Aouad likewise discriminated against students with special needs by placing at least one named student, I.A., on a reduced day schedule without an IEP team meeting or approval based on student needs.

Allegation 5: Luqman alleges that Aouad did not do his due diligence in obtaining the out-of-state records for I.A. and therefore did not appropriately place the student in his least restrictive environment, thereby causing the alleged Discrimination.

Allegation 6: Luqman in her communication on December 20, 2022 alleges that Smith had opened the district up to liability for class-action discrimination for the statements she made at the HPS Board of Education meeting held on October 12, 2022 .

Allegation 7: Luqman made one other allegation both verbally on December 20, 2022 and in her email communication on January 13, 2023 regarding discrimination against students with disabilities that was exacted by the Board of Education (BOE) on or after October 12, 2022. Specifically, Luqman filed a Freedom of Information Act Request on November 11, 2022 requesting data on students with special needs and those with a reduced day schedule and any investigations that were ordered by the district within the last 14 months. The response from district attorneys was received by the Complainant on December 5, 2022 denying the FOIA request. Luqman indicated that her presumption became that no investigations into the discriminatory statements made on October 12 were initiated by the District or the BOE. Luqman alleged that the HPS BOE thus became a party to the discrimination by Smith because they failed to investigate/refer to investigation the statements that were made by Smith at the Board meeting on October 12, 2022 within two days after they became aware of the discrimination. Luqman referenced the requisite under po2660 that states the following and alleges that the BOE and District were not in compliance with it:

*Any Board employee who directly observes unlawful discrimination/retaliation of a student is obligated, in accordance with this policy, to report such observations to one of the COs within two (2) business days.*

82.  On February 9, 2023, the investigator met with the District's Pupil Services Director to cross-reference the Excessive Absence Report and Student Absence Summaries in order to verify which and how many students were attending a on reduced-day schedule. When the absence records of known students on reduced-hour school days were compared to the reports with pupil services, it was discovered that there were discrepancies across the board. Students that were in fact on reduced-hour days were being marked present for a full day of schooling, even as they had been attending for a few hours or not at all. In order to verify the veracity of the attendance being reported, it was determined that obtaining a list from Transportation of students that were transported on half days would assist in identifying additional potential errors and retrieving and comparing the Student Sign-in and Sign-out sheets at each building would verify if the attendance was intentionally being misreported.

83.  That same morning of February 9, 2023, the investigator contacted the Director of the Transportation Department to verify what, if any, transportation was being provided for students on reduced school days. The Transportation Department indicated the changes to bussing came as a directive from Smith herself for ECE students and ensured he would follow up with a list of students thereafter. That list was never produced by the

Director. According to Smith, the Director instead contacted Smith directly to advise her that the investigator was inquiring about the students on half days. This was divulged by an email Smith wrote to the investigator, the Interim Superintendent, and the BOE later that afternoon. In his interview, the Director of Special Education (Aouad) also indicated that transportation changes for students on reduced days were made by Smith personally, without consent or approval, verified by a text message that he sent to the Interim Superintendent upon discovery in October. Smith herself admitted making the changes to the Transportation of these students independently in an email (later discussed) and without proper approvals.

After contacting Transportation, the investigator obtained sign-in and sign-out sheets from schools across the district. Upon retrieving the Sign In/Out Sheets, it was discovered that students were in fact being marked present, even when they were attending partial days or not in attendance at all. The discrepancy was specifically noted at the ECE for a student represented by Luqman, A.M., who was marked present for full day attendance throughout the school year, although she has never attended school for an entire school day and continues to attend only half days. For her part, Smith was the only administrator to both take issue with the verification of attendance by the investigator and to specifically instruct staff and personnel to break the law

in terms of attendance reporting, later discussed. During his interview, Aouad denied any knowledge and was seemingly unaware of any discrepancies between actual and reported attendance.

84. On the afternoon of Feb. 9th, 2023, Smith sent an email to the Interim Superintendent, the investigator, and the BOE stating that the retrieval of Sign-In/Out sheets "was so obviously intended to upset and intimidate the staff and me as you and your team retaliate against district employees who are forced to break the law". The statement reiterates an awareness and understanding that what Smith was doing in terms of reducing school hours for students was indeed breaking the law in spite of the attempts to divert blame to the reduction in school hours as parental requests or as a result of aggressive behaviors just two weeks prior.

85. On February 13, 2023, an email was received from a staff member at ECE. The email indicated that just prior to the investigator's visit to obtain the Sign-In/Out sheets at the schools, Smith had communicated via the walkie-talkie system on February 9, 2023 to the entire staff in the building that the administration was coming to "harass ECE" and "to ask if we have any half day students in our classroom". The verbal communication directed staff "to tell you [the investigator] (that) we keep our students here at ECE all day". The staff member's email indicated that these sentiments were again

reiterated by Smith that afternoon during a staff meeting. Additionally, a text message went out to staff later that evening advising them that communication with "higher level admin members is not acceptable". These communications were not only attempts to impede an investigation, but also violated board policy in threatening employees not to go through appropriate chain of command even as Smith continued to do so in her emails to the board, and most importantly, broke attendance and enrollment reporting laws in the state of MI.

86. The investigation uncovered additional discrepancies in attendance and record keeping policies or actions by staff and personnel and found and analyzed prior practices going back to the 2021/2022 school year at ECE and at other schools. It was the opinion of the Investigator that these violations require a more intensive investigation to be approved and conducted by the District Administration or BOE. Due to limited time, resources, evidence, and in accordance with the specificity of Luqman's allegations, further detailed scrutiny of the impacts and additional evidence pertaining to those violations at other schools and into other administrators were limited. Misreporting of attendance at other schools requires further investigation as well. The submission of the investigative report served as a notification that approval to conduct such additional inquiries is required.

87.  The investigation report concluded with a summary of findings (the names of the children have been changed to their representative initials):

"A. Allegations 1 and 2:

In terms of students with violent behaviors, no data was found to indicate that several of the students on a reduced day schedule were in fact violent or aggressive. A RESA representative analysis of the district from 2021-2022 received by email on October 21, 2022, indicated that although aggressive behaviors were cited as a rationale for reduction in school hours by HPS administrators and staff, the students in question had no actual observed aggressive behaviors, indicating a lack of credibility on the part of Smith as well as those at DE and DW that had implemented the same practice. Additionally, the RESA Representative observed the following: "District wide (administration and teachers) show a lack of ownership of the ASD students that we discussed. In each building, we heard from administration and staff: the students didn't belong here and staff was inquiring when we could get them out of their buildings. Also, in each building, the SE teacher was able to identify only one or zero students that would benefit from a center program placement. All other students could be successful in their current environment if paras were available.. It appears at times, decisions are made to accommodate the adults versus what is in the students' best

interest." This email analysis is evidence that the practice had been specifically targeting students with special needs; Autism Spectrum Disorder and essentially looking for a way to have students with special needs removed from the classrooms/buildings, as reported by the RESA representative. The reduction in school hours was therefore used purposely, with intent, and specifically targeted students with special needs. I.e. Of the 10 students that were nonreporting at ECE in 2021/2022, all of them were ASD or in "need of special education programming". On the flip side, in the last two years, there were no general education students placed on reduced schedules or told not to report to accommodate a special education classroom to be opened at ECE or any other school in the district. The professional developments and notifications by RESA and attorneys from October 2021-October 2022 serve as validation that the district provided enough notice and adequate training to district staff and administration on the correct and legal processes and practices. Several emails were sent by Aouad and the Interim Superintendent regarding ceasing the practice of reducing school hours for students with special needs. Several admissions were made by both Respondents indicating they were aware that the practice was illegal and not in compliance. As such, any actions taken by these or other individuals were made with full knowledge of the laws and are

individual actions, not reflective of district policy and deserving of personal
accountability.

Allegations 1 and 2 are thus substantiated, with the following notes: Smith's
engagement was more prolonged, blatant, and her responses to the
investigation were defiant, constituted insubordination, and led to the further
uncovering of the attendance reporting violations. The attempt to contact the
Board to delegitimize a valid discrimination complaint and to thwart the
subsequent investigation, which is required by law, while simultaneously
admitting fault indicated an attempt at obstruction of a legally mandated
investigation under OCR and Section 504. Aouad's actions were apparently
due to a lack of understanding of state laws in terms of comparable
placements for out of state special education transfers, or when known,
showed a negligence to act to resolve issues or to request and provide
services to the students. Much of the reasoning provided by staff and
administrators on the reduction of school hours could and should have been
alleviated with the conduction and implementation of an IEP and the hiring
of one-on-one aides. As Director of Special Education, the responsibility to
ensure this occurred rests on his shoulders, albeit the decisions made by
Smith were still unconscionable independent of this fact."

"B. Allegations 3 and 4:

In terms of the procedural and timeline violations, the evidence points to a knowledge of the laws governing attendance, enrollment, and special education by Smith. Her redirections of blame were enumerable; the parents requested it, the children were too aggressive, they did not have the staff, the students in question were actually general education students, the investigation was unmeritorious, and that she was being forced to commit the violations. On that latter note, the investigation did not uncover any directives, ultimatums, threats, or mechanism that would have "forced [Smith] to break the law." Aouad similarly, as Director of Special Education, should and would have had the foresight and knowledge to know that these practices were illegal. Although he categorically denied knowledge of the practice being implemented by the administrators, which the evidence supports, there were instances of reduced school days for two students that were made as a result of the IEP process, where the placement of the students in a categorical classroom may have allowed for the student to attend a full day. These IEPs were convened under the direction and supervision of Aouad acting as the District Representative. Moreover, the pervasiveness of the practice having been uncovered by Wayne RESA since 2021/2022 led to a district-wide professional development that was provided to HPS administrators specifically on May 26, 2022. Additionally, two

attorneys sent emails in the beginning of October 2022 (one dated October 7, 2022, just prior to the board meeting), which were forwarded to district personnel advising them that the unilateral reduction of school hours for special needs students was an inappropriate practice. These trainings and emails, coupled with Smith's emails and statement to the BOE and Aouad's presentation to the BOE and interview, all indicate that both Smith and Aouad had knowledge of the law and that they were breaking it. The statements made and actions taken by Smith indicate a knowledge of the illegalities of her actions and an intent to target those children with special needs and exclude them from the school setting as much as possible. The change in placement and hours of I.A. in the IEP conducted in December 2022 by Aouad indicates merely an attempt to bring the district into compliance with an inappropriate placement of the student (i.e. reduced day schedule) instead of adding services based on the student's needs to support the student's full-day attendance. These actions were taken outside of the administration and district's established guidelines and practices, in violation of board policies, and without regard to "child find", "least restrictive environment", or statutory rules regarding completion of evaluations and IEPs within mandatory timelines and appropriate noticing of procedural safeguards to parents. The Allegations 3 and 4 are thus substantiated against

both individuals that proper statutory and procedural guidelines were not followed.

"C. Allegation 5:

After a review of the evidence and timeline of the requests made to I.A. 's prior school (district) in New York, it is arguable whether Aouad did do his due diligence in attempting to obtain the cumulative file for the student. The law indicates the following Transmittal of records. To facilitate the transition for a child described in paragraphs (e) and (f) of this section— (1) The new public agency in which the child enrolls must take reasonable steps to promptly obtain the child's records, including the IEP and supporting documents and any other records relating to the provision of special education or related services to the child, from the previous public agency in which the child was enrolled, pursuant to 34 CFR 99.31(a)(2); and (2) The previous public agency in which the child was enrolled must take Michigan Administrative Rules for Special Education With Related IDEA Federal Regulations Page 65 reasonable steps to promptly respond to the request from the new public agency. It is therefore up for interpretation whether "reasonable steps" were taken to acquire the records. Aouad indicated that 5 phone call attempts were made to acquire the records between July and October 2022 to no avail. However, no physical authorizations or releases

were actually sent to the prior school district, and in accordance with privacy laws, HPS would not have been privy to the records unless and until one was sent. Additionally, Mrs Alkusari indicated that the student's previous IEP indicating a required placement into a categorical classroom was submitted to the administration upon enrollment in July of 2022. The district therefore did have sufficient record to place I.A. in a categorical classroom for a full day while an evaluation was being conducted. The IEP conducted in December and its resulting placement are assessed under Allegation 4 (above).

Allegation 5 is thus substantiated with explanation as noted."

"D. Allegations 6 and 7:

As it pertains to Allegations 6 and 7, the allegations are dismissed for the following reason: It is the Compliance Officer's opinion that this does not fall under the Title IX Compliance Officers' or District's purview. Liability for an individual employee's actions are to be determined by legal counsel or in the court of law. Additionally, since the Board of Education is above the District in terms of chain of command, it would not be appropriate for the District to investigate their actions. Deference should be made to the district's legal counsel to advise if an independent investigation is warranted or to instruct the Board on how to proceed."

"E. Other Violations

Other violations not covered in the initial complaint include grave

attendance violations that could result in serious ramifications from the state.

Smith, as the administrator of the building, was reported to have instructed

staff to violate the law in reporting students present when they were in fact

absent part or all of the day. This creates an even broader and more wide-

scale problem in terms of the accuracy and validity of the district's student

attendance and enrollment counts reported to the state in accordance with

MCL 388.1619. The extent of this violation is unknown and would require a

more extensive and broader investigation that, should the state become

aware, would open the district up for greater scrutiny than for just the

Special Education violations uncovered. In addition to the allegations raised,

Smith violated district policy in her refusal to participate in the investigatory

process. District Counsel was contacted and assisted in the drafting of follow

up emails and providing guidance on the necessary steps to be taken when

an employee refuses to participate in compelling or otherwise mandated

compliance investigations. Based on the consultation and recommendation

of counsel, refusal to participate in Title IX investigations in which the

participant is the Respondent further constitutes insubordination by that

individual. In terms of transportation changes that were made, Smith

violated policy by overstepping her role and making transportation changes that required IEP team consensus and administrative approval. The transportation changes also created conflict and violations in terms of the funding for transportation for general education versus special needs students. General education bussing cannot be used to transport special needs students, as funding for each is required to be separate. Special education bussing cannot be changed or provided unless done through an IEP and with the district's offer of FAPE. The Transportation Department was found not to have been at fault specifically for the changes that were requested by Smith or knowledgeable of the intent behind the changes, but the line in the chain of command for making transportation changes was blurred, and this was a serious error. It is recommended that a more clear and concise administrative guideline be established both for general and special education population transportation changes that would require approval from the Administrative Center as opposed to directly from a building principal."

"The Recommendations based on the finding above are hereby submitted in the attached letter."

88.   HPS has failed to implement these recommendations, and the MDE failed to enforce its own policies.

89.  A shortened school day that results in a denial of free appropriate public education (FAPE) is not permitted. The decision may not be driven by budgetary concerns, staffing shortages, scheduling conflicts, or other non-student-driven reasons.[13]

90.  In September 2022, MDE's Special Education Office published a guidance page regarding shortened school days.

91.  MDE's guidance states, "In general, a school day for a student with a disability should not be shorter than a school day for students without disabilities. When a student's IEP Team determines a student needs a shorter school day, appropriate modifications must be incorporated into the IEP to ensure the student receives FAPE in the LRE. These modifications must be based on the unique needs of the student. For example, a shortened school day may be needed when the nature or severity of the student's disability impacts a full school day of attendance even with the use of supplementary aids and services. This reduced school day determination would be made by the student's IEP Team which may include, when appropriate, the student's medical provider or other treatment specialists. Of note, the practice of shortening a student's school day as a disciplinary measure could be

---

[13] *Shortened School Day,* MDE Office of Special Education Guidance (Sep. 18, 2023), Shortened School Day (michigan.gov).

considered a denial of FAPE if the student's IEP Team does not consider additional services and supports that could enable a student to remain in school, in the LRE, for the full school day before placing the student on a shortened school day."[14]

92.   MDE's guidance states: "The only time it is appropriate to shorten the school day for a student with a disability is when the student's IEP Team determines a shortened day is required to address the student's unique disability-related needs. It is the position of the MDE that affording a student less than a full school day is contrary to the IDEA's goal that an IEP results in appropriate progress."[15]

93.   MDE's guidance states: "Under most circumstances, a shortened school day should be in place for only a limited amount of time. When an IEP Team determines the need to shorten a student's school day, the student's IEP should include: 1. An explanation of why the student's unique disability-related needs require a shortened day. 34 CFR §300.320(a)(1). 2. A clear explanation of the unique need or skill gap prohibiting the student from attending a full day of school 34 CFR §§300.320(a)(4) and (5). 3. A clear connection to the growth and progress expected to be achieved by

---

[14] *Id.*
[15] *Id.*

shortening the student's school day (e.g., the student is expected to recover from the physical or medical condition with rest and medical treatment). 34 CFR §300.320(a)(3). 4. A plan for the student's return to school for a full day, which may include a plan to meet more frequently to review student data and determine whether the student is able to return to school full-time. 34 CFR §300.114. The student must return to a full school day as soon as they are able, affording a student a full educational opportunity as required by 34 CFR §300.109."[16]

94. MDE's guidance states: "The MDE considers a shortened school day a critical compliance consideration. IEPs missing this critical information, such as in response to the critical compliance inquiries above, may be considered noncompliant with the requirements of the IDEA. Any IEP that addresses a shortened school day through a conclusory statement or a checked box without addressing the critical compliance inquiries and without full consideration by the IEP Team will be considered noncompliant. The IEP must address the use of positive behavioral interventions and supports and other strategies to address behavior that impedes the student's learning, or the learning of others as required by 34 CFR §300.324(a)(2)(i). Further, IEPs that do not align the reasons for the

---

[16] *Id.*

shortened school day with the identified unique disability-related needs of the student and the specific link to increasing the skills necessary for a return to a full school day, will be deemed noncompliant and in need of corrective action."[17]

95.  According to the Hamtramck Public Schools 2022-2023 General Fund Original Budget, HPS spent $2,056,055 on special education.[18]

96.  According to the Hamtramck Public Schools 2021-2022 General Fund Original Budget, HPS spent $1,891,122 on special education.[19]

97.  In November 2021, the Hamtramck Review posted: "Over 30 teachers have resigned in recent months, and now, with a national teacher shortage, the district is scrambling to fill many key positions. And then the superintendent took a surprise leave of absence, along with the director of the Human Resources Department."[20]

98.  In 2022 Detroit's NPR maintained: "At least 28 HPS employees have resigned since the start of the 2022 school year, including 12 teachers at Dickinson East Elementary who quit recently. That's a significant loss to a system with only around 200 teachers and — like many districts — already

---

[17] *Id.*

[18] *2022-2023 General Fund Original Budget,* Hamtramck Public Schools (June 27, 2022), GENERAL FUND ORIGINAL 2022-23.xlsx (hamtramck schools.org).

[19] *Id.*

[20] *Public School District overcame challenges in the past,* The Review Hamtramck (Nov. 5, 2021), Public School District overcame challenges in past | Hamtramck Review (thehamtramckreview.com).

dealing with a shortage of teachers. The district is also facing allegations it has retaliated against outspoken staff."[21]

99.  These factors create a disincentive for HPS to identify, locate and evaluate all children with known or suspected disabilities and to provide the special education and related services they need, as required by law.

100.  The injuries of the named Plaintiffs are representative of the class of all individuals who are similarly situated.

### NAMED PLAINTIFFS' INJURIES

101.  Summarized below are the violations of federal and state law suffered by the named Plaintiffs as a result of the Defendants' failure to comply with their legally mandated responsibilities under the IDEA, Section 504, Title II, and Michigan law. These violations illustrate the specific harm suffered by the Plaintiff class as a result of the Defendants' failure to comply with federal and state law.

**Plaintiff I.A.**

102.  Plaintiff I.A. is a seven-year-old male with autism spectrum disorder who attended Dickinson West Elementary, part of the Hamtramck Public School District, located in Hamtramck, Wayne County. I.A. attended Dickinson

---

[21] *Hamtramck Public Schools Names Acting Superintendents Amid Staff Resignations and Teacher Shortage*, Detroit's NPR Station (Oct. 14, 2021), Hamtramck Public Schools Names Acting Superintendents Amid Staff Resignations and Teacher Shortage - WDET 101.9 FM

West Elementary through the 2022-2023 academic year. I.A. transferred to

Dearborn Public Schools for the 2023-2024 school year. He brings this case

through his parent and next of friend, Ibrahim Alzandani.

103.  Previously, I.A. attended New York Public Schools  where he was found

eligible for special education services as a student with autism spectrum

disorder.

104.  In July of 2022, I.A.'s family moved to Hamtramck, Michigan. I.A.'s

mother enrolled her child in Hamtramck Public Schools that same month,

July of 2022.

105.  Before the start of the school year, the mother was informed that I.A.

could only start school on a full day in the general education setting with no

services until an IEP could be completed. In order for the IEP to be

completed, I.A. had to be evaluated by a psychologist. I.A.'s mother was

informed by HPS that she would be contacted at the end of August by the

psychologist. She was not.

106.  The evaluation nor the IEP were completed by I.A.'s first day of school on

September 26, 2022.

107.  In the meantime, on I.A.'s first day of school on September 26, 2022, the

mother informed the school that I.A. elopes. The school then indicated that

I.A. should be in a categorical classroom setting with a one-on-one

paraprofessional.  However, the school did not have a one-on-one

paraprofessional available. I.A. and mother left.

108.   The school and mother contacted Special Education Director Menham

Aouad and informed him a paraprofessional was needed.

109.   On October 3, 2022, the mother texted Aouad to follow up regarding

obtaining a paraprofessional for her child so that he could attend. Aouad told

her that they were still in the process of interviewing people for a

paraprofessional. The mother told Aouad that she would not be able to send

her child to Dickinson-West without at least a one on one paraprofessional

due to her fears of elopement.

110.   Aouad told the mother that I.A. should be going full day and that there

was a paraprofessional available in the classroom that could assist until a

one on one was hired. Aouad also informed the mother that the ASD

classrooms were full, and that even after the IEP would be completed, there

was no guarantee for placement of the child in a categorical classroom

because there were no seats available; that the classroom was full. On Oct. 4

2022, the mother went back to the school with I.A. and was told there was

still no paraprofessional hired but that they had one that could help for one

hour and 45 minutes.

111. HPS also gave the option for I.A. to attend full-day, but without a paraprofessional, so the parents opted for the hour and forty-five minutes a day.

112. On December 1, 2022, after four months of waiting, an IEP meeting was convened, and the offer of faith from HPS was one hour and forty-five minutes. I.A.'s placement was determined to be a categorical classroom. The mother was told that her child would be placed into a categorical placement after the new year.

113. However, I.A. was not placed in a categorical classroom any time during the 2022-2023 school year because of a continuing "lack of resources" by HPS.

114. I.A. attended Dickinson-West for one hour and forty five minutes in the morning with no services except a paraprofessional until HPS told I.A.'s parents to bring him in from 1-2:45 p.m. because they had more resources later in the day.

115. In March, 2023, I.A. began attending half-days, and in mid-May he began full-days. During this time I.A. did not have services and was not in a categorical classroom, rather just with a paraprofessional.

116. On May 30th, 2023, I.A. received a new IEP. From the 12/01/2022 IEP to this 5/30/2023 IEP, YZ's academic achievement and functional performance

remained the same. His resulting needs for each area of educational performance are maximum 1:1 support.

117. I.A.'s new IEP indicates he should be placed in a categorical classroom beginning 09/05/2023. The new offer of faith from HPS was thirty hours per week.

118. As a result of the continued IEP violations throughout the 2022-2023 school year, specifically the reduction in learning hours, I.A. is now at a greater risk of developmental delays.

119. Further, as a result of the continued IEP violations through the 2022-2023 school year, I.A.'s family left HPS and enrolled him in Dearborn Public Schools for the 2023-2024 school year.

**Plaintiff N.A.**

120. Plaintiff N.A. is a nine-year-old nonverbal male with autism spectrum disorder. N.A. attended Dickinson East Elementary, part of Hamtramck Public Schools, until the 2023-2024 school year, when his family decided to enroll him in Dearborn Public Schools. N.A. has been diagnosed with autism spectrum disorder since one and half years old, and was found eligible for special education services as a student with autism spectrum disorder. He brings this case through his parent and next of friend, Nadhem Alnajar.

121.  During the 2022-2023 school year, N.A.'s father would drop N.A. off in the morning, and an hour to two hours into the day, the school would call him and tell him he needs to pick N.A. up.

122.  When N.A.'s father would arrive to pick N.A. up from school, N.A. was in the basement of the school, where he was in seclusion for problem behavior. No learning took place in the basement and N.A. was not allowed to leave.

123.  The basement in Dickinson East has no bathroom.

124.  N.A. was secluded for over half an hour.

125.  On one occasion, N.A.'s parents found him screaming, scared, and traumatized. N.A. had urinated on himself, took off all of his clothes, and was crying uncontrollably on the floor.

126.  N.A. never received special services, not even speech therapy.

127.  The family left HPS and enrolled N.A. in Dearborn Public Schools for the 2023-2024 school year, specifically because of the deficiencies in the special education services.

**Plaintiff A.M.**

128.  Plaintiff A.M. is a five-year-old female with down's syndrome and autism spectrum disorder. A.M. is a kindergartner who attends Early Childhood

Education (ECE), which is the Pre-K to 2nd grade school within HPS. She

brings this case through her parent and next of friend, Abraham Muzib

129.  A.M. was first enrolled in HPS in 2022, for the 2022-2023 school year.

130.  A.M. was enrolled in Early Childhood Education, the Pre-K to 2nd grade

school, in a general education setting through a virtual classroom.

131.  A.M. 's parents requested an IEP evaluation for A.M. at the beginning of

the school year in September 2022.

132.  After months of repeated requests, HPS continued to not complete an IEP

for A.M., so a state complaint was filed.

133.  The IEP was completed in March 2023.

134.  The state required a Moderate Cognitive Impairment Classroom (MOCI)

for A.M. and other students as a placement; ruling in May 2023.

135.  An investigation was also conducted internally that showed that HPS was

falsifying A.M.'s attendance records throughout the 2022-2023 school year,

as well as on the state headcount dates.

136.  The Board of Education was advised of allegations of discrimination

against the Superintendent and other HPS staff in May when the outcomes

of the internal investigation were received, but they declined to give A.M.'s

family any response or recourse, including denying their right to a hearing.

137. Following the state's ruling in May 2023, A.M. was supposed to be placed in a categorical classroom the following year, for the 2023-2024 school year.

138. HPS did not place her in a categorical classroom at the start of the 2023-2024 school year, and instead retained her in the Early Childhood Elementary (ECE) school.

139. The ECE has been undergoing construction since the beginning of the 2023-2024 school year, so A.M. has been forced to continue in a general education setting through a virtual classroom.

140. The virtual classroom is insufficient for A.M. and all of the children with disabilities at the Early Childhood Education Center.

141. A.M.'s parents contacted HPS about A.M. not being placed in the categorical classroom as she should have been per her IEP.

142. On September 26, 2023, HPS informed A.M. 's parents that A.M. could be moved to the categorical classroom located in Dickinson East.

143. The categorical classroom in Dickinson East that HPS suggested is insufficient for A.M.'s needs, and according to MARSE rules, HPS was required to create a new categorical classroom that meets A.M.'s needs.

144. The MOCI categorical classroom that HPS recommended moving A.M. to in Dickinson East, is on the lower level/basement of the school.

145.  All of the other Early Childhood Education classrooms for non-disabled children are on the main floor of the building.

146.  The lower level/basement of Dickinson East does not have a bathroom. The only way to get to the bathroom is by taking the stairs to the main floor.

147.  A.M. has physical impairments that prevent her from being able to take the stairs as normal, evidenced by her need to have physical therapy in and outside of school.

148.  Additionally, A.M. is not potty-trained, so she requires a bathroom nearby, not one that is two flights of stairs away.

149.  This concern has been relayed to HPS but no change has occurred.

150.  The stairs poses a significant safety concern. In the case of a fire, A.M. would not be able to quickly climb up the stairs and evacuate.

151.  Dickinson East does not have ramps or evacuation lifts at any of its staircases.

152.  The categorical classroom in Dickinson East is also in a poorer condition than any of the other classrooms in the school. It is in the basement and it is not painted.

153.  A.M.'s parents had requested that the classroom be moved to ECE or another building where A.M. could be on the ground level, but HPS ignored the requests.

154. The children in the categorical classroom in Dickinson East are greater than 6 years in age apart from each other.

155. A.M. has not received adequate services by several providers in addition to these grievances for the entirety of the last and current school year.

156. A.M. has not had a functional behavioral analysis completed that was promised to be completed by the district at the beginning of the 2023-2024 school year.

157. All of these questions were posed to HPS in a meeting on October 4th, 2023, that was supposed to be held with the Superintendent. Upon learning that the family had a non-attorney advocate, the Superintendent refused to be present and sent 2 other staff in her place to take the concerns and complaints.

158. On November 2, 2023, Luqman once again asked HPS staff why a categorical classroom has not been created to meet A.M.'s needs.

159. HPS responded that they were in the process of creating a classroom that meets A.M.'s needs, including a bathroom and no children more than 6 years in age difference with A.M.

160. HPS alleged the new classroom will be completed by Monday, November 6, 2023.

161.  By indicating that this new categorical classroom will have a bathroom and other requirements, HPS conceded that they were aware the categorical classroom located in Dickinson East that was recommended for A.M was insufficient.

## CAUSES OF ACTION

## COUNT I (as to all Defendants)

## Systemic Violations of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. and Implementing Federal Regulations

## Systemic Violation 1:

## Failure to Provide a Free Appropriate Public Education that Confers a Meaningful Educational Benefit in the Least Restrictive Environment

162.  Plaintiffs re-allege all preceding paragraphs as though fully set forth herein.

163.  Federal law requires that qualifying children with disabilities receive a free appropriate public education ("FAPE"). 20 U.S.C. § 1412(a)(1)(A); 34 C.F.R. § 300.101(a). To achieve this goal, the IDEA requires that Defendants design and develop an individualized education program ("IEP") for each qualifying child with a disability in their district. 20 U.S.C. § 1412(a)(4), §1414(d); 34 C.F.R. § 300.112, §§ 300.320-24.

164.  IDEA requires IEPs to contain several key pieces of information to ensure that they are designed to confer a meaningful educational benefit, including: (1) a statement of the student's present levels of academic achievement and functional performance; (2) a statement of measurable annual academic and functional goals; (3) a statement of the special education and related services that will be provided to the student; (4) an explanation of the extent, if any, to which the student will not participate with nondisabled students in regular classes; (5) a statement of any individual appropriate accommodations necessary to measure the academic achievement and functional performance of the student; (6) the projected start date for any related services; and (7) transition services for students who have reached the age of 16. 20 U.S.C. § 1414(d)(3).

165.  The IDEA requires, to the maximum extent possible, that children with disabilities be educated with children who are not disabled, and that removal from the regular education environment occurs only when education in regular classes with the use of supplementary aids and services cannot be satisfactorily achieved. 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.114(a)(2). Districts must have available a continuum of alternative placements for children with disabilities. 34 C.F.R. § 300.115. 370. Defendants HPS and WRESA have an ongoing pattern and practice of systemically failing to

provide special education and related services compliant with students' IEPs in the least restrictive environment as required by the IDEA.

166.  Defendant MDE has failed to appropriately monitor, conduct proper oversight, and provide Defendants HPS and WRESA with the resources and expertise to provide the necessary services in the least restrictive environment. As a result of the Defendants' failures, children with disabilities are denied the educational services to which they are legally entitled under the IDEA.

## Systemic Violation 2:

## Failure to Develop and Implement Child Find Procedures

167.  Plaintiffs re-allege all preceding paragraphs as though fully set forth herein.

168.  Pursuant to the IDEA's child find mandate, the State must have in effect policies and procedures to ensure that all children with disabilities residing in the State who are in need of special education and related services are identified, located, and evaluated, regardless of the severity of their disabilities. 20 U.S.C. §1412(a)(3)(A); 34 C.F.R. § 300.111(a)(1)(i).

169.  Under the IDEA, a SEA or LEA must conduct a full and individual initial evaluation before the initial provision of special education and related services to a child with a disability. 20 U.S.C. § 1414(a)(1)(A); 34 C.F.R. §

300.301(a). The initial evaluation shall consist of procedures to determine whether a child is a child with a disability and the educational needs of that child. 20 U.S.C. § 1414(a)(1)(C)(i); 34 C.F.R. § 300.301(c)(2). The parent, SEA, other State agency, or LEA may initiate a request for an initial evaluation. 20 U.S.C. § 1414(a)(1)(B); 34 C.F.R. § 300.301(b).

170. The initial evaluation must be conducted within 60 days of receiving parental consent, or within the timeframe established by the State, if the State establishes such a timeframe. 20 U.S.C. § 1414(a)(1)(C)(i)(I); 34 C.F.R. § 300.301(c)(1). Under Michigan law, the initial evaluation must be conducted and an eligibility determination must be made within 30 school days of receiving parental consent. MARSE Rule 340.1721b(1).

171. Defendants must ensure that a reevaluation of each child with a disability is conducted if the educational or related services needs of the child warrant a reevaluation. 20 U.S.C. § 1414(a)(2)(A)(i); 34 C.F.R. §300.303(a)(1). A LEA is also responsible for ensuring that a reevaluation is conducted if the child's parent or teacher requests one. 20 U.S.C. § 1414(a)(2)(A)(ii); 34 C.F.R. §300.303(a)(2). At a minimum, a reevaluation must occur on a triennial basis, even in the absence of an explicit request or qualifying circumstances, unless the parent and the LEA agree that a reevaluation is unnecessary. 20 U.S.C. § 1414(a)(2)(B)(ii); 34 C.F.R. §300.303(b)(2). 356.

The IDEA outlines detailed and comprehensive procedures for the conduct of evaluations, requiring the Defendants to "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining – (i) whether the child is a child with a disability; and (ii) the content of the child's individualized education program, including information related to enabling the child to be involved in and progress in the general education curriculum." 20 U.S.C. § 1414(b)(2)(A) (emphasis added); see also 34 C.F.R. §300.304(b)(1). 357. Importantly, each LEA "shall ensure that the child is assessed in all areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B) (emphasis added). Areas related to the suspected disability include, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities. 34 C.F.R. § 300.304(c)(4). The child find mandate expressly includes all children with a suspected disability, even if they are advancing from grade to grade. 34 C.F.R. § 300.111(c)(1). 117 358. The Defendants must "use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors." 20 U.S.C. § 1414(b)(2)(C) (emphasis added); 34 C.F.R. § 300.304(b)(3)

(emphasis added). Each Defendant must also ensure that "assessments and other evaluation materials include those tailored to assess specific areas of educational need and not merely those that are designed to provide a single general intelligence quotient." 34 C.F.R. § 300.304(c)(2) (emphasis added). The evaluation must be "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6). 359. As part of an initial evaluation, if appropriate, and as part of any reevaluation, the IEP Team and other qualified professionals shall review existing evaluation data on the child, including: "(i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; (iii) and observations by teachers and related services providers." 20 U.S.C. § 1414(c)(1)(A) (emphasis added); 34 C.F.R. § 300.305(a)(1) (emphasis added). On the basis of that review, and input from the child's parents, the IEP Team and other qualified professionals, as appropriate, shall identify what additional data, if any, are needed to fulfill the child find obligations under the IDEA. 20 U.S.C. § 1414(c)(1)(B); 34 C.F.R. § 300.305(a)(2). The LEA must administer the assessments and

evaluation measures needed to produce such additional data. 20 U.S.C. §

1414(c)(2); 34 C.F.R. § 300.305(c).

172. In addition, the LEAs are charged with ensuring that assessments "are

administered by trained and knowledgeable personnel." 20 U.S.C. §

1414(b)(3)(A)(iv); 34 C.F.R. § 300.304(c)(1)(iv).

173. Finally, in interpreting the evaluation data for the purpose of determining

if a child is a child with a disability and the educational needs of the child,

Defendants must "[d]raw upon information from a variety of sources,

including aptitude and achievement tests, parent input, and teacher

recommendations, as well as information about the child's physical

condition, social or cultural background, and adaptive behavior." 34 C.F.R.

§ 300.306(c)(1)(i) (emphases added). Defendants shall "[e]nsure that

information obtained from all of these sources is documented and carefully

considered. 34 C.F.R. § 300.306(c)(1)(ii).

174. Defendants have a pattern and practice of systematically failing to provide

early screening and timely referrals for evaluations for three- and four-year-

olds residing in Hamtramck to identify the existence of a qualifying

disability and eligibility for special education and related services, and are

systematically failing to provide appropriate early intervention services,

including universal, high-quality preschool education. With respect to

children aged 3-4, the child find mandate, requiring proactive identification, location, and evaluation of children with disabilities, is not likely to be discharged unless children in this age range are provided early intervention services, or enrolled in universal preschool, which would allow suspected disabilities among this population to be observed and assessed.

175.  Defendants also have a pattern and practice of systematically failing to ensure that Hamtramck students with disabilities are identified, located, and evaluated in compliance with the IDEA.

176.  Defendants HPS and WRESA have a pattern and practice of systemically failing to provide ongoing screening and timely referrals for evaluations to identify qualifying disabilities which make students eligible for special education services pursuant to IDEA's child find mandate.

177.  Moreover, Defendant MDE has failed to appropriately monitor, conduct proper oversight, and provide Defendants HPS and WRESA with the resources and expertise to perform the necessary evaluations, meaning that the IDEA's child find mandate cannot be properly implemented by the Defendant LEAs. As a result of the Defendants' failures, children with disabilities remain unidentified and are denied the educational services and procedural safeguards to which they are legally entitled under the IDEA.

**Systemic Violation 3:**

### Failure to Protect Students' Due Process Procedural Safeguards in the Disciplinary Process

178.  Plaintiffs re-allege all preceding paragraphs as though fully set forth herein.

179.  In order to ensure that each child with a disability is provided with a free appropriate public education, the IDEA has established a number of procedural safeguards that must be provided to a student with a disability who is subject to disciplinary removals.

180.  IDEA requires that students with disabilities be granted certain procedural safeguards with respect to the disciplinary process to ensure that they are not removed from the learning environment on account of their disabilities.

181.  Under IDEA, when a child with a disability is removed from his or her original educational placement for more than ten cumulative school days in an academic school year, procedural protections and services must be provided to the student. 20 U.S.C. §1415(k). One such procedural protection is a manifestation determination review ("MDR") to determine whether the student's behaviors are a manifestation of his or her disabilities. 20 U.S.C. §1415(k)(1)(E). This requirement helps ensure that a school does not impose a long-term suspension, series of suspensions, or expulsion on a special

education student on account of a behavior that is merely a "manifestation" of his or her disability. 20 U.S.C. § 1415(k)(1)(E). 123

182.  The IDEA mandates that if a child's behavior is a manifestation of that student's disability, the child must be permitted to return to, or remain at, his or her current school placement and be provided with all of the behavioral services necessary to support and reinforce the child's positive behavior. 20 U.S.C § 1415(k)(1)(F). These behavioral supports include a functional behavioral assessment ("FBA") to determine the function or cause of the child's disability and an accompanying behavioral intervention plan ("BIP") to adequately accommodate the student's educational and behavioral needs. 20 U.S.C § 1415(k)(1)(F)(i)-(ii).

183.  A manifestation determination review is triggered after ten cumulative days of suspensions or expulsions. Additionally, the IDEA and its implementing regulations state that a series of removals totaling more than 10 school days can form a "pattern" of behavior (e.g. "because the child's [disciplined] behavior is substantially similar to the child's behavior in previous incidents that resulted in the series of removals") that also triggers a mandatory MDR. 34 C.F.R. 300.536(a)(2). Notably, the MDR is not limited to determining whether the behavior at issue is a byproduct of the child's disability, but must additionally inquire into whether it may be the

consequence of the district's failure to adequately implement his or her IEP. 20 U.S.C. § 1415(k)(1)(E)(i).

184. There are, however, certain specified behaviors that permit a school district to alter a student's prescribed placement in favor of an "interim alternative educational setting" for up to 45 days. 20 U.S.C. § 1415(k)(1)G). This exception is restricted to the following three behaviors: (1) carrying a weapon to school; (2) knowingly possessing or using illegal drugs, or selling or soliciting the sale of a controlled substance, at school; or (3) inflicting serious bodily injury on another individual at school. Id.

185. Nevertheless the interim alternative educational setting must still provide the child a free appropriate public education. The placement must also include services designed to adequately address the behavior for which the student is being suspended. 20 U.S.C. § 1415(k)(1)(D).

186. Under the IDEA, even students who do not already have an IEP in place are equally entitled to the same procedural safeguards afforded to their special education peers. Indeed, disciplinary protections extend to students who the LEA knew or should have known are students with disabilities. 20 U.S.C. § 1415(k)(5).

187. Defendants HPS and WRESA have an ongoing pattern and practice of systemically failing to provide students with disabilities with procedural

safeguards as required by IDEA in the administration of disciplinary practices, as well as a pattern and practice of using unduly harsh disciplinary measures with students with disabilities, including physical restraints and seclusion techniques, in violation of IDEA. Defendant MDE has failed to appropriately monitor, conduct proper oversight, and provide Defendants HPS and WRESA with the resources and expertise to provide the necessary procedural safeguards. As a result of Defendants' failures, students with disabilities are subjected to disciplinary practices and excluded from the classroom environment, instead of receiving the instructional and behavioral supports they need.

### Systemic Violation 4:

### Discrimination on the Basis of Disability and Denial of Access to Educational Services

188.  Plaintiffs re-allege all preceding paragraphs as though fully set forth herein.

189.  Defendant MDE must ensure that each LEA in Michigan, including Defendants HPS and WRESA, takes steps to ensure that children with disabilities within its jurisdiction have available to them the variety of educational programs and services available to nondisabled children,

including art, music, industrial arts, consumer and homemaking education, and vocational education. 20 U.S.C. § 1412(a)(2), § 1413(a)(1); 34 C.F.R. § 300.110.

190. Defendants' systematic failure to ensure that children with disabilities have available the same variety of programs and services as nondisabled children is a violation of their rights under the IDEA.

**COUNT II (as to all Defendants)**

**Discrimination Based on Disability in Violation of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.***

191. Plaintiffs re-allege all preceding paragraphs as though fully set forth herein.

192. As detailed above, all Defendants have—through their respective actions and inactions—exercised gross misjudgment and discriminated against Plaintiffs and similarly situated children by denying them access to essential services and programming that is available to non-disabled students solely on account of their disabilities in violation of Section 504 of the Rehabilitation Act (29 U.S.C. § 794 et seq., 34 C.F.R. § 104 et seq.). 387. As described above, Defendants have failed to provide Plaintiffs and similarly situated children with a FAPE and/or reasonable accommodations due to their disability-related behaviors.

193.  Defendant MDE has further failed to comply with its general supervisory responsibilities by failing to adequately oversee and supervise Defendants WRESA and HPS to ensure that the representative Plaintiffs and the class of similarly situated individuals receive a free appropriate public education and/or reasonable accommodations.

**COUNT III (as to all Defendants)**

**Discrimination Based on Disability in Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.***

194.  Plaintiff re-allege all preceding paragraphs as though fully set forth herein.

195.  As detailed above, all Defendants have—through their respective actions and inactions—exercised "gross misjudgment" and discriminated against Plaintiffs and similarly situated children by denying them access to essential services and programming that is available to non-disabled students solely on account of their disabilities and/or behaviors related to those disabilities in violation of Title II of the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.).

196.  Each of the class members has been denied meaningful access to an adequate public education by Defendants.

## COUNT IV (as to Defendants HPS and WRESA only)

## Violation of Mich. Comp. Laws § 380.1701 *et seq.*

197.  Plaintiffs re-allege all preceding paragraphs as though fully set forth
herein.

198.  Under Michigan law, each child with a disability shall be provided with
programs and services designed to develop his or her maximum potential.
Mich. Comp. Laws § 380.1711(1)(a).

199.  Under Michigan law, curriculum, eligibility of specific persons for special
education programs and services and for each particular program or service,
review procedures regarding the placement of persons in the programs or
services, size of classes, size of programs, quantity and quality of equipment,
supplies and housing, adequacy of methods of instruction, and length and
content of school day shall be in accordance with rules promulgated by the
state board relative to special education programs and services. Mich. Comp.
Laws § 380.1703(2)

200.  The rules promulgated by the state board relative to special education
programs and services are known as the Michigan Administrative Rules for
Special Education (MARSE).

201.  By failing to provide a free and appropriate public education, Defendants
have, a fortiori, failed to meet their obligations under Michigan law to

provide children with programs designed to reach the higher threshold of
developing the maximum potential of each child.

### DEMAND FOR RELIEF

202.  WHEREFORE, Plaintiffs request that this Court:

A.  Assert jurisdiction over this matter;

B.  Certify this action as a class action pursuant to Fed. R. Civ. P. 23(a) and
(b)(2).

C.  Issue a declaratory judgment that Defendants' laws, policies, practices,
procedures, acts, and omissions complained of herein deprive Plaintiffs
of their statutory rights, are illegal and/or invalid, and contravene
Defendants' statutory duties to ensure that Plaintiffs and similarly
situated children receive access to a free appropriate public education and
freedom from disability-based discrimination associated with disability-
related limitations.

D.  Order Defendants MDE and WRESA to provide teacher training in
positive behavioral interventions and end the practice of restraint and
seclusion.

E.  Order a review of all current IEPs to ensure compliance with the IDEA in
order to provide each student with a free appropriate public education in
the least restrictive environment possible, order Defendants to prepare

quarterly reports on IEP progress, and order Defendants to devise an effective complaint process to handle and resolve IDEA violations with meaningful oversight.

F. Convene an expert group to evaluate the provision of special education services as mandated by law, identify corrective measures that address the medical, health, and trauma issues that result from lead exposure and that can be adopted by this court, and recommend a special monitor to ensure implementation of a plan including but not limited to:

   a. Identification: Allocate responsibility for identifying, locating and evaluating individuals suspected of having a disability attending HPS schools.

   b. Reduced Days: Mandatory special education training for the entire district specifically on procedural processes and on reduced school days for special needs students.

   c. Discipline: Review the code of conduct and/or discipline policy for compliance with the IDEA, require that each HPS school contain a written description of the IDEA's disciplinary procedural protections and procedural safeguards for students with disabilities and a plan for supporting school behavior and discipline. Each

HPS school's plan will be monitored on a quarterly basis and the rates of suspensions and expulsions will be accurately recorded.

d. Professional Development: Provide annual professional development to all HPS schools on disciplinary procedures for students with disabilities.

e. Enrollment: Ensure that all HPS schools enroll and serve students with disabilities pursuant to federal law.

G. Order remediation services and compensatory education for each and every child that was placed on a reduced schedule.

H. Mandatory changes in the oversight of transportation changes for special education students.

I. Assign a Special Monitor for a period of seven years to oversee implementation of the expert recommendations within one year and to continue to monitor the implementation of those recommendations for the entire seven year period.

J. Award Plaintiffs and the Plaintiff Class all compensatory monetary damages, special damages, exemplary damages, punitive damages and all other money damages.

K. Award Plaintiffs costs and attorneys' fees pursuant to 29 U.S.C. § 794a and 20 U.S.C. § 1415(i)(3)(B)(i)(I);

L.  Retain jurisdiction over this action until such time as this Court is

satisfied that the unlawful laws, policies, practices, procedures, acts, and

omissions complained of herein have been rectified; and

M. Grant other appropriate relief as this Court deems just and proper.

Respectfully submitted,

HAMMOUD, DAKHLALLAH, &
ASSOCIATES, PLLC

/s/ Kassem M. Dakhlallah
Kassem M. Dakhlallah (P70842)
Attorney for Plaintiffs
6050 Greenfield Rd., Ste., 201
Dearborn, MI 48126
(313) 551-3038
kd@hdalawgroup.com

FAGAN MCMANUS, P.C.

By: /s/ Jennifer L. McManus
Jennifer L. McManus  (P65976)
Attorney for Plaintiffs
25892 Woodward Avenue
Royal Oak, MI  48067-0910
(248) 542-6300
Dated:  November 6, 2023        jmcmanus@faganlawpc.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

I.A., A MINOR CHILD, BY
NEXT FRIEND, IBRAHIM ALZANDANI,          Case No.
N.A., A MINOR CHILD BY                    Hon.
NEXT FRIEND NADHEM ALNAJAR,
AND A.M., A MINOR CHILD BY
NEXT FRIEND ABRAHAM MUZIB,

      Personally and on behalf of all similarly situated persons,

      Plaintiffs,

v.

HAMTRAMCK PUBLIC SCHOOLS,
WAYNE COUNTY REGIONAL
EDUCATIONAL SERVICE AGENCY,
AND MICHIGAN DEPARTMENT OF
EDUCATION,

      Defendants.

_____/

## **JURY DEMAND**

Plaintiffs I.A., N.A., and A.M. ("Plaintiffs"), on behalf of themselves and all other

similarly situated persons, hereby demand that this case be tried before a jury.

      Respectfully submitted,

      HAMMOUD, DAKHLALLAH, &
      ASSOCIATES, PLLC

/s/ Kassem M. Dakhlallah
Kassem M. Dakhlallah (P70842)
Attorney for Plaintiffs
6050 Greenfield Rd., Ste., 201
Dearborn, MI 48126
(313) 551-3038
kd@hdalawgroup.com


FAGAN MCMANUS, P.C.

By: /s/ Jennifer L. McManus
     Jennifer L. McManus  (P65976)
     Attorney for Plaintiffs
     25892 Woodward Avenue
     Royal Oak, MI  48067-0910
     (248) 542-6300
Dated:  November 6, 2023          jmcmanus@faganlawpc.com