## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Y.A., A MINOR CHILD, BY
NEXT FRIEND, IBRAHIM ALZANDANI,     Case No. 23-cv-12817
W.A., A MINOR CHILD BY     Hon. David Lawson
NEXT FRIEND NADHEM ALNAJAR,
AND A.M., A MINOR CHILD BY
NEXT FRIEND ABRAHAM MUZIB,

     Personally and on behalf of all similarly situated persons,

     Plaintiffs,

v.

HAMTRAMCK PUBLIC SCHOOLS,
WAYNE COUNTY REGIONAL
EDUCATIONAL SERVICE AGENCY,
AND MICHIGAN DEPARTMENT OF
EDUCATION,

     Defendants.

_____/

## FIRST AMENDED CLASS ACTION COMPLAINT
## AND RELIANCE ON JURY DEMAND

Pursuant to Rule 15(a)(1), Plaintiffs Y.A., W.A., and A.M. ("Plaintiffs"), on

behalf of themselves and all other similarly situated persons, state as follows in their

First Amended Class Action Complaint and Reliance on Jury Demand against

Defendants Hamtramck Public Schools ("HPS"), Wayne County Regional

Educational Service Agency ("WRESA"), and Michigan Department of Education ("MDE") (collectively, "Defendants"):

## INTRODUCTION

1. On Hamtramck Public School's website, under "Special Services," HPS maintains, "The Hamtramck Department of Special Services is responsible for providing services to children with disabilities aged 0-26 years of age. If appropriate, interventions and supports can occur as early as birth and last throughout a child's educational career."[1] Yet, there are over 100 children with disabilities enrolled in Hamtramck Public Schools who have not been receiving the services HPS claims to provide. This class action civil lawsuit seeks to correct that failure and compensate its victims.

2. For the 2022-2023 school year, there were eight public schools serving 3,062 students in the Hamtramck Public School District. Children with disabilities make up 6.2% of the student body. 86% of HPS students are economically disadvantaged. 8.7% of HPS students met the college readiness benchmark. HPS's average testing ranking is 2/10, which is in the bottom 50% of public schools in Michigan. Schools in the Hamtramck School District have an average math proficiency score of 12% (versus the Michigan public school

---

[1] *Special Services*, Hamtramck Public School District, Special Services - Departments - Home (hamtramckschools.org) (last visited Jan. 18, 2023).

average of 35%), and reading proficiency score of 19% (versus the 48% statewide average). Minority enrollment is 42% of the HPS student body (majority Asian).[2]

3. "Disability" refers to the state of being disabled, which can be physical or mental. "Special needs" refer to specific needs that someone has as a result of their disability, which may relate to extra accommodations at school or extra learning support. Special needs are about education, while a disability is a physical or mental condition that limits a person's movements, senses, or activities.[3]

4. Congress enacted the Education for All Handicapped Children Act (Public Law 94-142), also known as the EHA, in 1975 to support states and localities in protecting the rights of, meeting the individual needs of, and improving education results and opportunities for infants, toddlers, children, and youth with disabilities and their families. This landmark law's name changed to the Individuals with Disabilities Education Act, or IDEA, in a 1990 reauthorization. The law was last reauthorized in 2004, and the United States

---

[2] *Hamtramck, School District the City of (82060)*, MI School Data, District - Entity View Page (mischooldata.org) (last visited Sep 12, 2023).
[3] *Special Needs vs Disability: What Are the Differences?,* Pulchra Magazine (Aug. 5, 2022), *Special Needs vs Disability: What Are the Differences? | Pulchra*.

Department of Education has periodically issued new or revised regulations to address the implementation and interpretation of the IDEA.[4]

5. Before EHA, many children were denied access to education and opportunities to learn. In 1970, U.S. schools educated only one in five children with disabilities, and many states had laws excluding certain students, including children who were deaf, blind, emotionally disturbed, or had an intellectual disability.

6. Since the passage of EHA in 1975, significant progress has been made toward meeting major national goals for developing and implementing effective programs and services for early intervention, special education, and related services. The U.S. has progressed from excluding nearly 1.8 million children with disabilities from public schools prior to EHA implementation to providing more than 7.5 million children with disabilities with special education and related services designed to meet their individual needs in the 2020-21 school year.[5]

7. Within Hamtramck Public Schools, this progression has halted. Hamtramck's special education services, or lack thereof, are reminiscent of special

---

[4] *A History of the Individuals with Disabilities Education Act,* Individuals with Disabilities Education Act, A History of the Individuals With Disabilities Education Act  (last updated Jan. 11, 2023).
[5] *Id.*

education in the U.S. prior to the EHA implementation. For example, as recently as 2023, children with disabilities were excluded from or offered reduced time in HPS because of an alleged lack of resources.

8. "Special education provides students with disabilities with the support and accommodations they need to succeed in school and in life, promotes diversity and inclusion in education, and can have a significant impact on the long-term outcomes for students with disabilities."[6]

9. When special education services are lacking or not properly implemented, the child is at a greater risk of developmental delays. Moreover, the child's long-term outcome will be affected.

10. Hamtramck Public Schools must remedy their special services, or their children with disabilities will continue to be at a greater risk of developmental delays.

## SUMMARY OF LEGAL CLAIMS

11. This is a class action civil rights lawsuit for declaratory and injunctive relief and damages, brought pursuant to federal and state law, to vindicate the rights of all school-age children with disabilities residing in Hamtramck who are

---

[6] *Special Education: Definition, Concept, Benefits, Importance of Special Education: Strategies, Challenges in It,* MRM (Mar. 8, 2023), Special Education: Definition, Concept, Benefits, Importance of Special Education: Strategies, Challenges in It (mizanur mizan.info).

currently experiencing, or who have experienced violations of special education and civil rights law. These children require special services that comply with the mandates of the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), 20 U.S. § 1400 et seq.; § 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; Title II of the Americans with Disabilities Act ("Title II"), 42 U.S.C. § 12131 et seq.; and Michigan law.

12. HPS has an ongoing pattern and practice of systemically failing to provide special education and related services compliant with students' individualized education programs in the least restrictive environment, as required by IDEA.

13. HPS has an ongoing pattern and practice of systematically failing to provide a free and appropriate education in accordance with IDEA.

14. HPS has a pattern and practice of systemically failing to provide screening and timely referrals for evaluations to identify students eligible for special education services pursuant to IDEA's child find mandate.

15. HPS also has an ongoing pattern and practice of systemically failing to provide students with disabilities with procedural safeguards as required by IDEA in the administration of disciplinary practices, as well as a pattern and practice of using unduly harsh disciplinary measures against students with

disabilities, including physical restraints and seclusion techniques, contrary to IDEA.

16. WRESA, the intermediate school district ("ISD") which has responsibilities for overseeing special education services for students who attend public schools in Hamtramck, coordinating the delivery of special education services, and ensuring compliance with IDEA in the special education programs and services, has engaged in an ongoing pattern and practice of systemically failing to provide special education and related services compliant with students' individualized education programs in the least restrictive environment, as required by IDEA.

17. WRESA has an ongoing pattern and practice of systematically failing to provide a free and appropriate education ("FAPE") in accordance with IDEA.

18. WRESA has a pattern and practice of systemically failing to provide screening and timely referrals for evaluations to identify students eligible for special education services pursuant to IDEA's child find mandate.

19. WRESA also has an ongoing pattern and practice of systemically failing to provide students with disabilities with procedural safeguards as required by IDEA in the administration of disciplinary practices, as well as a pattern and practice of using unduly harsh disciplinary measures against students with

disabilities, including physical restraints and seclusion techniques, contrary to IDEA.

20. WRESA has engaged in an ongoing pattern and practice of systemically failing to provide HPS with sufficient funding for special education services compliant with students' individualized education programs in the least restrictive environment.

21. WRESA has engaged in an ongoing pattern and practice of systematically failing to ensure compliance with IDEA.

22. WRESA has engaged in an ongoing pattern and practice of systemically failing to provide HPS with sufficient funding for identifying children at risk of a disability in fulfillment of the child find mandate.

23. WRESA has engaged in an ongoing pattern and practice of systemically failing to address state complaints regarding HPS' ongoing violation of IDEA, Section 504, Title II, and Michigan law.

24. WRESA, which is required to develop and maintain an ISD Plan for the Delivery of Special Education Programs and Services, has engaged in an ongoing pattern and practice of systemically failing to provide programs and services as documented in the ISD Plan within the requirements of the IDEA and the Michigan Administrative Rules for Special Education ("MARSE").

25. MDE, the State agency charged with conducting oversight and ensuring HPS' compliance with IDEA in the provision of special education services, has engaged in an ongoing pattern and practice of systemically failing to provide HPS with sufficient funding for identifying children at risk of a disability in fulfillment of the child find mandate.

26. MDE has engaged in an ongoing pattern and practice of systemically failing to provide HPS with sufficient funding for special education services compliant with students' individualized education programs in the least restrictive environment.

27. MDE has engaged in an ongoing pattern and practice of systematically failing to ensure compliance with IDEA.

28. MDE has engaged in an ongoing pattern and practice of systemically failing to address state complaints regarding HPS' ongoing violation of IDEA, Section 504, Title II, and Michigan law.

29. The named plaintiffs bring this action on behalf of all similarly situated children with disabilities at HPS.  Plaintiffs seek to remedy the ongoing violations of IDEA, Section 504, Title II, and Michigan law by seeking the identification, evaluation. and appropriate education of all children with, or at risk of, disabilities who are attending, or who may attend, HPS school and are

entitled to special education services compliant with students' individualized education programs in the least restrictive environment in HPS schools.

## JURISDICTION AND VENUE

30. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, given the federal questions raised, and 28 U.S.C. § 1343(a), given the civil rights claims raised. This Court also has jurisdiction over the claims raised herein under 20 U.S.C. § 1415(i)(3)(A) and 29 U.S.C. § 794, which provide the district courts of the United States with jurisdiction over any action pursuant to those sections regardless of the amount in controversy. This Court has supplemental jurisdiction over the state-law claim pursuant to 28 U.S.C. § 1367.

31. Venue is proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims asserted occurred within Wayne County, which is located in the Eastern District of Michigan.

## PARTIES

**Representative Plaintiffs**

32. Plaintiff Y.A. is a seven-year-old male with autism spectrum disorder. Y.A. attended Dickinson West Elementary, part of Hamtramck Public Schools, through the 2022-2023 academic year. Previously, Y.A. attended New York

Public Schools where he was found eligible for special education services as a student with autism spectrum disorder. HPS failed to obtain Y.A.'s out-of-state IEP, and Y.A. was put on a reduced day schedule throughout the 2022-2023 school year at Dickinson West Elementary due to an alleged lack of staffing. He was also provided with inadequate special services, and as a result, faced a lack of progress. On February 6, 2023, student advocate Samraa Luqman filed a state complaint with the MDE Office of Special Education ("OSE") on behalf of Y.A. On April 7, 2023, the MDE OSE determined that HPS violated Y.A.'s right to a free appropriate public education. Despite these findings, Defendants continued to violate Y.A.'s right to a free appropriate public education because the ongoing violations were not remedied by the Defendants. For these reasons, Y.A.'s family had no choice but to leave HPS, and enrolled him in Dearborn Public Schools for the 2023-2024 school year. Y.A.'s injury from Defendants' violations presents continuing adverse effects to Y.A.'s development, in addition to a financial burden for Y.A.'s family as a result of having to move school districts. Y.A. brings this case through his parent and next of friend, Ibrahim Alzandani.

33. Plaintiff W.A. is a nine-year-old male with autism spectrum disorder. W.A. attended Dickinson East Elementary, part of Hamtramck Public Schools. W.A. has been diagnosed with autism spectrum disorder since one and half

years old and was found eligible for special education services as a student with autism spectrum disorder. He attended Hamtramck Public Schools until the 2023-2024 school year, and during this time W.A. was being placed on reduced days and was provided with inadequate special services in violation of his IEP due to a lack of staffing. Defendants' violation caused a lack of progress in W.A.'s development.  As a result, W.A.'s family had no choice but to leave HPS, and enrolled him in Dearborn Public Schools for the 2023-2024 school year. W.A.'s injury from Defendants' violations presents continuing adverse effects to W.A.'s development, in addition to a financial burden for W.A.'s family as a result of having to move school districts. W.A. brings this case through his parent and next of friend, Nadhem Alnajar.

34. Plaintiff A.M. is a five-year-old female with down's syndrome and autism spectrum disorder. In the 2022-2023 school year, A.M. attended Early Childhood Education (ECE), which is the Pre-K to 2nd grade school in HPS. During this time, A.M.'s IEP was expired, and HPS failed to respond to A.M.'s parent's request for an evaluation. As a result, A.M. was provided with inadequate social services. On March 16, 2023, student advocate Samraa Luqman filed a state complaint with the MDE OSE on behalf of A.M. On June 15, 2023, the MDE OSE determined HPS violated A.M.'s right to a free appropriate public education. Despite these findings, Defendants continued to

violate A.M.'s right to a free appropriate public education. A.M.'s injury from Defendants' violations presents continuing adverse effects. A.M. has suffered from a lack of progress and developmental delays. A.M. brings this case through her parent and next of friend, Abraham Muzib.

**Defendants**

35.  Defendant MICHIGAN DEPARTMENT OF EDUCATION ("MDE") is the department of the State of Michigan government responsible for administering and enforcing laws related to public education. Mich. Comp. Laws §§ 16.400-16.402. As Michigan's state educational agency ("SEA"), MDE bears the ultimate responsibility for ensuring that all public schools in Michigan— including public school academies or charter schools—comply with the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 1412(a)(11)(A). MDE is also a "program or activity" covered by Section 504, 20 U.S.C. § 794(b), and a "public entity" under Title II, 42 U.S.C. § 12131(1)(A).

36.  Defendant WAYNE COUNTY REGIONAL EDUCATIONAL SERVICE AGENCY ("WRESA") is the intermediate school district ("ISD") responsible for overseeing special education services for students who attend public schools in Hamtramck. As such, WRESA provides federal, state and local funds to HPS and public school academies for special education; (2)

coordinates the delivery of special education services; and (3) investigates special education programs and services it or a local district has been contracted to provide. Mich. Comp. Laws § 380.1711(1)(h).

37. Defendant HAMTRAMCK PUBLIC SCHOOLS ("HPS") is a public school district in Hamtramck, Michigan required under Michigan law to provide "special education programs and services designed to develop the maximum potential of each student with a disability in its district on record under section 1711 for whom an appropriate educational or training program can be provided in accordance with the intermediate school district special education plan." Mich. Comp. Laws §380.1751(1). HPS is a local educational agency ("LEA") under IDEA, responsible for ensuring that its special education policies, procedures, and programs are consistent with those of the SEA under IDEA. 20 U.S.C. §1414(a)(1). HPS is also a "program or activity" covered by Section 504, 20 U.S.C. §794(b), and a "public entity" under Title II, 42 U.S.C. §12131(1)(A).

## DESCRIPTION OF PLAINTIFF CLASS

38. Plaintiffs bring this suit as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on their own behalf and on behalf of all past, present and future children, ages 3 through age 26, and the parents of such children, residing within Hamtramck, Michigan, who were, are or may be

eligible for special education and related services pursuant to the IDEA and its federal implementing regulations, Section 504, and Title II, but who have not been timely identified, located, referred, evaluated, or provided with appropriate special education and related services.

39. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements necessary to have this case certified as a class action lawsuit.

40. Under Fed. R. Civ. P. 23(b)(2) and (b)(3), Plaintiff seeks certification of the following classes:

Three subgroups as follows: 1) children who attend HPS schools who have not been provided special education and related services in accordance with their individualized education programs in the least restrictive environment; 2) children who attend or may attend HPS schools and whose disabilities have not been timely identified and evaluated to determine their eligibility for special education and related services and who do not have completed individualized education programs in accordance with IDEA; and 3) all persons who formerly attended HPS and who during any portion of their attendance fit the definitions of subgroups 1) or 2) above. The class consists of hundreds of current and past children, as well as numerous future unknown children, so numerous as to make joinder of all members impractical.

41. Material questions of fact and law are common to the class, including:

    a. Whether Defendants violated Plaintiffs' rights under the IDEA, Section 504, Title II, and Michigan law by: i) failing timely to identify and evaluate all children with disabilities who attend or who may attend HPS schools who require or who may require special education services; ii) failing to provide timely and adequate special education and related services to children determined eligible; and iii) failing to provide compensatory education to all children determined eligible for special education who were not timely identified, evaluated, or provided with legally mandated special education and related services.

    b. Whether Defendants MDE and WRESA additionally violated Plaintiffs' rights under the IDEA, Section 504, and Title II by failing appropriately to monitor and enforce Defendant HPS's timely identification of, evaluation of, and provision of, legally mandated special education and related services to, children with known or suspected disabilities who require or may require such services.

42. The claims of the representative Plaintiffs are typical of the claims of the class. The representative Plaintiffs, like all class members, claim that Defendants have violated their rights under the IDEA, its federal implementing regulations, Section 504, Title II, and Michigan law, to be

identified, evaluated, and, if eligible, provided with special education and related services. The representative Plaintiffs, like all class members, also assert that Defendants MDE and WRESA have failed appropriately to monitor the provision of special education and related services by HPS. The representative class members, like all class members, likely will suffer future injury and/or are suffering continuing, present adverse effects from Defendants' violations.

43.  The representative Plaintiffs will fairly and adequately protect the interests of the class as they have no interests antagonistic to those of the class and are highly motivated to seek justice for the hundreds of their similarly-situated, vulnerable and voiceless peers.

44.  The representative Plaintiffs' counsel, attorneys from Hammoud, Dakhlallah & Associates, PLLC, and Fagan McManus, PC, are experienced in civil rights litigation, disability law, education law, and class actions. The representative Plaintiffs' attorneys will vigorously prosecute this action on behalf of the entire class.

45.  Defendants' conduct as alleged in this case is systematic, widespread and pervasive.  Defendants are acting or refusing to act on grounds generally applicable to the Plaintiff class, making appropriate injunctive relief and declaratory relief with respect to the Plaintiff class as a whole. The Plaintiff

class seeks to enjoin Defendants from continuing to violate their federal and state rights to receive a free and appropriate public education free of discrimination based on their disabilities.

## LEGAL STANDARDS

### FEDERAL LAW

### IDEA REQUIREMENTS

46. The Individuals with Disabilities Education Improvement Act of 2004 ("IDEA") requires that eligible children with disabilities, including children with disabilities who have been suspended or expelled from school, receive a "free appropriate public education." 20 U.S.C. § 1412(a)(1)(A); 34 C.F.R. § 300.101(a). The IDEA establishes a system of procedural and substantive requirements to which the Defendants must adhere to ensure that each child with a disability receives a free appropriate public education. 20 U.S.C. § 1401 et seq.

47. A "child with a disability" is defined as a child with intellectual disabilities, mental retardation, a hearing impairment (including deafness), a speech or language impairment, visual impairment (including blindness), a serious emotional disturbance, an orthopedic impairment, autism, traumatic brain injury, another health impairment, a specific learning disability, deaf-

blindness, or multiple disabilities, and who, by reason thereof, needs special education and related services. 20 U.S.C. § 1401(3); 34 C.F.R. § 300.8(a)(1).

48. "Autism" means a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age three, that adversely affects a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences. 20 U.S.C § 300.8(c)(1)(i).

49. "Intellectual disability" means significantly subaverage general intellectual functioning, existing concurrently with deficits in adaptive behavior and manifested during the developmental period, that adversely affects a child's educational performance. The term "intellectual disability" was formerly termed "mental retardation." 20 U.S.C § 300.8(c)(6).

50. A "free appropriate public education" (FAPE) is defined as special education and related services that (a) are provided at public expense, under public supervision and direction, and without charge; (b) meet the standards of the state educational agency ("SEA"); (c) include an appropriate preschool, elementary school, or secondary school education; and (d) conform with the

student's individualized education program ("IEP"). 20 U.S.C. § 1401(9); 34 C.F.R. §300.17.

51.  Moreover, a FAPE must be provided in the least restrictive environment ("LRE"). 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.114(a)(1). To the maximum extent appropriate, children with disabilities, including children in public or private settings, "are [to be] educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment [should] occur only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A); *see also* 34 C.F.R. § 300.114(a)(2).

52.  Local educational agencies ("LEAs"), such as Defendants HPS and WRESA, must have in effect policies, procedures, and programs that are consistent with the State policies and procedures established under the IDEA in providing for the education of children with disabilities within their respective jurisdictions. 20 U.S.C. § 1413(a)(1); 34 C.F.R. § 300.201. The State of Michigan has set forth the policies and procedures as required by the IDEA in Mich. Admin. Code R. 340.1701 et seq.

53.  The state educational agency ("SEA"), such as Defendant MDE, bears the ultimate responsibility for ensuring that all public schools in the state of Michigan comply with the IDEA. 20 U.S.C. § 1412(a)(11)(A). Accordingly, Defendant MDE is responsible for ensuring that the LEAs – Defendants HPS and WRESA – are monitored for implementation of, and compliance with, the IDEA. 34 C.F.R. § 300.600(a)(1). If the state determines that the LEA is not in compliance, the state must take necessary action to enforce compliance. C.F.R. §§ 300.600(a)(3), 300.608(a), 300.222(a). An assurance of compliance with this law is required by Mich. Admin. Code R. 340.1701a.

54.  In addition to its general supervisory responsibilities, Defendant MDE has responsibility to ensure that all LEAs in Michigan, including Defendants HPS and WRESA, implement and comply with the following specific provisions of the IDEA.

55.  The IDEA mandates that Defendants must have in effect policies and procedures to ensure that all children with disabilities who are in need of special education and related services, including those attending private schools, are identified, located, and evaluated. 20 U.S.C. §§ 1412(a)(3), (a)(7), 1414(a)-(c); 34 C.F.R. §§ 300.111, 300.301, 300.304-300.306. With respect to children aged 3-4, the child find mandate, requiring proactive identification, location, and evaluation of children with disabilities, is not likely to be

discharged unless children in this age range are provided early intervention services, or enrolled in universal preschool, which would allow suspected disabilities among this population to be observed and assessed. The initial evaluation of the child must be conducted within sixty days of receiving parental consent for the evaluation or within the timeframe that is established by the State. 20 U.S.C. § 1414(a)(1)(C)(i)(I); 34 C.F.R. § 300.301(c)(1). Under Michigan law, the time from receipt of parental consent for an evaluation to the notice of an offer of a free appropriate public education or the determination of ineligibility shall not be more than 30 school days. Mich. Admin. Code R. 340.1721b(1).

56.  Defendants must ensure that a reevaluation of each child with a disability is conducted if Defendants determine that the educational or related services needs of the child warrant a reevaluation, or if the child's parent or teacher requests a reevaluation. 34 CFR § 300.303(a).

57. Defendants must also ensure that an individualized education program ("IEP") is developed, reviewed, and revised for each child with a disability to enable the child to receive a free appropriate public education. 20 U.S.C. §§ 1412(a)(4), 1414(d); 34 C.F.R. §§ 300.112, 300.320-300.324. The IEP is defined as a written statement which must include, inter alia, a statement of the student's present levels of academic achievement and functional

performance, measurable annual goals, and the special education and related services that will be provided. 20 U.S.C. §1414(d)(1)(A)(i); 34 C.F.R. § 300.320(a). A meeting to develop an IEP must be conducted within 30 days of a determination that the child needs special education and related services. 34 C.F.R. § 300.323(c)(1). By the beginning of each school year, each local educational agency, State educational agency, or other State agency, shall have in effect, for each child with a disability in the agency's jurisdiction, an IEP in place for each eligible child that offers a FAPE. 20 U.S.C. §1414(d)(2). The IEP Team consists of: a) the parents of the child; b) the child, where appropriate; c) at least one regular education teacher; d) at least one special education teacher, or if appropriate, at least one special education provider; e) a representative of the LEA who is qualified to provide or supervise the provision of specially designed instruction for children with disabilities and is knowledgeable about the general curriculum and the availability of LEA resources; f) an individual who can interpret the instructional implications of evaluation results, who may already be a member of the team; and g) at the discretion of the parent or agency, other individuals with knowledge or special expertise regarding the child, including related services personnel. 20 U.S.C. §1414(d)(1)(B); 34 C.F.R. §300.321(a). As soon as possible following the development of the IEP, the SEA and LEAs must ensure that special education

and related services are made available to the child in accordance with the IEP. 34 C.F.R. § 300.323(c)(2). Under Michigan law, within seven school days from the date of the IEP team meeting, the public agency shall provide the parent with the notice of the offer of a free appropriate public education, and shall initiate the IEP as soon as possible and not more than 15 school days after the parent's receipt of the written notice. Mich. Admin. Code R. 340.1721b(3).

58. Defendants must ensure that each SEA ensures that each public agency establishes, maintains, and implements procedural safeguards that meet the requirements of §§300.500 through 300.536. 20 U.S.C. §300.500.

59. When disciplinary action is contemplated, Defendants must ensure that children with disabilities are afforded the procedural safeguards required by the IDEA. 20 U.S.C. §§ 1412(a)(6)(A), 1415(k); 34 C.F.R. §§ 300.150, 300.500, 300.530-300.536. Pursuant to the IDEA, the SEA must examine data to determine if significant discrepancies exist in the rates of long-term suspensions and expulsions of children with disabilities, either between different LEAs or between disabled and nondisabled students within the same LEA. 20 U.S.C. 26 §1412(a)(22)(A); 34 C.F.R. § 300.170(a). If such discrepancies exist, the SEA must review and, if appropriate, revise (or require the affected LEA to revise) its policies, procedures and practices relating to

the development and implementation of IEPs, the use of positive behavioral interventions and supports, and procedural safeguards, to ensure compliance with the IDEA. 20 U.S.C. § 1412(a)(22)(B); 34 C.F.R. § 300.170(b).

60. Defendants must ensure that if a child's behavior is a manifestation of that student's disability, the child must be permitted to return to, or remain at, his or her current school placement and be provided with all of the behavioral services necessary to support and reinforce the child's positive behavior. 20 U.S.C. § 1415(k)(1)(F).

61. Defendant MDE must ensure that each LEA in Michigan, including Defendants HPS and WRESA, takes steps to ensure that children with disabilities within its jurisdiction have available to them the variety of educational programs and services available to nondisabled children, including art, music, industrial arts, consumer and homemaking education, and vocational education. 20 U.S.C. §§1412(a)(2), 1413(a)(1); 34 C.F.R. § 300.110.

62. When facilitating the transfer of schools of a child with disabilities, Defendants must take reasonable steps to promptly obtain the child's records, including the IEP and supporting documents and any other records relating to the provision of special education or related services to the child, from the

previous school in which the child was enrolled. 20 U.S.C. § 1414(c)(i)(ii); CFR § 300.323(g) and 34 CFR § 99.31(a)(1)(i)(A).

63. Defendants must ensure that a child with a disability (who had an IEP that was in effect in a previous public agency in the same State) transfers to a new public agency in the same State, and enrolls in a new school within the same school year, the new public agency (in consultation with the parents) must provide FAPE to the child (including services comparable to those described in the child's IEP from the previous public agency), until the new public agency either adopts the child's IEP from the previous public agency; or develops, adopts, and implements a new IEP that meets the applicable requirements in §§ 300.320 through 300.324. 34 C.F.R. §300.323(e)(1)and(2).

64. Defendants must ensure if a child with a disability (who had an IEP that was in effect in a previous public agency in another State) transfers to a public agency in a new State, and enrolls in a new school within the same school year, the new public agency (in consultation with the parents) must provide the child with FAPE (including services comparable to those described in the child's IEP from the previous public agency), until the new public agency conducts an evaluation pursuant to §§ 300.304 through 300.306 (if determined to be necessary by the new public agency); and develops, adopts,

and implements a new IEP, if appropriate, that meets the applicable requirements in §§ 300.320 through 300.324. 34 C.F.R. § 300.323 (f)(1) and (2).

65. In resolving a complaint in which the SEA has found a failure to provide appropriate services, an SEA, pursuant to its general supervisory authority under Part B of the Act, must address— (1) The failure to provide appropriate services, including corrective action appropriate to address the needs of the child (such as compensatory services or monetary reimbursement); and (2) Appropriate future provision of services for all children with disabilities. 34 C.F.R. § 300.151(b).

**SECTION 504 AND TITLE II REQUIREMENTS**

66. Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act ("Title II") prohibit public entities such as SEAs and LEAs from discriminating against individuals with disabilities. Pursuant to Section 504 and Title II, public schools are prohibited from excluding students with disabilities from participating in or receiving the benefits of a school's services, programs, or activities, and such exclusion constitutes disability discrimination. 29 U.S.C. § 794(a); 42 U.S.C. § 12132. Accordingly, each student with a disability must be provided access to all programs provided to non-disabled students. 29 U.S.C. § 794; 42 U.S.C. § 12132; 34 C.F.R. §

104.21. Furthermore, Section 504 and Title II require that each disabled student be provided reasonable accommodations and modifications designed to provide meaningful access to educational benefits, or as necessary to avoid discrimination on the basis of disability. 34 C.F.R. § 104.12; 34 C.F.R. § 104.44; 28 C.F.R. § 35.130(b)(7).

67.  The nearly identical anti-discrimination mandates in Section 504 and Title II apply to qualified individuals with disabilities. 29 U.S.C. § 794(a); 42 U.S.C. § 12132. In the preschool, elementary and secondary education context, the term "qualified individual" refers to:

> a handicapped person (i) of an age during which non handicapped persons are provided [public preschool, elementary, or secondary educational] services (ii) of any age during which it is mandatory under state law to provide such services to handicapped persons, or (iii) to whom a state is required to provide a free appropriate public education under [the IDEA]. 34 C.F.R. § 104.3(l)(2).

68. Section 504 and Title II define "disability" as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A); 29 U.S.C. § 705(9)(A).

69. Section 504 defines a physical or mental impairment as: (A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs;

cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine; or (B) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. 34 C.F.R. § 104.3(j)(2)(i).

70.  Major life activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 34 C.F.R. § 104.3(j)(2)(ii).

71. Qualified students with disabilities can demonstrate that their SEA discriminated against them pursuant to the following analysis:

1. The plaintiff-student is disabled, according to the common definition;

2. The plaintiff-student is otherwise qualified to participate in school activities;

3. The SEA receives federal financial assistance; and

4. The plaintiff-student was excluded from participation in, denied the benefits of, or subject to discrimination at the school.

72. Section 504 also mandates that each child with a disability in Hamtramck receive a free appropriate public education including the provision of regular or special education and related aides and services to meet the needs of the student. 29 U.S.C. § 794; 34 C.F.R. § 104.33.

## MICHIGAN LAW

## MICHIGAN MANDATORY SPECIAL EDUCATION ACT

73.  Under Michigan law, Defendants must ensure each child with a disability shall be provided with programs and services designed to develop his or her maximum potential. Mich. Comp. Laws § 380.1711(1)(a).

74.  The State of Michigan requires the superintendent of public instruction at the Michigan Department of Education to have each Intermediate School District ("ISD") board submit a plan pursuant to M.C.L. §380.1711, in accordance with special education rules. Mich. Comp. Laws §380.1701. Once approved, the board of a local school district "shall provide special education programs and services designed to meet the individual needs of each student with a disability in its district on record under section 1711 for whom an appropriate educational or training program can be provided in accordance with the Intermediate School District (ISD) special education plan". Mich. Comp. Laws §380.1751(1). The Intermediate School Board must "develop, establish, and continually evaluate and modify in cooperation with its constituent districts, a plan for special education that provides for the delivery of special education programs and services designed to meet the individual needs of each student with a disability of whom the intermediate School Board is required to maintain a record under subdivision (f)." Mich. Comp. Laws

§380.1711(1)(aq). The ISD is required to maintain a record of each student with a disability under 26 years of age, who is a resident of one of its constituent districts and who has not graduated from high school, and the special education programs or services in which the student with a disability is participating. Mich. Comp. Laws §380.1711 (f).

75.  Defendants must ensure that seclusion and restraint are used only as a last resort in an emergency situation, and encourage the use of proactive, effective, evidence and research-based strategies and best practices to reduce the occurrence of challenging behaviors and eliminate the use of seclusion and restraint. Emergency use is not permitted if the seclusion is used for the convenience of school personnel, as a substitute for an educational program, as a form of discipline, as a substitute for less restrictive alternatives, as a substitute for adequate staffing, or as a substitute for school personnel training in positive behavioral intervention and support. Mich. Comp. Laws §380.1307.

76.  Defendants must ensure that: curriculum; eligibility of specific persons for special education programs and services and for each particular program or service; review procedures regarding the placement of persons in the programs or services; size of classes; size of programs; quantity and quality of equipment, supplies and housing; adequacy of methods of instruction; and

length and content of school day shall be in accordance with rules promulgated by the state board relative to special education programs and services. Mich. Comp. Laws § 380.1703(2).

77. The rules promulgated by the state board relative to special education programs and services are known as the Michigan Administrative Rules for Special Education (MARSE).

**MARSE REQUIREMENTS**

78. The Michigan Administrative Rules for Special Education (MARSE) With Related IDEA Federal Regulations includes the full Michigan rules and pairs each rule with any of the relevant regulations from the Individuals with Disabilities Education Act (IDEA).

79. "Student with a disability" means a person who has been evaluated according to the individuals with disabilities education act and these rules, and is determined by an individualized education program team, an individualized family service plan team, or an administrative law judge to have 1 or more of the impairments specified in this part that necessitates special education or related services, or both, who is not more than 25 years of age as of September 1 of the school year of enrollment, and who has not graduated from high school. A student who reaches the age of 26 years after September 1 is a "student with a disability" and entitled to continue a special education

program or service until the end of that school year.  MARSE R 340.1702

"Student with a disability" defined. Rule 2.

80. Defendants must ensure that each public agency shall provide special
education and related services to a student in accordance with the student's
individualized education program. MARSE R 340.1722.

81. Defendants must ensure that an intermediate school district, local school
district, public school academy, and any other agency shall adhere to all of the
following general requirements for all programs and services for students with
disabilities: (a) Special education classrooms or areas where related services
are provided shall have at least the same average number of square feet per
student, light, ventilation, and heat conditions as provided for general
education students in the school district; (b) Programs for students with severe
cognitive impairment and severe multiple impairments which have students
under 16 years of age shall not exceed a 6-year age span at any 1 time. (c) All
other special education programs which have students under 16 years of age
and which are operated in separate facilities shall not exceed a 4-year age span
at any 1 time. (d) The age span for students who are assigned to special
education programs, except for programs for students with severe cognitive
impairment and severe multiple impairments, operated in elementary
buildings attended by children who are nondisabled, shall not exceed, at any

1 time, a 6-year age span or the age span of the students who are nondisabled in the building, whichever is less. (e) The age span for students who are assigned to special education programs, except for programs for students with severe cognitive impairment and severe multiple impairments, operated in secondary buildings attended by students who are nondisabled, shall not exceed, at any 1 time, the age span of the students who are nondisabled in the building, except in high school buildings where students up to 26 years of age may be served. The term "nondisabled" shall not include persons participating in adult education programs. (f) Programs for students with severe cognitive impairment, severe multiple impairments, and moderate cognitive impairment shall comply with subdivisions (b), (c), (d), and (e) of this rule unless a program is operated in accordance with an approved intermediate school district plan where, due to the low incidence of eligible students, expanded age ranges may be necessary for programmatic feasibility and meeting the needs of students. (g) Students with disabilities qualifying for special education programs and services shall be provided with supplies and equipment at least equal to those provided to other students in general education programs, in addition to those supplies and equipment necessary to implement a student's individualized education program. (h) Intermediate school districts, local school districts, public school academies, or a

combination of such agencies in cooperation with public and private entities, shall provide or contract for the provision of transition services. Special education teachers shall be assigned to supervise such services. Professional special education personnel, a transition coordinator, or both, shall coordinate transition services.  MARSE R 340.1733.

82.  Each intermediate school district shall implement monitoring procedures and evaluation methods developed by the department to ensure that the standards and criteria established are being achieved by the intermediate school district, their constituent local school districts, and their public school academies. MARSE R 340.1839.

83.  Districts cannot determine placement or services based on "administrative convenience." MARSE R 340.1721b.

## STATEMENT OF FACTS

84.  Hamtramck Public School District contains eight schools and 3,062 students. Children with disabilities make up 6.2% of the student population. That totals to at least 189 HPS children with identified disabilities.[7] The number does not include the children with disabilities who have not yet been identified, or

---

[7] MI School Data, *supra*.

children who left HPS due to inadequate special services and are facing continued injury.

85.  On October 11, 2021, HPS superintendent, Jaleelah Ahmed, resigned amidst allegations that district leaders were retaliating against teachers who spoke out about ongoing issues, namely unsafe working conditions, inequitable discipline, and alleged retaliation against teachers who complained about understaffing and other problems. Her time of resignation was at the start of the 2021-2022 school year, and since then at least 28 other HPS staff members have resigned, including 12 teachers at Dickinson East Elementary.[8] This was a significant loss to a system with only around 200 teachers.

86.  In November 2021, the Hamtramck Review posted: "Over 30 teachers have resigned in recent months, and now, with a national teacher shortage, the district is scrambling to fill many key positions. And then the superintendent took a surprise leave of absence, along with the director of the Human Resources Department."[9]

---

[8] *Hamtramck Public Schools Names Acting Superintendents Amid Staff Resignations and Teacher Shortage,* W Detroit, (Oct. 14, 2021), Hamtramck Public Schools Names Acting Superintendents Amid Staff Resignations and Teacher Shortage - WDET 101.9 FM.
[9] *Public School District overcame challenges in the past,* The Review Hamtramck (Nov. 5, 2021), Public School District overcame challenges in past | Hamtramck Review (thehamtramckreview.com).

87. Of Hamtramck students, 86.7% are economically disadvantaged.[10] HPS, which serves an extremely high-poverty, high-needs population, is hampered by a chronic and severe shortfall of funding and essential resources. As the evidence here demonstrates – and as explained below – the large and constantly growing number of students with disabilities, coupled with chronic budget deficits, has overwhelmed HPS's limited resources and chronic staffing shortages. As a consequence, HPS is failing to provide special education and related services on a system-wide basis, resulting in students not educated in the least restrictive environment, disciplinary practices without procedural safeguards and behavioral supports, and extremely low student performance and outcomes.

88. The facts below demonstrate that Defendants' violations were systemic in nature, Plaintiffs' problems could not have been remedied by administrative bodies because the framework and procedures for assessing and placing students in appropriate educational programs were at issue, and because the nature and volume of complaints were incapable of correction by the administrative hearing process, demonstrated by the fact that two out of three

---

[10] MI School Data, *supra*.

of the named Plaintiffs filed state complaints with the MDE, exhausted their administrative remedies, but still did not find relief.

89. Here, Plaintiffs are not requesting that the court individually determine Plaintiffs' educational needs, the very subject of an administrative review; but rather, are raising the question of whether the Defendants, in meeting Plaintiffs' educational needs, employed practices that caused Plaintiffs to be placed in more restrictive environments than necessary.

90. Plaintiffs are not seeking individual relief, but rather, injunctions mandating system-wide reforms to the school district policies and practices, as the Defendants were or should have been on notice to the system-wide failures to uphold statutory mandates.

**Facts Demonstrating the Systemic Nature of Defendants' Violations**

91. An analysis of HPS's special education services, students, and those placed on reduced days was conducted by a Wayne County RESA Representative during the 2021-2022 school year. (*See* **Exhibit A** – WRESA Report). The report was received by HPS Interim Superintendent, Nabil Nagi, on October 12, 2021. In it, WRESA details systemic concerns stemming from a concentration of students that were being placed on reduced day schedules in the 2021-2022 school year. In fact, the report contains a section titled "Systemic Concerns."

92.  For the 2021-2022 school year, the following was determined:

    a.  At Dickinson-East ("DE"), 5 were on a reduced-day schedule out of a total of 13 Autism Spectrum Disorder ("ASD") students.

    b.  At Dickinson-West ("DW"), 3 out of 4 ASD students were on a reduced-day schedule.

    c.  At Early Childhood Elementary ("ECE"), 6 out of 7 ASD students were on a reduced-day schedule.

93.  Excerpts from the report include:

    a.  "District wide (administration and teachers) show a lack of ownership of the ASD students that we discussed. In each building, we heard from administration and staff: the students didn't belong here and staff was inquiring when we could get them out of their buildings. Also, in each building, the SE teacher was able to identify only one or zero students that would benefit from a center program placement. All other students could be successful in their current environment if paras were available."

    b.  "It appears at times, decisions are made to accommodate the adults versus what is in the students' best interest. For example, 13 students are on a reduced day schedules and 3 students do not report to school

at all. Staff is not providing FAPE for these students. The staff shared that they are on a reduced schedule or not reporting for one of the following reasons, which are;

1. Parent doesn't want the student in the unsafe environment, due to lack of paras

2. Staff shared with us that they told parents: the district cannot provide the appropriate supports or a safe environment due to lack of paras or toilet training needs

3. The student isn't potty trained

4. Student Behaviors are too severe

5. Student elopes"

c.   "The staff does not hold meetings to discuss students' progress data to determine when, if and how much the student's daily schedule can be extended."

d.  "Administration and Staff needs to learn their roles and responsibilities with providing FAPE to their students with Autism."

e.  "DW: Has 1 para and needs 2 additional for students to be successful, DE: Has 1 para and needs 5 additional for students to be successful"

    f. "Critical shortage of paras: In ECE, DW, and DE SE and GE staff said numerous times that the students are not getting what they need to be successful due to lack of para support."

    g. "Teachers have thinking that these students are too challenging and don't belong in their classrooms/buildings."

    "Reasons for reduced day, aggressive behaviors (no aggressive behaviors were seen), not potty trained: staff needs to be educated that there's no rule that state- no potty training means no education."

94. On October 12, 2022, there was a Hamtramck Public Schools Board of Education meeting. This Board meeting was broadcasted.[11]

95. During this meeting, Special Education Director, Menhem Aouad, admitted to the Hamtramck Board of Education that many children with disabilities were placed on reduced day schedules by at least one individual and in violation of their standing Individualized Education Plans. The reason given for the widespread reduction in days in violation of IEPs was critical shortages in staff.

---

[11] Hamtramck Public Schools, *Hamtramck Public Schools Regular Meeting 10/12/2022*, Youtube (Oct. 12, 2022), Hamtramck Public Schools Regular Meeting 10/12/2022 - YouTube. Incorporated and alleged by reference as part of the Complaint.

96. Menhem Aouad admitted to the Hamtramck School Board that HPS was behind in the completion of over one hundred IEPs.

97. Aouad stated HPS was facing increased special education enrollment, space was lacking, and that many HPS buildings were not ADA compliant.

98. Aouad also stated HPS still needed to complete 78 re-evaluations for the school year.

99. Admissions from Aouad during the meeting include:

   a. "Enrollment trends, I would like to provide you with a comparison. At this time last year when the Board asked me to provide a presentation following the departure of the school psychologist and how far behind we were in evaluations, we had 45 evaluations by November. The number for this year is 114 initial evaluations. When I stated in my opening statements that we are busy, that was an underestimation."

   b. "We do have a critical shortage, we are short staff members in some very key, visible positions, specifically at ECE."

   c. "[In regards to ECE]We currently have six students on reduced day, two students are students with IEPs, four students are students that need to go through the evaluation process."

100. During the public comment period of the broadcast, the administrator of Hamtramck's Early Childhood Center, Vicki Smith, made the following statements during the comment period of the publicly broadcast and recorded Board meeting:

   a. "Today I received an email from two individuals in the district office who questioned me as to why students are half time, do you know why they are on half, because there is nobody there for those kids to service them. The day we opened school we were not in compliance and the folks in this district office knew that and they put us in positions at ECE for breaking the law. So I took kids into the school and I am not going to change that because we are here for all children. I took kids into this school and I got chastised for that. I got phone calls about that, and I didn't deserve that because if there is anyone here, there is not one person here who will say, Vickie Smith lies, Vickie Smith does not tell the truth because I am brutally honest whether people what to hear that or not and I will fight for my building and I will fight for these kids and I am not going to go away and I am not going to be quietly fired. I am here."

   b. "Before the school year started, I told the cabinet here, these people up here who represent the district, that how can we start school with no

special education teachers, no social workers, no school psychologist, very few paras….”

101. In response to the admissions at the HPS Board of Education meeting on October 12, 2022, on December 20, 2022, advocate for students with special needs Samraa Luqman, met with Hamtramck Public Schools Special Education Director Menhem Aouad, Interim Superintendent Nabil Nagi, Wayne County RESA Consultant Wanda Ajrouche, Wayne County RESA Representative Patti Silveri, and the coordinator of HPS' multi-tier support system, Heather Dorogi. Luqman made a formal oral complaint with the Office of Civil Rights ("OCR") regarding allegations of discrimination by HPS District employee Vicki Smith. Luqman requested a formal investigation into the assertion that the Hamtramck Public Schools has discriminated against students with disabilities.

102. On January 13, 2023, Luqman followed up with a more detailed email pronouncing more specific allegations, investigation requests, and resolutions and remedies sought. Luqman's email stated:

"I'm writing to follow up on the oral complaint I made on December 20, 2022. I was very much appalled by the fact that at a Board meeting in October, the Special Education Director admitted that there were a large number of students on reduced school days. An administrator followed up with some statements during the public comment period that essentially admitted that the Hamtramck School District was engaging in blatant discrimination against students with disabilities. I

was further appalled by the fact that neither the board, nor anyone in the administration had initiated an investigation into the claims made during that meeting. I had therefore requested a formal investigation into the assertion that the Hamtramck Public Schools has discriminated against students with disabilities. Specifically, I am alleging that students were placed on reduced day schedules by at least one individual and in violation of their standing Individualized Education Plans. Since my complaint was formally made on December 20, 2022, I am asking that the district ensure its adherence to the timelines determined by Board Policy."

103.   On January 26, 2023, Luqman sent another email further expanding the

investigation request to include allegations of discrimination by Menhem

Aouad. Luqman's email stated:

"I'm writing to follow up and amend the complaint I've filed. As you all may recollect, on December 20, 2022, we met and discussed several special education complaints I had received and discussed the multiple students and families I was representing.  During that meeting, I specifically asked three questions in terms of compliance:
-If there were any students in the district that remained on reduced days due to staffing concerns. I was reassured that all students had been returned to a full school day. I was told in the discussion regarding reduced school days that the issue was limited to ECE.

-Whether all IEPs were in compliance. I was reassured that they were.

-I also asked if all students that required the support of a paraprofessional or Instructional aide had the proper supports in place. I was reassured that was the case.
So you can imagine my surprise when I received the complaint that I am pasting below this email regarding [Y.A.] I'm attached the release of information for this family to this email as well. Wanda, please send me the cumulative special education file for the student. Considering that the special education department itself has been illegally and unethically denying special needs students from their rights to a "free and appropriate public education" in accordance with IDEA, MARSE, Section 504 of the ADA, and several other statutes I can go on forever naming,  and in light of this new complaint, I'm asking for the

investigation to be expanded to all students in the Hamtramck Public Schools district, and I'm further naming Menham Aouad as another party to the ongoing discrimination against students with disabilities. In accordance with Board policy, I'm requesting the same respective outcomes as indicated in my prior email and an expanded investigation as aforementioned."

104.  An internal Title VII investigation into HPS' compliance with the Office of Civil Rights immediately commenced in accordance with Board Policy po1422, po2260, po2260.01. (*See* **Exhibit B –** Title VII HPS Investigation Report of Findings and Recommendations). The investigator was the coordinator of HPS' multi-tier support system, Heather Dorogi.  Luqman was provided a letter acknowledging and summarizing her allegations.

105.  The following is a statement of facts and a summary of the allegations received from Luqman.

-  Luqman represented A.M. and family

-  Luqman represented Y.A. and family

-  Luqman requested the verification of attendance records, transportation changes, a review of IEPs, and confirmation of parental notifications and/or consent.

Allegation 1: Luqman alleged that Smith inappropriately and illegally targeted and discriminated against students with special needs by unilaterally placing them on reduced day schedules.

Allegation 2: Luqman alleged that Smith unilaterally implemented said reduction in school hours specifically as a result of staffing and personnel issues and not based on the individualized needs of the students.

Allegation 3: Luqman alleged that Smith violated timeline and procedural rules in that said reduction was not conducted through IEP team meetings or via appropriate channels. Luqman thus alleged that Smith did not provide adequate noticing or procedural safeguards to families of students with special needs.

Allegation 4: Luqman alleged that the Aouad likewise discriminated against students with special needs by placing at least one named student, Y.A., on a reduced day schedule without an IEP team meeting or approval based on student needs.

Allegation 5: Luqman alleged that Aouad did not do his due diligence in obtaining the out-of-state records for Y.A. and therefore did not appropriately place the student in his least restrictive environment, thereby causing the alleged discrimination.

Allegation 6: Luqman in her communication on December 20, 2022 alleged that Smith had opened the district up to liability for class-action discrimination for the statements she made at the HPS Board of Education meeting held on October 12, 2022.

Allegation 7: Luqman alleged that the HPS BOE thus became a party to the discrimination by Smith because they failed to investigate/refer to investigation the

statements that were made by Smith at the Board meeting on October 12, 2022 within two days after they became aware of the discrimination.

106.  The following are excerpts from the HPS Title VII Investigation Report of Findings and Recommendations:

    a.  "The investigation uncovered additional discrepancies in attendance and record keeping policies or actions by staff and personnel and found and analyzed prior practices going back to the 2021/2022 school year at ECE and at other schools."

    b.  "In terms of Special Education laws and regulations, the governing federal statute of the Individuals with Disabilities Education Act (IDEA) and state Michigan Administrative Rules for Special Education (MARSE) dictate identifying, evaluating, and placement of children with special needs. Any child who is presumed to have a disability either by a parent or school personnel is to be referred for a special education Review of Existing Evaluation Data (REED) immediately. This is known as 'child find,' and makes it incumbent upon all personnel to identify and refer children for immediate testing if a disability is presumed. Although the MTSS process can be used to identify children with a disability if progress is not made with MTSS supports, it does not trump 'child find.' If it is evident a child has a

disability, the district should not wait to go through the MTSS process to refer the child for evaluation. With consent of the parent, an offer of a Free and Appropriate Public Education (FAPE) must be made by the district within 30 days of receipt of that consent for testing. The FAPE is provided through the convening of an Individualized Education Plan (IEP) Meeting, which is what will determine the placement of a child. The MARSE is clear in stating that districts cannot determine placement or services based on 'administrative convenience' (MARSE R 340.1721b). Therefore, it is not debatable as to whether it is allowed for a district to reduce hours or services due a lack of staffing or resources to service or service a child's disability or the behaviors in which it manifests itself. Placement of students with special needs is guided by the principle of 'Least Restrictive Environment', which means that students must be allowed to remain in a general education setting on a full time basis with proper supports in place to the maximum extent possible. Any deviation or removal from that setting is to be decided with an IEP; as a team decision, and with a formal offer of FAPE and must contain documented data and observations that explain the necessity for the placement. If a student is placed on a reduced day schedule, all efforts must have been made to place the child

in a general education setting full time, having first provided adequate supports in place and documentation that these attempts were unsuccessful or insufficient. The question becomes whether the district attempted to provide those supports before giving them the reduction in school hours."

c. "The email between Smith and the Board was very informative otherwise, providing insight as to the intent, how, and why the reduction of school hours were made. In it, Smith confirmed that she would be refusing to attend the investigative interview scheduled in advance and directed all inquiries and requests made by the investigator to her personal attorney. She also indicated that she had independently 'set up a general education bus for half day' for those special needs students 'at parent request, and since we had no special education teachers'. According to Smith, the students who were placed on half days were special needs students that still did not have IEPs conducted, which was true. The students, she rationalized, were thus considered general education students and were not protected as students with disabilities. This of course is not accurate or true according to MARSE R 340.1721. Additionally § 300.111 states, 'Child find also must include Children who are suspected of being a child with a disability

under § 300.8 and in need of special education, even though they are advancing from grade to grade;...'. According to Smith in her BOE statement, several emails, and evidence gathered, the students were referred for a REED, and were presumed to have a disability, therefore granting them protections under IDEA, the Civil Rights Act, and Section 504 of the Rehabilitation Act. Many of the students also had prior IEPs where the students' placements were full day either in a general education setting or a categorical classroom. Furthermore, even if these had been general education students, Smith would be in violation of state truancy laws herself in forcing students to attend only half of a school year or putting them on what are essentially indefinite half day suspensions. The email's contentions and deflections serve as another indicator that Smith was aware that these students were in fact special education students, required an IEP to be convened, were placed on half days by her unilaterally (evident by the change in transportation), were done at her own directive without administrative or IEP team approval, and that she knew this was an illegal practice."

d. "The admission of placing students on reduced schedules as a result of lack of staffing is an admission of a violation of the Michigan Administrative Rules of Special Education. The statement indicates not

51

an ignorance of this fact, but an acknowledgement that Smith knows this is 'not in compliance' and rather deflects the blame of placement of these kids on to the district instead. Her statement 'the day we opened school we were not in compliance' also foreshadowed a material fact unknown at the beginning of the investigation, but later discovered upon review of an analysis conducted by Wayne county's Regional Educational Service Agency (RESA) of the prior school year. The admission made here was that Smith had been reducing hours for students with special needs since at least 20221/2022; even prior to the commencement of the 2022/2023 school year. Smith therefore knew the district was not in compliance with this practice when she knowingly commenced and continued it on the first day of school, as declared in her statement that day."

e. "For the 2021-2022 school year, the following was determined:

- At DE, 5 were on a reduced-day schedule out of a total of 13 ASD students.

- At DW, 3 out of 4 ASD students were on a reduced-day schedule

- At ECE, 6 out of 7 ASD students were on a reduced-day schedule

For the 2022-2023 school year, the following was determined:

- Holbrook has 1 student on a reduced-day schedule determined by an IEP

- DE has 1 student on a reduced-day schedule

- DW has 1 student on a reduced-day schedule as determined by an IEP

- ECE has 6 students on a reduced-day schedule"

[…] "The rationale behind all of these was essentially the same: lack of staffing. Specifically, RESA's report indicated 5 reasons that were provided by staff and administrators for placing students on reduced days:

1. Parent did not want the child in an 'unsafe environment, due to lack of paras'

2. Staff told the parents that the district could not provide adequate supports for safety or toileting

3. The student is not potty-trained

4. Behaviors were too severe

5. The student elopes

It's important to note that all of these issues could have been alleviated with adequate one-on-one supports in place for the vast majority of the students during the 2021/2022 school year."

f.  "On February 9, 2023, the investigator met with the District's Pupil Services Director to cross-reference the Excessive Absence Report and Student Absence Summaries in order to verify which and how many students were attending a on reduced-day schedule. When the absence records of known students on reduced-hour school days were compared to the reports with pupil services, it was discovered that there were discrepancies across the board. Students that were in fact on reduced-hour days were being marked present for a full day of schooling, even as they had been attending for a few hours or not at all. In order to verify the veracity of the attendance being reported, it was determined that obtaining a list from Transportation of students that were transported on half days would assist in identifying additional potential errors and retrieving and comparing the Student Sign-in and Sign-out sheets at each building would verify if the attendance was intentionally being misreported."

g.  "That same morning of February 9, 2023, the investigator contacted the Director of the Transportation Department to verify what, if any,

transportation was being provided for students on reduced school days. The Transportation Department indicated the changes to bussing came as a directive from Smith herself for ECE students and ensured he would follow up with a list of students thereafter. That list was never produced by the Director. According to Smith, the Director instead contacted Smith directly to advise her that the investigator was inquiring about the students on half days. This was divulged by an email Smith wrote to the investigator, the Interim Superintendent, and the BOE later that afternoon. In his interview, the Director of Special Education (Aouad) also indicated that transportation changes for students on reduced days were made by Smith personally, without consent or approval, verified by a text message that he sent to the Interim Superintendent upon discovery in October. Smith herself admitted making the changes to the Transportation of these students independently in an email (later discussed) and without proper approvals."

h. "After contacting Transportation, the investigator obtained sign-in and sign-out sheets from schools across the district. Upon retrieving the Sign In/Out Sheets, it was discovered that students were in fact being marked present, even when they were attending partial days or not in

attendance at all. The discrepancy was specifically noted at the ECE for a student represented by the Complainant, A.M., who was marked present for full day attendance throughout the school year, although she has never attended school for an entire school day and continues to attend only half days. For her part, Smith was the only administrator to both take issue with the verification of attendance by the investigator and to specifically instruct staff and personnel to break the law in terms of attendance reporting, later discussed. During his interview, Aouad denied any knowledge and was seemingly unaware of any discrepancies between actual and reported attendance."

i.  "On the afternoon of Feb. 9th, 2023, Smith sent an email to the Interim Superintendent, the investigator, and the BOE stating that the retrieval of Sign-In/Out sheets 'was so obviously intended to upset and intimidate the staff and me as you and your team retaliate against district employees who are forced to break the law'. The statement reiterates an awareness and understanding that what Smith was doing in terms of reducing school hours for students was indeed breaking the law in spite of the attempts to divert blame to the reduction in school hours as parental requests or as a result of aggressive behaviors just two weeks prior."

j. "Allegations 1 and 2:

In terms of students with violent behaviors, no data was found to indicate that several of the students on a reduced day schedule were in fact violent or aggressive. A RESA representative analysis of the district from 2021-2022 received by email on October 21, 2022, indicated that although aggressive behaviors were cited as a rationale for reduction in school hours by HPS administrators and staff, the students in question had no actual observed aggressive behaviors, indicating a lack of credibility on the part of Smith as well as those at DE and DW that had implemented the same practice. Additionally, the RESA Representative observed the following: 'District wide (administration and teachers) show a lack of ownership of the ASD students that we discussed. In each building, we heard from administration and staff: the students didn't belong here and staff was inquiring when we could get them out of their buildings. Also, in each building, the SE teacher was able to identify only one or zero students that would benefit from a center program placement. All other students could be successful in their current environment if paras were available.. It appears at times, decisions are made to accommodate the adults versus what is in the students' best interest.' This email analysis

is evidence that the practice had been specifically targeting students with special needs; Autism Spectrum Disorder and essentially looking for a way to have students with special needs removed from the classrooms/buildings, as reported by the RESA representative. The reduction in school hours was therefore used purposely, with intent, and specifically targeted students with special needs. I.e. Of the 10 students that were nonreporting at ECE in 2021/2022, all of them were ASD or in 'need of special education programming'. On the flip side, in the last two years, there were no general education students placed on reduced schedules or told not to report to accommodate a special education classroom to be opened at ECE or any other school in the district. The professional developments and notifications by RESA and attorneys from October 2021-October 2022 serve as validation that the district provided enough notice and adequate training to district staff and administration on the correct and legal processes and practices. Several emails were sent by Aouad and the Interim Superintendent regarding ceasing the practice of reducing school hours for students with special needs. Several admissions were made by both Respondents indicating they were aware that the practice was illegal and not in compliance. As such, any actions taken by these or other individuals were made with

full knowledge of the laws and are individual actions, not reflective of district policy and deserving of personal accountability. Allegations 1 and 2 are thus substantiated, with the following notes: Smith's engagement was more prolonged, blatant, and her responses to the investigation were defiant, constituted insubordination, and led to the further uncovering of the attendance reporting violations. The attempt to contact the Board to delegitimize a valid discrimination complaint and to thwart the subsequent investigation, which is required by law, while simultaneously admitting fault indicated an attempt at obstruction of a legally mandated investigation under OCR and Section 504. Aouad's actions were apparently due to a lack of understanding of state laws in terms of comparable placements for out of state special education transfers, or when known, showed a negligence to act to resolve issues or to request and provide services to the students. Much of the reasoning provided by staff and administrators on the reduction of school hours could and should have been alleviated with the conduction and implementation of an IEP and the hiring of one-on-one aides. As Director of Special Education, the responsibility to ensure this occurred rests on his shoulders, albeit the decisions made by Smith were still unconscionable independent of this fact."

k. "Allegations 3 and 4:

In terms of the procedural and timeline violations, the evidence points to a knowledge of the laws governing attendance, enrollment, and special education by Smith. Her redirections of blame were enumerable; the parents requested it, the children were too aggressive, they did not have the staff, the students in question were actually general education students, the investigation was unmeritorious, and that she was being forced to commit the violations. On that latter note, the investigation did not uncover any directives, ultimatums, threats, or mechanism that would have 'forced [Smith] to break the law.' Aouad similarly, as Director of Special Education, should and would have had the foresight and knowledge to know that these practices were illegal. Although he categorically denied knowledge of the practice being implemented by the administrators, which the evidence supports, there were instances of reduced school days for two students that were made as a result of the IEP process, where the placement of the students in a categorical classroom may have allowed for the student to attend a full day. These IEPs were convened under the direction and supervision of Aouad acting as the District Representative. Moreover, the pervasiveness of the practice having been uncovered by Wayne RESA

since 2021/2022 led to a district-wide professional development that was provided to HPS administrators specifically on May 26, 2022. Additionally, two attorneys sent emails in the beginning of October 2022 (one dated October 7, 2022, just prior to the board meeting), which were forwarded to district personnel advising them that the unilateral reduction of school hours for special needs students was an inappropriate practice. These trainings and emails, coupled with Smith's emails and statement to the BOE and Aouad's presentation to the BOE and interview, all indicate that both Smith and Aouad had knowledge of the law and that they were breaking it. The statements made and actions taken by Smith indicate a knowledge of the illegalities of her actions and an intent to target those children with special needs and exclude them from the school setting as much as possible. The change in placement and hours of Y.A. in the IEP conducted in December 2022 by Aouad indicates merely an attempt to bring the district into compliance with an inappropriate placement of the student (i.e. reduced day schedule) instead of adding services based on the student's needs to support the student's full-day attendance. These actions were taken outside of the administration and district's established guidelines and practices, in violation of board policies, and

without regard to 'child find', 'least restrictive environment', or statutory rules regarding completion of evaluations and IEPs within mandatory timelines and appropriate noticing of procedural safeguards to parents. The Allegations 3 and 4 are thus substantiated against both individuals that proper statutory and procedural guidelines were not followed."

l. "Allegation 5:

After a review of the evidence and timeline of the requests made to Y.A. 's prior school (district) in New York, it is arguable whether Aouad did do his due diligence in attempting to obtain the cumulative file for the student. The law indicates the following Transmittal of records. To facilitate the transition for a child described in paragraphs (e) and (f) of this section— (1) The new public agency in which the child enrolls must take reasonable steps to promptly obtain the child's records, including the IEP and supporting documents and any other records relating to the provision of special education or related services to the child, from the previous public agency in which the child was enrolled, pursuant to 34 CFR 99.31(a)(2); and (2) The previous public agency in which the child was enrolled must take Michigan Administrative Rules

for Special Education With Related IDEA Federal Regulations Page 65 reasonable steps to promptly respond to the request from the new public agency. It is therefore up for interpretation whether 'reasonable steps' were taken to acquire the records. Aouad indicated that 5 phone call attempts were made to acquire the records between July and October 2022 to no avail. However, no physical authorizations or releases were actually sent to the prior school district, and in accordance with privacy laws, HPS would not have been privy to the records unless and until one was sent. Additionally, Mrs Alkusari [Y.A.'s mother] indicated that the student's previous IEP indicating a required placement into a categorical classroom was submitted to the administration upon enrollment in July of 2022. The district therefore did have sufficient record to place Y.A. in a categorical classroom for a full day while an evaluation was being conducted. The IEP conducted in December and its resulting placement are assessed under Allegation 4 (above). Allegation 5 is thus substantiated with explanation as noted."

m. "Allegations 6 and 7:

As it pertains to Allegations 6 and 7, the allegations are dismissed for the following reason: It is the Compliance Officer's opinion that this

does not fall under the Title IX Compliance Officers' or District's purview. Liability for an individual employee's actions are to be determined by legal counsel or in the court of law. Additionally, since the Board of Education is above the District in terms of chain of command, it would not be appropriate for the District to investigate their actions. Deference should be made to the district's legal counsel to advise if an independent investigation is warranted or to instruct the Board on how to proceed."

n.   "Other Violations

Other violations not covered in the initial complaint include grave attendance violations that could result in serious ramifications from the state. Smith, as the administrator of the building, was reported to have instructed staff to violate the law in reporting students present when they were in fact absent part or all of the day. This creates an even broader and more wide-scale problem in terms of the accuracy and validity of the district's student attendance and enrollment counts reported to the state in accordance with MCL 388.1619. The extent of this violation is unknown and would require a more extensive and broader investigation that, should the state become aware, would open

the district up for greater scrutiny than for just the Special Education violations uncovered. In addition to the allegations raised, Smith violated district policy in her refusal to participate in the investigatory process. District Counsel was contacted and assisted in the drafting of follow up emails and providing guidance on the necessary steps to be taken when an employee refuses to participate in compelling or otherwise mandated compliance investigations. Based on the consultation and recommendation of counsel, refusal to participate in Title IX investigations in which the participant is the Respondent further constitutes insubordination by that individual. In terms of transportation changes that were made, Smith violated policy by overstepping her role and making transportation changes that required IEP team consensus and administrative approval. The transportation changes also created conflict and violations in terms of the funding for transportation for general education versus special needs students. General education bussing cannot be used to transport special needs students, as funding for each is required to be separate. Special education bussing cannot be changed or provided unless done through an IEP and with the district's offer of FAPE. The Transportation Department was found not to have been at fault specifically for the

changes that were requested by Smith or knowledgeable of the intent behind the changes, but the line in the chain of command for making transportation changes was blurred, and this was a serious error. It is recommended that a more clear and concise administrative guideline be established both for general and special education population transportation changes that would require approval from the Administrative Center as opposed to directly from a building principal."

o. "The Recommendations based on the finding above are hereby submitted in the attached letter."

107. On or about February 6, 2023, Samraa Luqman filed a state complaint with the MDE Office of Special Education on behalf of Y.A, the proper administrative route for students whose rights are being violated.

108. The complaint alleged that HPS violated the IDEA and MARSE as it related to Y.A.

109. Pursuant to 34 CFR 300.153 through 300.153, the MDE OSE investigated the allegations in the complaint.

110. On April 7, 2023, MDE issued its decisions that determined HPS had committed two violations. First, HPS failed to adopt the previous out-of-state district's IEP until a new one had been developed, and second, HPS failed to

promptly obtain Y.A.'s records from the previous school. (*See* **Exhibit C** –

Y.A. MDE State Complaint Investigation Report).

111. The MDE OSE included a corrective action plan.

112. On or about  March 16, 2023, Samraa Luqman filed a state complaint with

the MDE Office of Special Education on behalf of A.M, the proper

administrative route for students whose rights are being violated.

113. The complaint alleged that HPS violated the IDEA and MARSE as it related

to A.M.

114. Pursuant to 34 CFR 300.153 through 300.153, the MDE OSE investigated

the allegations.

115. On June 15, 2023, MDE issued its decision that determined HPS had

committed a violation: HPS did not respond to A.M.'s parent's request for

evaluation. (*See* **Exhibit D** – A.M. MDE State Complaint Investigation

Report).

116. MDE OSE ordered a student level corrective plan. However, under the

district level corrective plan, they noted:

"As the District is currently engaged in corrective action regarding

responding to requests for special education evaluations, the MDE will

not order additional corrective action through this State Complaint. The

correction will be addressed and monitored through the corrective

action plans that were ordered for State Complaints 22-0219, 22-0220, and 23-0047."

117.  The above statement indicates that HPS' violations are systemic, and that at least four state complaints regarding HPS' violations of IDEA and MARSE have been filed with the MDE OSE and substantiated. This demonstrates that at least four Plaintiffs have exhausted their administrative remedies.

118.  As is systemic with the Defendants, HPS and WRESA failed to implement these corrective action plans, and the MDE failed to follow its monitoring and enforcement duties.

119.  On June 26, 2023, the Detroit News published an article titled, "Hamtramck schools violating rights of special needs students, probes find."[12] In fact, the article has a section titled, "Too many kids on reduced day schedules."

120.  Excerpts from the article include:

a.  "Hamtramck — A state investigation and an internal district probe have found that Hamtramck public schools have been violating the rights of students who need special education services but are not receiving them."

---

[12] *Hamtramck schools violating rights of special needs students, probes find,* Detroit News, (June 26, 2023), The Detroit News.

b.   "A Title VII civil rights disability investigation by the district obtained by The Detroit News through an open records request found that Hamtramck's elementary schools were falling short of Michigan law, which requires schools to provide free, appropriate, public education to students whose disabilities affect their ability to learn. The education must meet the student's unique needs, and districts cannot determine placement or services based on what is convenient for the districts."

c.   "The state investigation found that the district was failing to adopt a special needs student's individual education plan from his former school when he changed to the Hamtramck district. School districts are required to do this until they conduct their own evaluations and form a new plan for the student that results in 'the least restrictive environment, if appropriate,' according to the Michigan Department of Education April 7 report obtained by The News through a public records request."

d.   "The Hamtramck district also failed 'to promptly obtain the student's records' from a prior school or public agency, the Michigan Department of Education said."

e.   "The district's Title VII investigation also found that Early Childhood Elementary Principal Vickie Smith and Special Education Director

Menhem Aouad improperly put students with special needs on a reduced day schedule, which violated their rights."

f. "The internal Hamtramck Title VII investigation found a disproportionate number of kids on the autism spectrum were on a reduced day schedule at Early Childhood Elementary. In the 2021-22 school year, 14 students on the autism spectrum were on a reduced day schedule out of 24 total at three schools, according to the Title VII report. Six of those were at ECE."

g. "There were also 13 children with special needs who were not attending school at Dickenson-East and 10 at Early Childhood Elementary. It's not clear from the report how many of these students had an IEP that called for a reduced schedule."

h. "For the 2022-23 school year, nine students on the autism spectrum had a reduced day scheduled. Only two of those were determined by an IEP. Six were at ECE."

i. "The reasons for the reduced days essentially boiled down to a lack of staffing, according to the district probe. The Title VII report indicated Aouad's actions were due to a lack of understanding of state laws in some cases, and in others was negligent to act to resolve issues. He

should have had the foresight and knowledge to know his practices were illegal, the report said."

j. "The Wayne County Regional Educational Service Agency representative for Hamtramck said during the investigation that 'it appears at times, decisions are made to accommodate the adults versus what is in the students' best interest.' The representative's name wasn't given in the report."

k. " 'A child should be in school all day unless the team that constructed the individual education plan decided it was best for the child to be on a reduced day,' said Lester, the lawyer specializing in special education."

l. " 'What a child is supposed to get is supposed to be based on their needs,' Lester said. 'A lack of funding is not an excuse, a lack of staffing is not an excuse, administrative convenience is not an excuse. But there is a little bit of conflict between that and reality. Schools don't have magic wands and can't get water from a rock.' "

m. " 'Lester said, based on a review of the Title VII report, Smith was choosing between the lesser of two evils. No matter what she did, she was going to be violating their rights, he said. So she had to choose:

Send the kids home early or put them in a situation in general education classrooms where they or other students might get hurt, Lester said.' "

n.   " 'It's not legal; it's not appropriate,' Lester said. 'But she's being forced to respond to a situation that was not her doing.' "

o.   "Coral said she's not sure if the district is doing everything it can to hire the teachers and paraprofessionals it needs to support students. The district of 3,300 students has seen a mass exodus of teachers, administrators and paraprofessionals, she said."

p.   "At a February school board meeting, second-grade teacher Amanda Lesko said instructors were nearly 100 days into the school year and still did not have a special education teacher at Early Childhood Elementary. She said IEPs weren't being met and students were regressing."

q.   "Students with special needs were in general education classrooms full-time, which isn't good for them or other students, Lesko said. Teachers, students and paraprofessionals were being harmed, and there had been an 'absolute destruction' of their mental health, she said."

r.   "Lesko expressed concern that the district was putting staff in situations they should not be in, and that administrators were not publicly advertising the open special education positions."

121. Since Defendants have systemically failed to conduct IEP evaluations, violated IEPs, and placed students with disabilities on reduced days, the Plaintiffs and other class members are not receiving the same educational programs and services available to nondisabled children, including art, music, industrial arts, consumer and homemaking education, and vocational education.

**MDE's Own Policies**

122. In September 2022, MDE's Special Education Office published a guidance page regarding shortened school days.[13]

123. However, HPS and WRESA have failed to adhere to such guidance, and MDE has failed to enforce its own guidance.

124. MDE's guidance states:

    a. "A shortened school day that results in a denial of free appropriate public education (FAPE) is not permitted. The decision may not be driven by budgetary concerns, staffing shortages, scheduling conflicts, or other non-student-driven reasons."

---

[13] *Shortened School Day,* MDE Office of Special Education Guidance, (Sep. 2022), Shortened School Day (michigan.gov).

b. "In general, a school day for a student with a disability should not be shorter than a school day for students without disabilities. When a student's IEP Team determines a student needs a shorter school day, appropriate modifications must be incorporated into the IEP to ensure the student receives FAPE in the LRE. These modifications must be based on the unique needs of the student. For example, a shortened school day may be needed when the nature or severity of the student's disability impacts a full school day of attendance even with the use of supplementary aids and services. This reduced school day determination would be made by the student's IEP Team which may include, when appropriate, the student's medical provider or other treatment specialists. Of note, the practice of shortening a student's school day as a disciplinary measure could be considered a denial of FAPE if the student's IEP Team does not consider additional services and supports that could enable a student to remain in school, in the LRE, for the full school day before placing the student on a shortened school day."

c. "The only time it is appropriate to shorten the school day for a student with a disability is when the student's IEP Team determines a shortened day is required to address the student's unique disability-related needs.

It is the position of the MDE that affording a student less than a full school day is contrary to the IDEA's goal that an IEP results in appropriate progress."

d. "Under most circumstances, a shortened school day should be in place for only a limited amount of time. When an IEP Team determines the need to shorten a student's school day, the student's IEP should include: 1. An explanation of why the student's unique disability-related needs require a shortened day. 34 CFR §300.320(a)(1). 2. A clear explanation of the unique need or skill gap prohibiting the student from attending a full day of school 34 CFR §§300.320(a)(4) and (5). 3. A clear connection to the growth and progress expected to be achieved by shortening the student's school day (e.g., the student is expected to recover from the physical or medical condition with rest and medical treatment). 34 CFR §300.320(a)(3). 4. A plan for the student's return to school for a full day, which may include a plan to meet more frequently to review student data and determine whether the student is able to return to school full-time. 34 CFR §300.114. The student must return to a full school day as soon as they are able, affording a student a full educational opportunity as required by 34 CFR §300.109."

e. "The MDE considers a shortened school day a critical compliance consideration. IEPs missing this critical information, such as in response to the critical compliance inquiries above, may be considered noncompliant with the requirements of the IDEA. Any IEP that addresses a shortened school day through a conclusory statement or a checked box without addressing the critical compliance inquiries and without full consideration by the IEP Team will be considered noncompliant. The IEP must address the use of positive behavioral interventions and supports and other strategies to address behavior that impedes the student's learning, or the learning of others as required by 34 CFR §300.324(a)(2)(i). Further, IEPs that do not align the reasons for the shortened school day with the identified unique disability-related needs of the student and the specific link to increasing the skills necessary for a return to a full school day, will be deemed noncompliant and in need of corrective action."

## Continuing Injury

125.  Despite some class members, such as Y.A. and W.A., being forced to move school districts because of the inadequate special services provided while at HPS, these class members continue to face injury from Defendants' violations.

126. Plaintiffs' continuing injuries present continuing adverse effects.

127. Just some of these adverse effects include:

   a. The costs associated with the purchase/rent and upkeep of a new home in a new school district.

   b. Little to no progress on annual IEP goals.

   c. Developmental delays

   d. Emotional injuries from past treatment.

**Representativeness**

128. The injuries of the named Plaintiffs are representative of the class of all individuals who are similarly situated.

129. The facts above demonstrate that Defendants' failing to conduct IEP evaluations, placing students on reduced days, failing to follow child find procedures, and failing to use procedural safeguards were common violations by Defendants, and not surprisingly, the named Plaintiffs experienced all or some of the same violations. Similarly, Defendants WRESA and MDE failed to prevent, correct, or remedy HPS's violations of the rights of the Plaintiffs and all those similarly situated.

## NAMED PLAINTIFFS' INJURIES

130. Summarized below are the violations of federal and state law suffered by the named Plaintiffs as a result of the Defendants' failure to comply with their

legally mandated responsibilities under the IDEA, Section 504, Title II, and Michigan law. These violations illustrate the specific harm suffered by the Plaintiff class as a result of the Defendants' failure to comply with federal and state law.

**Plaintiff Y.A.**

131. Plaintiff Y.A. is a seven-year-old male with autism spectrum disorder who attended Dickinson West Elementary, part of the Hamtramck Public School District, located in Hamtramck, Wayne County. Y.A. attended Dickinson West Elementary during the 2022-2023 academic year. He brings this case through his parent and next of friend, Ibrahim Alzandani.

132. Previously, Y.A. attended New York Public Schools, where he was found eligible for special education services as a student with autism spectrum disorder.

133. In July of 2022, Y.A.'s family moved to Hamtramck, Michigan. Y.A.'s mother enrolled her child in Hamtramck Public Schools that same month, July of 2022.

134. During this time, Y.A.'s mother provided HPS with Y.A.'s out-of-state IEP from the previous district and provided written consent to HPS to request Y.A.'s full educational records from the previous district.

135.  Before the start of the school year, the mother was informed that Y.A. could only start school on a full day in the general education setting with no services until an IEP could be completed. For the IEP to be completed, Y.A. had to be evaluated by a psychologist. Y.A.'s mother was informed by HPS that she would be contacted at the end of August by the psychologist. She was not.

136.  For students who transfer over the summer, districts are required to have an IEP in place at the beginning of the school year. HPS did not have an IEP in place for Y.A. at the beginning of the school year. Further, districts are required to provide comparable services to those described in the child's IEP from the previous public agency. HPS did not provide services comparable to the previous district.

137.  Neither the evaluation nor the IEP were completed by Y.A.'s first day of school on September 6, 2022.

138.  Y.A.'s out-of-state IEP specified the need for special education classroom, speech, occupational therapy, physical therapy, and an augmentative communication device.

139.  However, during the first week of school at HPS, Y.A. was placed in a general education classroom with no services. Y.A.'s mother remained in the classroom for a few hours to support Y.A. Y.A. and mother then went home

due to safety concerns, specifically regarding Y.A.'s eloping, and lack of individualized support.

140. Of note, the Y.A.'s IEP had in fact been received by Aouad from the parent in July 2022 upon enrollment, which indicated that in terms of placement, Y.A. was previously placed in full day schooling in a categorical classroom.

141. As such, a full time placement categorical ASD classroom would have most closely resembled and been comparable to the student's prior placement setting.

142. Without services and in a general education classroom, if Y.A. began eloping, he could be seriously injured or injure others.

143. Y.A.'s mother followed up regarding the status of Y.A.'s special education evaluation.

144. On October 3, 2022, Y.A.'s mother was told all ASD classrooms were full, and that even after the IEP would be completed, there was no guarantee for placement of the child in a categorical classroom because there were no seats available. Y.A.'s mother was told Y.A. could attend a full day in the general education setting with a classroom aide.

145. Y.A. resumed attending on October 4, 2022, in the general education setting, however, a classroom aide was not available. A paraprofessional was able to support the student for one hour and forty-five minutes a day.

146.  According to the MDE, the initial evaluation referral was not received until October 3, 2022, despite the mother's repeated requests months before then. The school psychologist reported being unsure why HPS waited until October to begin the evaluation process.

147.  On November 29, 2022, HPS email documented the scheduled December 1, 2022, IEP team meeting for Y.A., and indicated Y.A. was currently on a reduced school day due to lack of individualized support for Y.A.'s needs.

148.  On December 1, 2022, after four months of waiting, an IEP meeting was convened, and the offer of faith from HPS was one hour and forty-five minutes in a resource room.

149.  Y.A.'s mother shared the December 1, 2022 IEP allocated a reduced amount of special education support relative to Y.A.'s identified needs in the out-of-state IEP.

150.  The IEP did not necessitate a categorical ASD classroom, which would have been most comparable to Y.A.'s previous out-of-state IEP.

151.  HPS informed Y.A.'s mother that her child would be placed into a categorical placement after the new year.

152.  However, Y.A. was not placed in a categorical classroom any time during the 2022-2023 school year because of a continuing lack of resources, specifically a shortage of special education staff and space by HPS.

153.  Instead, Y.A. continued to attend Dickinson-West for one hour and forty five minutes in the morning with no services except a paraprofessional until HPS told Y.A.'s parents to bring him in from 1-2:45 p.m. because they had more resources later in the day.

154.  On February 6, 2023 the MDE Office of Special Education received a special education state complaint filed by Samraa Luqman on behalf of Y.A. The state complaint alleged HPS violated IDEA and MARSE.

155.  Pursuant to 34 C.F.R. §300.151 through 300.153, the OSE investigated the allegations in the state complaint.

156.  In March 2023, Y.A. began attending half-days. During this time Y.A. did not have services and was not in a categorical classroom, rather just with a paraprofessional.

157.  On April 7, 2023, the MDE OSE issued its decision regarding the state complaint made on behalf of Y.A. *See* **Exhibit C.**

158.  The complaint asked, "Whether HPS provided Y.A. a free public education (FAPE) pursuant to 34 C.F.R. §300.17 and 300.101. Specifically, whether HPS provided a FAPE by adopting the previous out-of-state district's IEP until the District conducted an evaluation and developed a new IEP with considerations of the least restrictive environment, if appropriate, pursuant to

34 C.F.R. §300.114, 300.117, 300.323, and R 340.1721b(5)." The MDE OSE found:

> "The District failed to adopt the previous out-of-state district's IEP until the District conducted an evaluation and developed a new IEP. MDE determines a violation."

159. The state complaint also asked, "Whether the District followed the procedures and processes required by the IDEA and MARSE. Specifically, whether HPS took reasonable steps to promptly obtain Y.A.'s records related to the provision of special education or related services from the previous public agency in which Y.A. was enrolled pursuant to C.F.R. §300.323(g)(1)." The MDE OSE found:

> "The District failed to promptly obtain the Student's records from the previous public agency. MDE determines a violation."

160. In mid-May, Y.A. began attending full days, but still not in a categorical classroom.

161. On May 30, 2023, Y.A. received a new IEP. From the  IEP dated December 1, 2022, to the IEP dated May 30, 2023, Y.A.'s academic achievement and functional performance remained the same. His resulting needs for each area of educational performance are maximum 1:1 support.

162. As a result of Defendants' continued violations throughout the 2022-2023 school year, specifically the reduction in learning hours, Y.A. made little to no progress, and is now at a greater risk of developmental delays.

163. Further, because of the continued violations and lack of progress through the 2022-2023 school year, Y.A.'s family had no choice but to leave HPS and enroll Y.A. in Dearborn Public Schools for the 2023-2024 school year.

164. Y.A. and his family continue to suffer from emotional and financial injury due to the costs associated with moving school districts.

165. Further, as a result of Defendants' violations, one of the many examples of continuing adverse effects Y.A. suffers from is emotional injury from his rights violated for an entire year. Y.A. also faces a continued lack of developmental progress.

**Plaintiff W.A.**

166. Plaintiff W.A. is a nine-year-old nonverbal male with autism spectrum disorder. W.A. attended Dickinson East Elementary, part of Hamtramck Public Schools, until the 2023-2024 school year, when his family had no choice but to enroll him in Dearborn Public Schools because of Defendants' violations. W.A. has been diagnosed with autism spectrum disorder since one and half years old and was found eligible for special education services as a

student with autism spectrum disorder. He brings this case through his parent and next of friend, Nadhem Alnajar.

167.  Throughout the 2022-2023 school year, W.A.'s father would drop W.A. off in the morning, and an hour to two hours into the day, the school would call him and tell him he needs to pick W.A. up.

168.  On several occasions, when W.A.'s father would arrive to pick W.A. up from school, W.A. was in the basement of the school, where he was in seclusion for problem behavior. No learning took place in the basement and W.A. was not allowed to leave.

169.  The basement in Dickinson East has no bathroom. It is also in a poorer condition than any of the other classrooms in the school. It is not painted.

170.  W.A. was often secluded for over half an hour for his "problem behaviors."

171.  W.A.'s "problem behaviors" were manifestations of his disabilities.

172.  On one occasion, W.A.'s parents found him at Dickinson East, where he was secluded, screaming, scared, and traumatized. W.A. had urinated on himself, took off all of his clothes, and was crying uncontrollably on the floor.

173.  W.A. never received special services during the 2022-2023 school year, not even speech therapy, which was in violation of his IEP.

174.  As a result of Defendants' continued violations throughout the 2022-2023 school year, specifically the reduction in learning hours and use of seclusion,

W.A. made little to no progress, and is now at a greater risk of developmental delays.

175.  Further, because of the continued violations and lack of progress through the 2022-2023 school year, W.A.'s family had no choice but to leave HPS and enroll him in Dearborn Public Schools for the 2023-2024 school year.

176.  W.A. and his family continue to suffer from emotional and financial injury due to the costs associated with moving school districts.

177.  As a result of Defendants' violations, one of the many examples of continuing adverse effects W.A. suffers from is emotional injury from having his rights violated for an entire year. W.A. also faces a continued lack of progress.

**Plaintiff A.M.**

178.  Plaintiff A.M. is a five-year-old female with down's syndrome and autism spectrum disorder. A.M. is a kindergartner who attended Early Childhood Education (ECE) throughout the 2022-2023 school year, which is the Pre-K to second grade school within HPS. A.M. brings this case through her parent and next of friend, Abraham Muzib.

179.  A.M.'s first IEP was developed on February 11, 2021.

180.  On June 14, 2022, a "Build Up" referral from an outside agency was provided to HPS regarding the placement of A.M.

a. "Build Up helps parents and their children, ages 3 through 5, get additional educational support as they begin and continue to learn the skills needed to enter kindergarten. An initiative of the Michigan Department of Education, Office of Special Education, Build Up supports child find efforts through targeted outreach. Our goal is to refer all children who may be eligible for special education services through Michigan's Administrative Rules for Special Education and the Individuals with Disabilities Education Act Part B."[14]

181. A.M.'s parent contacted HPS Special Education Director, Menhem Aouad, regarding the enrollment of A.M. prior to the beginning of the 2022-2023 school year. A.M.'s parent was told HPS did not have a program for A.M., and that A.M. would need to attend school in a neighboring district.

182. On September 28, 2022, A.M's parent emailed Menhem Aouad with the following information:

a. The parent had a four-year old child with Down syndrome and autism whose expired IEP had not been addressed.

b. Parent spoke with Aouad on two separates occasions:

---

[14] *About,* Build Up Michigan, About | Build Up Michigan, (last visited Jan. 22, 2024).

    i.   On the first occasion, Aouad indicated HPS did not provide special education for students with down syndrome, and A.M. would have to attend in a neighboring district.

    ii.   On the second occasion, Aouad indicated A.M. could be put on a waiting list.

183.  Both statements were unacceptable and illegal, as follows:

    a.  A.M. lived in the HPS district and had the right to an education in the district despite her disabilities.

    b.  The Parent of A.M. should not have been told A.M. needed to go to school in a neighboring district.

184.  A.M.'s parent requested A.M. be evaluated by Defendants immediately and requested a follow up meeting to discuss the services Defendants would be providing to A.M.

185.  A.M.'s parent hired an advocate to ensure A.M. was receiving an appropriate education. The parent indicated to Menhem Aouad, that if the matter was not resolved in a timely manner, the advocate would be filing a state complaint with the MDE OSE.

186.  District-provided attendance records indicated A.M.'s first full day of instruction at Early Childhood Elementary was October 3, 2022.

187.  On October 4, 2022, A.M. was reduced to a half-day at school because of a lack of support, namely HPS' shortage of staff and space.

188.  In response, A.M.'s parents continued to request a reevaluation and a new IEP be developed, so that A.M. could receive adequate services.

189.  During the time A.M. was attending school on a reduced day, and according to the HPS' internal investigation, students were in fact being marked present, even when they were attending partial days or not in attendance at all. The discrepancy was specifically noted at the ECE for A.M., who was marked present for full day attendance throughout the 2022-2023 school year, although this was false  and she was only attending only half days. When the outcomes of the internal investigation were received, HPS declined to give A.M.'s family any response or recourse, including denying their right to a hearing.

190.  After months of repeated requests for A.M.'s IEP to be developed, with no progress, on March 16, 2023, the MDE Office of Special Education received a special education state complaint filed by Samraa Luqman on behalf of A.M. The state complaint alleged HPS violated IDEA and MARSE.

191.  Pursuant to 34 C.F.R. §300.151 through 300.153, the OSE investigated the allegations in the state complaint.

192.  On March 16, 2023, an IEP was developed for A.M.

193.  The IEP required a Moderate Cognitive Impairment Classroom (MOCI) for A.M., to be provided beginning September 5, 2023.

194.  On June 15, 2023, the MDE OSE issued its decision regarding the state complaint made on behalf of A.M. *See* **Exhibit D.**

195.  The complaint asked, "Whether HPS responded to the parent's request for an evaluation of A.M., and conducted an evaluation that was sufficiently comprehensive to identify all of the student's special education services and related service needs, including parental participation and timelines, in accordance 34 C.F.R. §300.303 through 306, 300.503(a)(b), and R 340.1721a and 340.1721b(3)." The MDE OSE found:

> "The District did not respond to the Parent's request for an evaluation. MDE determines a violation."

196.  In addition to the student level corrective plan, under the district level corrective plan, the MDE OSE noted:

> "As the District is currently engaged in corrective action regarding responding to requests for special education evaluations, the MDE will not order additional corrective action through this State Complaint. The correction will be addressed and monitored through the corrective

action plans that were ordered for State Complaints 22-0219, 22-0220, and 23-0047."

197.  This demonstrates the MDE OSE had received at least four state complaints regarding HPS.

198.  Further, HPS did not place A.M. in a categorical classroom at the start of the 2023-2024 school year, thus violating her IEP, and instead retained her in the Early Childhood Elementary (ECE) school.

199.  The ECE has been undergoing construction since the beginning of the 2023-2024 school year, so A.M. has been forced to continue in a general education setting through a virtual classroom.

200.  The virtual classroom is insufficient for A.M. and all of the children with disabilities at the Early Childhood Education Center.

201.  A.M.'s parents contacted HPS about A.M. not being placed in the categorical classroom as she should have been per her IEP.

202.  On September 26, 2023, HPS informed A.M.'s parents that A.M. could be moved to the categorical classroom located in Dickinson East.

203.  The categorical classroom in Dickinson East that HPS suggested is insufficient for A.M.'s needs, and according to MARSE rules, HPS was required to create a new categorical classroom that meets A.M.'s needs.

204.  The MOCI categorical classroom that HPS recommended moving A.M. to is in Dickinson East, which is on the lower level/basement of the school.

205.  All of the other Early Childhood Education classrooms for non-disabled children are on the main floor of the building.

206.  The lower level/basement of Dickinson East does not have a bathroom. The only way to get to the bathroom is by taking the stairs to the main floor.

207.  A.M. has physical impairments that prevent her from being able to take the stairs as normal, evidenced by her need to have physical therapy in and outside of school.

208.  Additionally, A.M. is not potty-trained, so she requires a bathroom nearby, not one that is two flights of stairs away.

209.  This concern has been relayed to HPS, but no change has occurred.

210.  The stairs pose a significant and continued future safety concern. In the case of a fire, A.M. would not be able to quickly climb up the stairs and evacuate.

211.  Dickinson East does not have ramps or evacuation lifts at any of its staircases.

212.  The categorical classroom in Dickinson East is also in a poorer condition than any of the other classrooms in the school. It is in the basement, and it is not painted.

213.  A.M.'s parent had requested that the classroom be moved to ECE or another building where A.M. could be on the ground level, but HPS ignored the requests.

214.  The children in the categorical classroom in Dickinson East are greater than 6 years in age apart from each other.

215.  A.M. has not received adequate services by several providers in addition to these grievances for the entirety of the last and current school year.

216.  A.M. has not had a functional behavioral analysis completed that was promised to be completed by the district at the beginning of the 2023-2024 school year.

217.  All of these questions were posed to HPS in a meeting on October 4, 2023, that was supposed to be held with the Superintendent. Upon learning that the family had a non-attorney advocate, the Superintendent refused to be present and sent two other staff in her place to take the concerns and complaints.

218.  On November 2, 2023, Luqman once again asked HPS staff why a categorical classroom has not been created to meet A.M.'s needs.

219.  HPS responded that they were in the process of creating a classroom that meets A.M.'s needs, including a bathroom and no children more than 6 years in age difference with A.M.

220.  HPS alleged the new classroom will be completed by Monday, November

6, 2023.

221.  By indicating that this new categorical classroom will have a bathroom and

other requirements, HPS conceded that they were aware the categorical

classroom located in Dickinson East that was recommended for A.M was

insufficient.

222.  As a result of Defendants' continued violations, one of the many examples

of continuing adverse effects A.M. suffers from is emotional injury. A.M. has

also faced a lack of developmental progress.

## CAUSES OF ACTION

## COUNT I (as to all Defendants)

## Systemic Violations of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. and Implementing Federal Regulations

## Systemic Violation 1:

## Failure to Provide a Free Appropriate Public Education that Confers a Meaningful Educational Benefit in the Least Restrictive Environment

223.  Plaintiffs re-allege all preceding paragraphs as though fully set forth herein.

224.  Federal law requires that qualifying children with disabilities receive a free

appropriate public education ("FAPE"). 20 U.S.C. § 1412(a)(1)(A); 34 C.F.R.

§ 300.101(a). To achieve this goal, the IDEA requires that Defendants design

and develop an individualized education program ("IEP") for each qualifying child with a disability in their district. 20 U.S.C. § 1412(a)(4), §1414(d); 34 C.F.R. § 300.112, §§ 300.320-24.

225. IDEA requires IEPs to contain several key pieces of information to ensure that they are designed to confer a meaningful educational benefit, including: (1) a statement of the student's present levels of academic achievement and functional performance; (2) a statement of measurable annual academic and functional goals; (3) a statement of the special education and related services that will be provided to the student; (4) an explanation of the extent, if any, to which the student will not participate with nondisabled students in regular classes; (5) a statement of any individual appropriate accommodations necessary to measure the academic achievement and functional performance of the student; (6) the projected start date for any related services; and (7) transition services for students who have reached the age of 16. 20 U.S.C. § 1414(d)(3).

226. By the beginning of each school year, each local educational agency, Defendants, shall have in effect, for each child with a disability in the agency's jurisdiction, an IEP in place for each eligible child that offers a FAPE. 20 U.S.C. §1414(d)(2).

227.  Defendants must ensure if a child with a disability (who had an IEP that was in effect in a previous public agency in another State) transfers to a public agency in a new State, and enrolls in a new school within the same school year, the new public agency (in consultation with the parents) must provide the child with FAPE (including services comparable to those described in the child's IEP from the previous public agency), until the new public agency conducts an evaluation pursuant to §§ 300.304 through 300.306 (if determined to be necessary by the new public agency); and develops, adopts, and implements a new IEP, if appropriate, that meets the applicable requirements in §§ 300.320 through 300.324. 34 C.F.R. §300.323(f)(1) and (2).

228.  Defendants must ensure that a child with a disability (who had an IEP that was in effect in a previous public agency in the same State) transfers to a new public agency in the same State, and enrolls in a new school within the same school year, the new public agency (in consultation with the parents) must provide FAPE to the child (including services comparable to those described in the child's IEP from the previous public agency), until the new public agency either adopts the child's IEP from the previous public agency; or develops, adopts, and implements a new IEP that meets the applicable requirements in §§ 300.320 through 300.324. 34 C.F.R. §300.323(e)(1) and (2).

229. The IDEA requires, to the maximum extent possible, that children with disabilities be educated with children who are not disabled, and that removal from the regular education environment occurs only when education in regular classes with the use of supplementary aids and services cannot be satisfactorily achieved. 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.114(a)(2). Districts must have available a continuum of alternative placements for children with disabilities. 34 C.F.R. § 300.115. 370. Defendants HPS and WRESA have an ongoing pattern and practice of systemically failing to provide special education and related services compliant with students' IEPs in the least restrictive environment as required by the IDEA.

230. As alleged in detail herein, Defendant MDE has failed to appropriately monitor, conduct proper oversight, and provide Defendants HPS and WRESA with the resources and expertise to provide the necessary services in the least restrictive environment. As a result of the Defendants' failures, Plaintiffs and other children with disabilities were, are and will be denied the educational services to which they are legally entitled under the IDEA.

**Systemic Violation 2:**

**Failure to Develop and Implement Child Find Procedures**

231. Plaintiffs re-allege all preceding paragraphs as though fully set forth herein.

232.  Pursuant to the IDEA's child find mandate, the State must have in effect policies and procedures to ensure that all children with disabilities residing in the State who are in need of special education and related services are identified, located, and evaluated, regardless of the severity of their disabilities. 20 U.S.C. §1412(a)(3)(A); 34 C.F.R. § 300.111(a)(1)(i).

233.  Under the IDEA, a SEA or LEA must conduct a full and individual initial evaluation before the initial provision of special education and related services to a child with a disability. 20 U.S.C. § 1414(a)(1)(A); 34 C.F.R. § 300.301(a). The initial evaluation shall consist of procedures to determine whether a child is a child with a disability and the educational needs of that child. 20 U.S.C. § 1414(a)(1)(C)(i); 34 C.F.R. § 300.301(c)(2). The parent, SEA, other State agency, or LEA may initiate a request for an initial evaluation. 20 U.S.C. § 1414(a)(1)(B); 34 C.F.R. § 300.301(b).

234. The initial evaluation must be conducted within 60 days of receiving parental consent, or within the timeframe established by the State, if the State establishes such a timeframe. 20 U.S.C. § 1414(a)(1)(C)(i)(I); 34 C.F.R. § 300.301(c)(1). Under Michigan law, the initial evaluation must be conducted and an eligibility determination must be made within 30 school days of receiving parental consent. MARSE Rule 340.1721b(1).

235.  Defendants must ensure that a reevaluation of each child with a disability is conducted if the educational or related services needs of the child warrant a reevaluation. 20 U.S.C. § 1414(a)(2)(A)(i); 34 C.F.R. §300.303(a)(1). A LEA is also responsible for ensuring that a reevaluation is conducted if the child's parent or teacher requests one. 20 U.S.C. § 1414(a)(2)(A)(ii); 34 C.F.R. §300.303(a)(2). At a minimum, a reevaluation must occur on a triennial basis, even in the absence of an explicit request or qualifying circumstances, unless the parent and the LEA agree that a reevaluation is unnecessary. 20 U.S.C. § 1414(a)(2)(B)(ii); 34 C.F.R. §300.303(b)(2). 356. The IDEA outlines detailed and comprehensive procedures for the conduct of evaluations, requiring the Defendants to "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining – (i) whether the child is a child with a disability; and (ii) the content of the child's individualized education program, including information related to enabling the child to be involved in and progress in the general education curriculum." 20 U.S.C. § 1414(b)(2)(A) (emphasis added); see also 34 C.F.R. §300.304(b)(1). 357. Importantly, each LEA "shall ensure that the child is assessed in all areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B) (emphasis added). The child find mandate expressly includes all children with

a suspected disability, even if they are advancing from grade to grade. 34 C.F.R. § 300.111(c)(1). 117 358. The Defendants must "use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors." 20 U.S.C. § 1414(b)(2)(C) (emphasis added); 34 C.F.R. § 300.304(b)(3) (emphasis added). Each Defendant must also ensure that "assessments and other evaluation materials include those tailored to assess specific areas of educational need and not merely those that are designed to provide a single general intelligence quotient." 34 C.F.R. § 300.304(c)(2) (emphasis added). The evaluation must be "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6). 359. As part of an initial evaluation, if appropriate, and as part of any reevaluation, the IEP Team and other qualified professionals shall review existing evaluation data on the child, including: "(i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; (iii) and observations by teachers and related services providers." 20 U.S.C. § 1414(c)(1)(A) (emphasis added); 34 C.F.R. § 300.305(a)(1) (emphasis added). On the basis of that review, and input from

the child's parents, the IEP Team and other qualified professionals, as appropriate, shall identify what additional data, if any, are needed to fulfill the child find obligations under the IDEA. 20 U.S.C. § 1414(c)(1)(B); 34 C.F.R. § 300.305(a)(2). The LEA must administer the assessments and evaluation measures needed to produce such additional data. 20 U.S.C. § 1414(c)(2); 34 C.F.R. § 300.305(c).

236.  When facilitating the transfer of a child with disabilities, Defendants must take reasonable steps to promptly obtain the child's records, including the IEP and supporting documents and any other records relating to the provision of special education or related services to the child, from the previous school in which the child was enrolled. 20 U.S.C. § 1414(c)(i)(ii); CFR § 300.323(g) and 34 CFR § 99.31(a)(1)(i)(A).

237.  In addition, the LEAs are charged with ensuring that assessments "are administered by trained and knowledgeable personnel." 20 U.S.C. § 1414(b)(3)(A)(iv); 34 C.F.R. § 300.304(c)(1)(iv).

238.  Finally, in interpreting the evaluation data for the purpose of determining if a child is a child with a disability and the educational needs of the child, Defendants must "[d]raw upon information from a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the child's physical condition,

social or cultural background, and adaptive behavior." 34 C.F.R. §
300.306(c)(1)(i) (emphases added). Defendants shall "[e]nsure that
information obtained from all of these sources is documented and carefully
considered. 34 C.F.R. § 300.306(c)(1)(ii).

239. As alleged in detail herein, Defendants have a pattern and practice of
systematically failing to provide early screening and timely referrals for
evaluations for children in Hamtramck to identify the existence of a qualifying
disability and eligibility for special education and related services, and are
systematically failing to provide appropriate early intervention services,
including universal, high-quality preschool education. With respect to
children aged 3-4, the child find mandate, requiring proactive identification,
location, and evaluation of children with disabilities, is not likely to be
discharged unless children in this age range are provided early intervention
services, or enrolled in universal preschool, which would allow suspected
disabilities among this population to be observed and assessed.

240. As alleged in detail herein, Defendants also have a pattern and practice of
systematically failing to ensure that Hamtramck students with disabilities are
identified, located, and evaluated in compliance with the IDEA.

241. As alleged in detail herein, Defendants HPS and WRESA have a pattern
and practice of systemically failing to provide ongoing screening and timely

referrals for evaluations to identify qualifying disabilities which make students eligible for special education services pursuant to IDEA's child find mandate.

242. Moreover, Defendant MDE has failed to appropriately monitor, conduct proper oversight, and provide Defendants HPS and WRESA with the resources and expertise to perform the necessary evaluations, meaning that the IDEA's child find mandate cannot be properly implemented by the Defendant LEAs. As a result of the Defendants' failures, children with disabilities remain unidentified and are denied the educational services and procedural safeguards to which they are legally entitled under the IDEA.

**Systemic Violation 3:**

**Failure to Protect Students' Due Process Procedural Safeguards in the Disciplinary Process**

243. Plaintiffs re-allege all preceding paragraphs as though fully set forth herein.

244. In order to ensure that each child with a disability is provided with a free appropriate public education, the IDEA has established a number of procedural safeguards that must be provided to a student with a disability who is subject to disciplinary removals.

245. IDEA requires that students with disabilities be granted certain procedural safeguards with respect to the disciplinary process to ensure that they are not removed from the learning environment on account of their disabilities.

246. Under IDEA, when a child with a disability is removed from his or her original educational placement for more than ten cumulative school days in an academic school year, procedural protections and services must be provided to the student. 20 U.S.C. §1415(k). One such procedural protection is a manifestation determination review ("MDR") to determine whether the student's behaviors are a manifestation of his or her disabilities. 20 U.S.C. §1415(k)(1)(E). This requirement helps ensure that a school does not impose a long-term suspension, series of suspensions, or expulsion on a special education student on account of a behavior that is merely a "manifestation" of his or her disability. 20 U.S.C. § 1415(k)(1)(E).

247. The IDEA mandates that if a child's behavior is a manifestation of that student's disability, the child must be permitted to return to, or remain at, his or her current school placement and be provided with all of the behavioral services necessary to support and reinforce the child's positive behavior. 20 U.S.C § 1415(k)(1)(F). These behavioral supports include a functional behavioral assessment ("FBA") to determine the function or cause of the child's disability and an accompanying behavioral intervention plan ("BIP")

to adequately accommodate the student's educational and behavioral needs. 20 U.S.C § 1415(k)(1)(F)(i)-(ii).

248.  A manifestation determination review is triggered after ten cumulative days of suspensions or expulsions. Additionally, the IDEA and its implementing regulations state that a series of removals totaling more than 10 school days can form a "pattern" of behavior (e.g. "because the child's [disciplined] behavior is substantially similar to the child's behavior in previous incidents that resulted in the series of removals") that also triggers a mandatory MDR. 34 C.F.R. 300.536(a)(2). Notably, the MDR is not limited to determining whether the behavior at issue is a byproduct of the child's disability, but must additionally inquire into whether it may be the consequence of the district's failure to adequately implement his or her IEP. 20 U.S.C. § 1415(k)(1)(E)(i).

249.  Under the IDEA, even students who do not already have an IEP in place are equally entitled to the same procedural safeguards afforded to their special education peers. Indeed, disciplinary protections extend to students who the LEA knew or should have known are students with disabilities. 20 U.S.C. § 1415(k)(5).

250.  In resolving a complaint in which the SEA has found a failure to provide appropriate services, a SEA, pursuant to its general supervisory authority under Part B of the Act, must address— (1) The failure to provide appropriate

services, including corrective action appropriate to address the needs of the child (such as compensatory services or monetary reimbursement); and (2) Appropriate future provision of services for all children with disabilities. 34 C.F.R. § 300.151(b).

251. As alleged in detail herein, Defendants HPS and WRESA have an ongoing pattern and practice of systemically failing to provide students with disabilities with procedural safeguards as required by IDEA in the administration of disciplinary practices, as well as a pattern and practice of using unduly harsh disciplinary measures with students with disabilities, including physical restraints and seclusion techniques, in violation of IDEA. Defendant MDE has failed to appropriately monitor, conduct proper oversight, and provide Defendants HPS and WRESA with the resources and expertise to provide the necessary procedural safeguards. As a result of Defendants' failures, students with disabilities, including Plaintiffs and others similarly situated, are subjected to disciplinary practices and excluded from the classroom environment, instead of receiving the instructional and behavioral supports they need.

**Systemic Violation 4:**

## Discrimination on the Basis of Disability and Denial of Access to

## Educational Services

252.  Plaintiffs re-allege all preceding paragraphs as though fully set forth herein.

253.  Defendant MDE must ensure that each LEA in Michigan, including Defendants HPS and WRESA, takes steps to ensure that children with disabilities within its jurisdiction have available to them the variety of educational programs and services available to nondisabled children, including art, music, industrial arts, consumer and homemaking education, and vocational education. 20 U.S.C. § 1412(a)(2), § 1413(a)(1); 34 C.F.R. § 300.110.

254.  Since Defendants have systemically failed to conduct IEP evaluations, violated IEPs, and placed students with disabilities on reduced days, the Plaintiffs and other class members are not receiving the same educational programs and services available to nondisabled children, including art, music, industrial arts, consumer and homemaking education, and vocational education.

255.  As alleged in detail herein, Defendants' systematic failure to ensure that children with disabilities, such as Plaintiffs and other similarly situated class members, have available the same variety of programs and services as nondisabled children is a violation of Plaintiffs' rights under the IDEA.

256.  As set forth and detailed herein, each of the Defendants have engaged in each of the systemic violations 1 – 4 above and have thereby caused damages to Plaintiffs and all other similarly situated class members.

## COUNT II (as to all Defendants)

## Discrimination Based on Disability in Violation of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*

257.  Plaintiffs re-allege all preceding paragraphs as though fully set forth herein.

258.  As detailed above, all Defendants have—through their respective actions and inactions—exercised bad faith, gross misjudgment and intentionally discriminated against Plaintiffs and similarly situated children by denying them access to essential services and programming that is available to non-disabled students solely on account of their disabilities in violation of Section 504 of the Rehabilitation Act (29 U.S.C. § 794 et seq., 34 C.F.R. § 104 et seq.).

259.  As described above, Defendants have failed to provide Plaintiffs and similarly situated class members with a FAPE and/or reasonable accommodations due to their disability-related behaviors.

260.  Defendant MDE has further failed to comply with its general supervisory responsibilities by failing to adequately oversee and supervise Defendants

WRESA and HPS to ensure that the representative Plaintiffs and the class of similarly situated individuals receive a free appropriate public education and/or reasonable accommodations.

## COUNT III (as to all Defendants)

## Discrimination Based on Disability in Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

261.  Plaintiff re-allege all preceding paragraphs as though fully set forth herein.

262.  As detailed above, all Defendants have—through their respective actions and inactions—exercised bad faith, "gross misjudgment" and intentionally discriminated against Plaintiffs and similarly situated children by denying them access to essential services and programming that is available to non-disabled students solely on account of their disabilities and/or behaviors related to those disabilities in violation of Title II of the Americans with Disabilities Act (42 U.S.C. § 12101 *et seq.*).

263.  Plaintiffs and each of the class members have been denied meaningful access to an adequate public education by Defendants.

## COUNT IV (as to all Defendants)

## Violation of Mich. Comp. Laws § 380.1701 *et seq.*

264.  Plaintiffs re-allege all preceding paragraphs as though fully set forth herein.

265.  Under Michigan law, each child with a disability shall be provided with programs and services designed to develop his or her maximum potential. Mich. Comp. Laws § 380.1711(1)(a).

266.  The State of Michigan requires the superintendent of public instruction at the Michigan Department of Education to have each Intermediate School District ("ISD") board submit a plan pursuant to MCLA 380.1711, in accordance with special education rules. Mich. Comp. Laws §380.1701. Once approved, the board of a local school district "shall provide special education programs and services designed to meet the individual needs of each student with a disability in its district on record under section 1711 for whom an appropriate educational or training program can be provided in accordance with the Intermediate School District (ISD) special education plan." Mich. Comp. Laws §380.1751(1). The Intermediate School Board must "develop, establish, and continually evaluate and modify in cooperation with its constituent districts, a plan for special education that provides for the delivery of special education programs and services designed to meet the individual needs of each student with a disability of whom the intermediate School Board is required to maintain a record under subdivision (f)." Mich. Comp. Laws §380.1711(1)(a). The ISD is required to maintain a record of each student with a disability under 26 years of age, who is a resident of one of its constituent

districts and who has not graduated from high school, and the special education programs or services in which the student with a disability is participating. Mich. Comp. Laws §380.1711 (f).

267. Defendants must ensure that seclusion and restraint are used only as a last resort in an emergency situation, and encourage the use of proactive, effective, evidence and research-based strategies and best practices to reduce the occurrence of challenging behaviors and eliminate the use of seclusion and restraint. Emergency use is not permitted if the seclusion is used for the convenience of school personnel, as a substitute for an educational program, as a form of discipline, as a substitute for less restrictive alternatives, as a substitute for adequate staffing, or as a substitute for school personnel training in positive behavioral intervention and support. Mich. Comp. Laws §380.1307.

268. Under Michigan law, curriculum, eligibility of specific persons for special education programs and services and for each particular program or service, review procedures regarding the placement of persons in the programs or services, size of classes, size of programs, quantity and quality of equipment, supplies and housing, adequacy of methods of instruction, and length and content of school day shall be in accordance with rules promulgated by the

state board relative to special education programs and services. Mich. Comp. Laws § 380.1703(2).

269. The rules promulgated by the state board relative to special education programs and services are known as the Michigan Administrative Rules for Special Education (MARSE).

270. By failing to provide a free and appropriate public education to Plaintiffs and those similarly situated, Defendants have, a fortiori, failed to meet their obligations under Michigan law to provide children with programs designed to reach the higher threshold of developing the maximum potential of each child.

**DEMAND FOR RELIEF**

271. WHEREFORE, Plaintiffs request that this Court:

A. Assert jurisdiction over this matter;

B. Certify this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

C. Issue a declaratory judgment that Defendants' laws, policies, practices, procedures, acts, and omissions complained of herein deprive Plaintiffs of their statutory rights, are illegal and/or invalid, and contravene Defendants' statutory duties to ensure that Plaintiffs and similarly situated children receive access to a free appropriate public education and freedom from

disability-based discrimination associated with disability-related limitations.

D. Order Defendants MDE and WRESA to provide teacher training in positive behavioral interventions and end the practice of restraint and seclusion.

E. Order a review of all current IEPs to ensure compliance with the IDEA in order to provide each student with a free appropriate public education in the least restrictive environment possible, order Defendants to prepare quarterly reports on IEP progress, and order Defendants to devise an effective complaint process to handle and resolve IDEA violations with meaningful oversight.

F. Convene an expert group to evaluate the provision of special education services as mandated by law, identify corrective measures that address the medical, health, and trauma issues that result from lead exposure and that can be adopted by this court, and recommend a special monitor to ensure implementation of a plan including but not limited to:

   a. Identification: Allocate responsibility for identifying, locating and evaluating individuals suspected of having a disability attending HPS schools.

b.  Reduced Days: Mandatory special education training for the entire district specifically on procedural processes and on reduced school days for special needs students.

c.  Discipline: Review the code of conduct and/or discipline policy for compliance with the IDEA, require that each HPS school contain a written description of the IDEA's disciplinary procedural protections and procedural safeguards for students with disabilities and a plan for supporting school behavior and discipline. Each HPS school's plan will be monitored on a quarterly basis and the rates of suspensions and expulsions will be accurately recorded.

d.  Professional Development: Provide annual professional development to all HPS schools on disciplinary procedures for students with disabilities.

e.  Enrollment: Ensure that all HPS schools enroll and serve students with disabilities pursuant to federal law.

G. Order remediation services and compensatory education for each and every child that was placed on a reduced schedule.

H. Provide mandatory changes in the oversight of transportation for special education students.

I.  Assign a Special Monitor for a period of seven years to oversee implementation of the expert recommendations within one year and to continue to monitor the implementation of those recommendations for the entire seven year period.

J.  As it applies to violations of Title II, Section 504, and Michigan law, award Plaintiffs and the Plaintiff Class all compensatory monetary damages, special damages, exemplary damages, punitive damages and all other money damages.

K.  Award Plaintiffs costs and attorneys' fees pursuant to 29 U.S.C. § 794a and 20 U.S.C. § 1415(i)(3)(B)(i)(I);

L.  Retain jurisdiction over this action until such time as this Court is satisfied that the unlawful laws, policies, practices, procedures, acts, and omissions complained of herein have been rectified; and

M. Grant other appropriate relief as this Court deems just and proper.

Respectfully submitted,

HAMMOUD, DAKHLALLAH, & ASSOCIATES, PLLC

/s/ Kassem M. Dakhlallah
Kassem M. Dakhlallah (P70842)
Attorney for Plaintiffs
6050 Greenfield Rd., Ste., 201
Dearborn, MI 48126
(313) 551-3038

kd@hdalawgroup.com

FAGAN MCMANUS, P.C.

By: /s/ Jennifer L. McManus
     Jennifer L. McManus  (P65976)
     Attorney for Plaintiffs
     25892 Woodward Avenue
     Royal Oak, MI  48067-0910
     (248) 542-6300
Dated:  January 23, 2024     jmcmanus@faganlawpc.com

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Y.A., A MINOR CHILD, BY
NEXT FRIEND, IBRAHIM ALZANDANI,          Case No. 23-cv-12817
W.A., A MINOR CHILD BY                    Hon. David Lawson
NEXT FRIEND NADHEM ALNAJAR,
AND A.M., A MINOR CHILD BY
NEXT FRIEND ABRAHAM MUZIB,

     Personally and on behalf of all similarly situated persons,

     Plaintiffs,

v.

HAMTRAMCK PUBLIC SCHOOLS,
WAYNE COUNTY REGIONAL
EDUCATIONAL SERVICE AGENCY,
AND MICHIGAN DEPARTMENT OF
EDUCATION,

     Defendants.

_____/

## PLAINTIFF'S RELIANCE ON JURY DEMAND

Plaintiffs Y.A., W.A., and A.M. ("Plaintiffs"), on behalf of themselves and all

other similarly situated persons, and hereby and hereby relies on the jury demand

previously filed in this matter.

     Respectfully submitted,

     HAMMOUD, DAKHLALLAH, &

ASSOCIATES, PLLC

/s/ Kassem M. Dakhlallah
Kassem M. Dakhlallah (P70842)
Attorney for Plaintiffs
6050 Greenfield Rd., Ste., 201
Dearborn, MI 48126
(313) 551-3038
kd@hdalawgroup.com


FAGAN MCMANUS, P.C.

By: /s/ Jennifer L. McManus
    Jennifer L. McManus  (P65976)
    Attorney for Plaintiffs
    25892 Woodward Avenue
    Royal Oak, MI  48067-0910
    (248) 542-6300
Dated:  January 23, 2024    jmcmanus@faganlawpc.com


## CERTIFICATE OF SERVICE

I, Kassem Dakhlallah, hereby certify that on January 23, 2024 I caused a true copy of this First Amended Complaint and Certificate of service to be served upon all parties of record by the Court's electronic filing system.

/s/ Kassem M. Dakhlallah
Kassem M. Dakhlallah