**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| Kelly L. Stephens<br>Clerk | 100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988 | Tel. (513) 564-7000<br>www.ca6.uscourts.gov |

Filed: May 22, 2025

Mr. Kassem M. Dakhlallah
Hammoud, Dakhlallah & Associates
6050 Greenfield Road
Suite 201
Dearborn, MI 48126-4234

Mr. Neil Anthony Giovanatti
Office of the Attorney General
of Michigan
P.O. Box 30758
Lansing, MI 48909

Ms. Kathleen Ann Halloran
Office of the Attorney General
of Michigan
3030 W. Grand Boulevard
Suite 10-200
Detroit, MI 48202

Ms. Ticara D. Hendley
Ms. Marissa Wiesen
Office of the Attorney General
Health Education & Family Services
P.O. Box 30758
Lansing, MI 48909

Ms. Jennifer Lossia McManus
Ms. Ryan Olivia Rosenberg Kobernick
Fagan McManus
25892 Woodward Avenue
Royal Oak, MI 48067

    Re:    Case No. 24-1855, *Ibrahim Alzandani, et al v. Hamtramck Public Schools, et al*
            Originating Case No. : 2:23-cv-12817

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                        Yours very truly,

                        Kelly L. Stephens, Clerk


                        Cathryn Lovely
                        Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0137p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

Y.A., a minor by Next Friend, IBRAHIM ALZANDANI;
W.A., a minor by Next Friend, NADHEM ALNAJAR;
A.M., a minor by Next Friend, ABRAHAM MUZIB,
    *Plaintiffs-Appellees*,

 *v.*

HAMTRAMCK PUBLIC SCHOOLS, et al.,
    *Defendants*,

MICHIGAN DEPARTMENT OF EDUCATION,
    *Defendant-Appellant*.

No. 24-1855

---

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:23-cv-12817—Brandy R. McMillion, District Judge.

Argued: April 30, 2025

Decided and Filed: May 22, 2025

Before: SUTTON, Chief Judge; BATCHELDER and RITZ, Circuit Judges.

---

## COUNSEL

**ARGUED:** Neil Giovanatti, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Detroit, Michigan, for Appellant. Kassem M. Dakhlallah, HAMMOUD, DAKHLALLAH & ASSOCIATES, PLLC, Dearborn, Michigan, for Appellees. **ON BRIEF:** Bryan W. Beach, Neil Giovanatti, Ticara D. Hendley, Marissa Wiesen, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Detroit, Michigan, for Appellant. Kassem M. Dakhlallah, HAMMOUD, DAKHLALLAH & ASSOCIATES, PLLC, Dearborn, Michigan, for Appellees.

---

**OPINION**

---

SUTTON, Chief Judge. A group of parents claim that their local public school denied their children access to essential special-education services. They sued the school district, unsurprisingly. More surprisingly, they sued the State, based on its alleged failure to supervise the school district and to provide more funding for it. The district court denied the State's motion to dismiss, holding that the relevant statute, the Americans with Disabilities Act, abrogated its sovereign immunity under the Fourteenth Amendment. This interlocutory appeal followed. We reverse.

I.

This case arises out of a small school district in Michigan. The City of Hamtramck, a 2.09-square-mile enclave of Detroit, runs eight public schools for its 2,900 students.

Since its incorporation as a municipality in 1922, Hamtramck has served as a new home for many immigrants. In 1925, seven in ten residents were recent immigrants from Eastern Europe, and the predominant language spoken in city schools was Polish. *See* JoEllen McNergney Vinyard, *For Faith and Fortune: The Education of Catholic Immigrants in Detroit, 1805–1925*, at 182–84 (1998); *see also* Arthur Evans Wood, *Hamtramck: Then and Now* 19–22, 115–25 (1955). The schools catered to the immigrant community to ensure that every child could learn what it means to "live successfully in a democracy," in a "social life" that "is dynamic and not static." Hamtramck Bd. of Ed., Public School Code 61, 66–68 (1927).

Dynamic indeed. Hamtramck today has few Polish speakers. But it remains a city of immigrants. Almost half of its residents were born abroad, and more of its students speak Arabic and Bengali at home than any other language. U.S. Census Bureau, American Community Survey, tbls. B04006, B05006, DP02 (2023).

Trying to be "the world in two square miles," as Hamtramck calls itself, sometimes generates challenges. Some of its schools' problems are familiar: limited funds, a shortage of

qualified teachers, and children left behind by the pandemic. Some are more unusual. Eight in ten students in Hamtramck are below grade level in English, Mathematics, and Social Studies. Seven in ten receive free school meals. Five in ten live in poverty. Two in ten graduate late or not at all. And, of particular relevance, almost one in ten requires special education as a result of a physical or intellectual disability. *See generally* District View, Hamtramck, Michigan School Data, *available at* https://www.mischooldata.org/district-entity-view-page/?LocationCode=82060 (last visited May 22, 2025).

Before us are three parents of children with disabilities, each of whom alleges that Hamtramck has failed to make good on its promise of an education "specially designed" to meet their child's "unique needs." 20 U.S.C. § 1401(29). The first, Ibrahim Alzandani, is the father of Y.A., a seven-year-old boy with autism. Hamtramck promised Y.A. a full-time teacher's aide. But Y.A.'s assigned aide could spend only a few hours a day with him. Y.A., as a result, spent most of first grade at home, unable to attend school.

The second parent, Nadhem Alnajar, tells a similar story. His nonverbal son, W.A., a nine-year-old boy with autism, was routinely sent home after just one or two hours at school, and sometimes placed in seclusion for students with "problem behaviors." R.46 at 85 ¶ 170. The school promised W.A.'s parents that he would receive special services, including speech therapy, but those services did not materialize.

The third parent, Abraham Muzib, says school administrators told him that they do "not provide service[s] to children with Down syndrome." R.46-4 at 6. Hamtramck offered his daughter A.M., age 5, only half-day preschool, and refused to evaluate her for additional assistance.

All three families allege that Hamtramck's failures caused setbacks in their children's education. Two of the parents initially turned to the State for help. A special advocate filed complaints on behalf of Alzandani and Muzib with Michigan's Department of Education, outlining these shortcomings. In both cases, the department found that the school district violated the child's right to receive a free and appropriate public education. And in both cases, the department put in place a corrective-action plan with backward-looking and forward-looking

Case: 24-1855    Document: 29-2    Filed: 05/22/2025    Page: 4    (6 of 17)

No. 24-1855                    Y.A. et al. v. Hamtramck Pub. Schs. et al.                    Page 4

components. Retrospectively, the district was required to compensate each student for the educational opportunities lost as a result of its actions. For both children, that meant a set number of additional hours of one-on-one educational services, provided at the district's expense. Prospectively, the district was required to fix the problems identified by each student and to provide "[e]vidence of timely compliance." R.46-3 at 12.

Neither parent claims that the district failed to provide the promised compensatory services. But both allege (with little by way of factual detail) that the district "failed to implement these corrective action plans" and that the State "failed to follow its monitoring and enforcement duties." R.46 at 68 ¶ 118. To this day, the parents claim, shortened school days, limited additional services, and inadequate processes remain the norm for children with disabilities in Hamtramck. They say that their experiences typify how the school district treats its students.

The children and parents sued the school district and the State in this putative class action. They claim that the defendants violated a number of federal laws: the Individuals with Disabilities Education Act (IDEA), the Americans with Disabilities Act (ADA), and the Rehabilitation Act. They seek damages under the last two statutes. And they seek injunctive relief under all three statutes, specifically "an expert group" to "identify corrective measures" and a special monitor "to oversee [their] implementation." R.46 at 115 ¶ 271.

The school district moved to dismiss, as did the State. The State argued that the parents' complaint failed to state a claim under all three statutes and that sovereign immunity barred the parents' ADA claim. The court denied the defendants' motions. This interlocutory appeal by the State concerns only its sovereign-immunity defense as to the ADA claim. *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993).

## II.

### A.

When the Framers "split the atom of sovereignty," they created something new. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring). The "genius

Case: 24-1855     Document: 29-2     Filed: 05/22/2025     Page: 5     (7 of 17)

No. 24-1855                 Y.A. et al. v. Hamtramck Pub. Schs. et al.                Page 5

of their idea" was "that our citizens would have two political capacities, one state and one federal, each protected from incursion by the other." *Id.*

The challenge for this idea and for a Constitution "unprecedented in form and design," *id.*, is that it soon led to questions unprecedented in form and design. One of those questions arose just a few years after the Constitution's ratification in *Chisholm v. Georgia*. 2 U.S. (2 Dall.) 419 (1793). A citizen of South Carolina wished to sue not a citizen of Georgia but the State of Georgia itself. *See id.* at 420. In this "case of uncommon magnitude," Justice Wilson explained, "[o]ne of the parties . . . is a State; certainly respectable, claiming to be sovereign" and thus immune from a lawsuit. *Id.* at 453 (opinion of Wilson, J.). But a State is not a sovereign in our political system, he reasoned. *See id.* at 454. "To the Constitution of the United States the term SOVEREIGN, is totally unknown." *Id.* "A State; useful and valuable as the contrivance is," he concluded, remains "the inferior contrivance of man." *Id.* at 455. By a 4–1 vote, the Court agreed.

The people did not. Within two years, they overruled *Chisholm*. In 1795, the States ratified the Eleventh Amendment, which bars exercise of "[t]he Judicial power of the United States" against any suit "commenced or prosecuted against one of the United States by Citizens of another State"—the precise situation faced in *Chisholm*. U.S. Const. amend. XI. But the amendment did not merely overrule *Chisholm*. James Madison described it as merely "declaratory" of the States' preexisting immunity, Letter from James Madison to Spencer Roane (May 6, 1821), *in* 2 The Papers of James Madison: Retirement Series 317, 320 (David B. Mattern et al. eds., 2013), and the Supreme Court has done the same. The Court has long "understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms: that the States entered the federal system with their sovereignty intact." *Blatchford v. Native Vill. of Noatak & Circle Vill.*, 501 U.S. 775, 779 (1991); *see also Alden v. Maine*, 527 U.S. 706, 728–29 (1999). The Eleventh Amendment restored the state-federal balance.

It would take a civil war to alter that balance again. The Reconstruction Amendments "were intended to be, what they really are, limitations of the power of the States and enlargements of the power of Congress." *Ex parte Virginia*, 100 U.S. 339, 345 (1880). That was

especially true of the Fourteenth Amendment. Not only did it require the States to provide "due process" and "equal protection of the laws," but it also granted Congress the "power to enforce" its provisions "by appropriate legislation." U.S. Const. amend. XIV. The Fourteenth Amendment authorized Congress to intrude upon "spheres of autonomy previously reserved to the States." *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455 (1976). That led the Court to hold that one of the protections left intact in the original Constitution—each State's sovereign immunity—had to yield to "appropriate" "enforce[ment]" legislation enacted under the amendment. *Id.* at 456.

In a number of cases, the Court has grappled with what counts as "appropriate legislation" to "enforce" the Fourteenth Amendment. *City of Boerne v. Flores* sets the framework. 521 U.S. 507 (1997). At issue was the Religious Freedom Restoration Act of 1993, commonly known as RFRA, enacted in response to *Employment Division v. Smith*. 494 U.S. 872 (1990). *Smith* held that the Free Exercise Clause did not require the States to satisfy strict scrutiny if they wished to deny religious exemptions from otherwise neutral laws. *See id.* at 890. RFRA said otherwise. Congress sought to overrule *Smith* and subject such laws to strict scrutiny anyway. *See City of Boerne*, 521 U.S. at 515–16. Did RFRA "enforce" the Fourteenth Amendment? No, the Court held. "Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the Clause." *Id.* at 519. Congress "enforce[s]" a constitutional right, the Court explained, only when its legislation is tailored "to remedy or to prevent" unconstitutional conduct in a "congruen[t] and proportional[]" way—when, in short, it enforces the guarantees as opposed to rewriting them. *Id.* at 520, 533. Anything more than that violates the Fourteenth Amendment.

All of this places limits on Congress's ability to abrogate the States' sovereign immunity. Congress may permit lawsuits against States to remedy violations of the Constitution. Such lawsuits—think § 1983—directly remedy unconstitutional conduct. *Fitzpatrick*, 427 U.S. at 456. And Congress may permit lawsuits against States for some "facially constitutional conduct," but only as part of a legislative scheme designed "to prevent and deter unconstitutional conduct." *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 727–28 (2003). To determine whether such a prophylactic statute passes muster, we consider "the extent of state conduct violating the Fourteenth Amendment," "the nature" of the constitutional problem, and "the scope of the

Case: 24-1855     Document: 29-2     Filed: 05/22/2025     Page: 7     (9 of 17)

No. 24-1855          Y.A. et al. v. Hamtramck Pub. Schs. et al.          Page 7

response Congress chose." *Allen v. Cooper*, 589 U.S. 248, 261 (2020); *see also, e.g.*, *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 639–48 (1999). "Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one." *City of Boerne*, 521 U.S. at 530.

That brings us to this case. At issue is Title II of the Americans with Disabilities Act, which targets "State[s]," "local government[s]," and their instrumentalities, 42 U.S.C. § 12131(1), and expressly abrogates the States' sovereign immunity under the Fourteenth Amendment, *id.* § 12202; *see United States v. Georgia*, 546 U.S. 151, 154 (2006). Title II forbids state and local entities from excluding individuals with disabilities from their "services," "programs," and "activities." 42 U.S.C. § 12132. Given Title II's broad sweep, from state courts to state-owned hockey rinks, the Court has rejected the idea that the statute should be evaluated "as an undifferentiated whole." *Tennessee v. Lane*, 541 U.S. 509, 530 (2004). We must instead evaluate it on a "claim-by-claim basis," asking whether Title II is appropriate legislation based on the particular lawsuit before us. *Georgia*, 546 U.S. at 159. Once we pin down the precise target of the allegation, we turn to whether the application of Title II is a "congruent and proportional" response. *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001).

That requires us to proceed in three steps, *Georgia* tells us. 546 U.S. at 159. We first ask whether the State violated Title II and, if so, identify precisely which aspects of its conduct did so. *Id.* We then ask whether that conduct also violated the Fourteenth Amendment. *Id.* If it did, our inquiry ends, as all agree that Congress may authorize a lawsuit "for conduct that *actually* violates the Fourteenth Amendment." *Id.* Only if the State's conduct violated Title II but not the Fourteenth Amendment do we ask whether Congress's attempt to abrogate sovereign immunity as to that "class of conduct" is congruent and proportional to the task. *Id.*; *see, e.g.*, *Babcock v. Michigan*, 812 F.3d 531, 539 (6th Cir. 2016).

B.

We begin and end at the first step in today's case. A claimant's failure "to identify conduct that violates" Title II, as we have said before, is "dispositive" of sovereign immunity.

No. 24-1855         *Y.A. et al. v. Hamtramck Pub. Schs. et al.*         Page 8

*Babcock*, 812 F.3d at 539; *see also, e.g.*, *Pickett v. Tex. Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1026 & n.2 (5th Cir. 2022). This complaint fails to state a claim against the State.

The operative provision of Title II, § 202, reads in full:

> Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

Americans with Disabilities Act of 1990, Pub. L. No. 101-336, § 202, 104 Stat. 327, 337 (codified at 42 U.S.C. § 12132). A "public entity," in turn, includes the "State[s]," the "local government[s]," and their "instrumentalit[ies]," such as school districts. *Id.* § 201(1), 104 Stat. at 337 (codified at 42 U.S.C. § 12131(1)).

Title II focuses on the particular conduct of particular public entities. To be liable, an entity must have denied someone access to one of its "services, programs, or activities" or otherwise have "subjected" someone "to discrimination." The relevant action, put another way, must be taken "by [the] entity" in question. Title II thus mirrors the Rehabilitation Act, upon which it was based, *see Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 599–600 (1999), and which similarly limits its reach to "the operations" of a public entity (if federally funded), 29 U.S.C. § 794(a)–(b). Title II allows a person to sue a State for what the State does, not for what another government does.

At issue in this case are Michigan's schools. Are they a "service," "program," or "activity" of the State? They are not. Under Michigan law, school districts undertake general responsibility for public education, making them separate public entities suable under Title II. *Durant v. State Bd. of Educ.*, 381 N.W.2d 662, 671 (Mich. 1985). Each district is responsible to the local voters, who elect the board. Mich. Comp. Laws §§ 380.384, .410. And each board has considerable discretion in how it chooses to operate its district's schools. The board, not the State, determines whether new schools should be opened and old ones closed, *id.* § .11a(3)(a)(i), who will teach and how much they will be paid, *id.* § .11a(3)(d), and—in most cases—what students will learn, *id.* § .1282. The State, then, relies on each school district to "educat[e] pupils" as it sees fit, *id.* § .11a(3)(a), and to "provide special education programs and services

designed to meet the individual needs of each student with a disability," *id.* § .1751(1). Whether a district does so well or poorly, it is the district that is to thank or to blame.

The school districts' independence, in fact, explains why they may be sued in the first place. The Supreme Court has long recognized that local governments, while "territorially a part of the State," remain "politically" separate from the State for purposes of sovereign immunity. *Lincoln County v. Luning*, 133 U.S. 529, 530 (1890). Just so for school districts. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977). School districts, much like local governments, "exercise a slice of state power," *Lake Country Ests. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979) (quotation omitted), but they do not do so as the State's mere agent—they remain responsible to their local electorates, levy their own taxes, and operate their schools largely as they see fit, *Mt. Healthy*, 429 U.S. at 280. It is precisely *because* school districts are not merely arms of the State, but truly independent entities, that they may not invoke the State's immunity as a bar to suit.

What helps the parents with their claims against the school district dooms their claim against the State. Their complaint focuses on the educational benefits allegedly denied their children. But it was not the State that reduced the children's school days, denied them additional services, and rejected appropriate accommodations. It was the school district that did that. The State, in fact, agreed with the parents that the district deprived their children of an appropriate public education and ordered the district to make the students whole. The parents may have a Title II claim against Hamtramck Public Schools, the "public entity" that provided the "services" and "activities" at issue. 42 U.S.C. § 12132. But they do not have a claim against the State.

The parents disagree. Because the State (partially) funds and supervises the school districts, they argue, the districts' failures are the State's own. But this argument—that Title II allows for supervisory liability—rewrites the statute. Title II, to repeat, limits its reach to the actions of particular "public entit[ies]." 42 U.S.C. § 12132. Judge Wilkinson put it well: "To hold that a city or State by virtue of its funding authority is liable for injury caused solely by a separate and independent corporate body is a novel and unprecedented theory." *Bacon v. City of Richmond*, 475 F.3d 633, 642 (4th Cir. 2007). The text of the statute "does not impose guarantor liability or make funding entities ADA insurers for funding recipients." *Id.* "To the contrary,"

Case: 24-1855     Document: 29-2     Filed: 05/22/2025     Page: 10     (12 of 17)

No. 24-1855          Y.A. et al. v. Hamtramck Pub. Schs. et al.          Page 10

Title II "limits responsibility to public entities that discriminate against or exclude persons with disabilities." *Id.* In this case, the school district, not the State, allegedly discriminated against children with disabilities. Ignoring the difference between the two entities would pave over Congress's careful separation of "public entity" between the "instrumentalit[ies]" of the States and the States themselves. 42 U.S.C. § 12131(1).

The parents' approach also would pave over the different approach taken in the rest of the Act, not to mention other federal laws, with respect to supervisory liability. Compare Title I, in which Congress barred discrimination against employees with disabilities. *Id.* § 12112(a). Congress in that instance carefully defined an "employer" to include not only "governments, governmental agencies, political subdivisions, . . . associations, [and] corporations" but also "any agent" of such entities. *Id.* §§ 2000e(a)–(b), 12111(7). The same was true in Title III, in which Congress required private businesses to accommodate customers with disabilities. *Id.* § 12182. There, too, Congress chose to impose liability not only on the operator of a non-compliant public accommodation, but also on the property's owner. *Id.* § 12182(a) ("No individual shall be discriminated against on the basis of disability . . . by any person who owns, leases (or leases to), or operates a place of public accommodation."). Titles I and III show that, when Congress wished to impose supervisory liability, "it knew how to do so." *Thompson v. United States*, 145 S. Ct. 821, 827 (2025) (quotation omitted); *see also, e.g.*, 7 U.S.C. § 2020(a)(2) (making each State liable for the distribution of food stamps, "whether the program is operated on a State-administered or county-administered basis").

Had Congress wished to work such a marked shift in the States' internal governance through Title II, we could fairly expect it to speak just as clearly. "No single tradition in public education is more deeply rooted than local control over the operation of schools." *Milliken v. Bradley*, 418 U.S. 717, 741 (1974). That tradition would come to an end under the parents' approach. The States would face a stark choice: centralize all educational decisions in the state capital or face liability for decisions made in hundreds of all-over-the-map localities. *Cf. San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 49–50 (1973). Our Nation's 13,000 school districts would become mere administrative units executing directives from above, not responsive bodies accountable to local voters. *See Bacon*, 475 F.3d at 642–43. We do not

lightly presume that Congress intended such "federal superintendence of . . . decisions traditionally entrusted to state governance." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 643 (1986) (plurality op.).

A State, we appreciate, could choose to design its government in a way that made this a state issue, as opposed to a local one. But "choose" is the operative word. It is "a crucial axiom of our government" that "the States have wide authority to set up their state and local governments as they wish." *McMillian v. Monroe County*, 520 U.S. 781, 795 (1997). Only Hawaii, to date, has opted to abolish its local school districts and to run its public schools centrally. In Michigan, local school boards run the local schools. "Local control of education," to quote the Michigan Supreme Court, "is a time-honored tradition in this state." *Durant*, 381 N.W.2d at 670. That is not to say that the State plays no role. It does. *See generally* Mich. Comp. Laws § 380.1703(1)–(2) (empowering the department of education to promulgate regulations governing the delivery of special-education services). But the school district remains the public entity that actually provides the "services" and "activities" at issue, 42 U.S.C. § 12132, not the State. While a State could be held liable if it seized authority over the public schools or used its regulatory power to instruct a school district to violate Title II, it may not be held liable simply because a district violated Title II of its own accord.

What about the doctrine of state action? In the constitutional context, it is true, we sometimes attribute the actions of a private actor to the State. *Ciraci v. J.M. Smucker Co.*, 62 F.4th 278, 281–84 (6th Cir. 2023). But that doctrine (even assuming it applied here) would not help the parents. It tells us when the action of a private party might be attributed to *a government*. It does not tell us *which government* its actions ought to be attributed to. Nor are these schools private parties in any case. To repeat, they belong to school districts, governmental units in themselves with a separate legal status. True, the State created the school districts. But the same is true for all local governments. We see no reason why the State would stand in loco parentis to its school districts any more than it would to all its subdivisions—or any more than a corporation would to its subsidiaries. *Cf. Dewberry Grp. v. Dewberry Eng'rs Inc.*, 145 S. Ct. 681, 686–87 (2025) (describing the "usual rule" that "separately incorporated organizations are

separate legal units with distinct legal rights and obligations," even if the entities have "a common owner" or are otherwise "affiliated" (quotation omitted)).

The parents point to the IDEA, but it does not help them either. Under the IDEA, States and school districts receive federal special-education funds. In exchange, States and school districts agree to establish "elaborate and highly specific procedural safeguards" to give parents a voice in their children's education. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 205 (1982). The State in particular must exercise "general supervision" over local educational agencies to ensure they comply with the statute's requirements, 20 U.S.C. § 1412(a)(11), and "establish and maintain procedures" through which parents may seek redress if a school fails to provide their child with a free appropriate public education, *id.* § 1415(a).

From these provisions, the parents infer that the State is responsible for the actions of its school districts. But the mere fact that "policy decision-making and supervision in certain areas are reserved to the State" does not mean that local control is a "sham" or that education is a state rather than "local function." *San Antonio Indep. Sch. Dist.*, 411 U.S. at 51 n.108. Just as "extensive" regulation does not transform a private utility into the State, *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974), oversight alone does not transform a local school into a state school. The schools are the districts' "services, programs, [and] activities," 42 U.S.C. § 12132, not the State's. The parents' IDEA-cum-ADA claim does not win the day.

No more helpful is the parents' reliance on precedents with respect to *state* universities. In most States, it is true, the State maintains control over its public universities and assumes "legal liability for judgments" against them. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 430–31 (1997). But that is why we call it the University of Michigan, not the University of Ann Arbor. *See Est. of Ritter ex rel. Ritter v. Univ. of Mich.*, 851 F.2d 846, 851 (6th Cir. 1988). Just as Michigan may choose to operate its public universities, it may choose to delegate the operation of its public schools. It is because each school district in Michigan is run locally that it is more akin to "a county or city" than "an arm of the State," like a state university. *Mt. Healthy*, 429 U.S. at 280.

Case: 24-1855     Document: 29-2     Filed: 05/22/2025     Page: 13     (15 of 17)

No. 24-1855                 Y.A. et al. v. Hamtramck Pub. Schs. et al.                 Page 13

Nor does it help the parents to focus solely on the actions of the State. The State, sure enough, undertakes a number of tasks related to special education: collecting data, allocating funds, resolving complaints, and so on. 20 U.S.C. § 1412(a). Even if we spotted the claim that these tasks amount to "services" under Title II, they do not count as services that people with disabilities could readily be "excluded from" or services that could themselves "subject[]" the disabled "to discrimination." 42 U.S.C. § 12132. To the extent such a case exists, it assuredly is not this one. As the parents' complaint acknowledges, two of them turned to the State for help—and got it. The State afforded them a hearing, promptly adjudicated their claims, and ruled in their favor. It ordered the school district not only to compensate the children with one-on-one educational services, but also to fix the problems identified by the parents and provide "[e]vidence of timely compliance." R.46-3 at 12; R.46-4 at 18.

The parents thus do not claim that the district failed to provide this additional instruction. They instead allege generally that the State "failed to implement" these plans (presumably their prospective aspects) and more broadly "failed to comply with its general supervisory responsibilities." R.46 at 68 ¶ 118, 108 ¶ 260. But these conclusory assertions do not suffice to move past the pleading stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Even taken at face value, moreover, the allegations still fail to show actions "by" the State that "excluded" children with disabilities or "subjected [them] to discrimination," as opposed to merely standing idly by while a separate public entity (allegedly) acted improperly. 42 U.S.C. § 12132. Title II requires more.

*Henrietta D. v. Bloomberg* does not alter our conclusion. 331 F.3d 261 (2d Cir. 2003). The Second Circuit held that the State of New York was responsible under the ADA for its municipalities' implementation of federally funded social services. *See id.* at 287. The court acknowledged that the ADA "on its face does not directly announce that [the] States will be subject to supervisory liability," *id.* at 285, but imposed such liability based on the "general rules of contract," "[t]he Justice Department's interpretation" of the related Rehabilitation Act, and the ADA's legislative history, *id.* at 285–87 & n.17, 289 n.18. We do not lightly look away from the statute's text. Either way, *Henrietta D.*, accurate or not, is distinguishable. Under New York law, as the court explained, local social services agencies "act on behalf of and as agents for the

State." *Id.* at 266 (quoting *Beaudoin v. Toia*, 380 N.E.2d 246, 247 (N.Y. 1978)). The same cannot be said of school districts in Michigan. *See Durant*, 381 N.W.2d at 671. The State is entitled to immunity.

* * *

One final note. It might give the reader pause that an appeal based on sovereign immunity could turn on the merits of the underlying claim—what seems to be the transformation of a Civil Rule 12(b)(1) appeal into a Civil Rule 12(b)(6) appeal. The first answer comes from *United States v. Georgia*. Only after we have determined "which aspects of the State's alleged conduct violated Title II," it says, may we look to the constitutional questions: whether the State's misconduct "also violated the Fourteenth Amendment," and whether, if not, "Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid" as congruent and proportional. 546 U.S. at 159; *see also, e.g.*, *Pickett*, 37 F.4th at 1026 & n.2. Because the merits and jurisdiction "come intertwined," *Brownback v. King*, 592 U.S. 209, 217 (2021) (quotation omitted), we may decide the former if it is necessary to decide the latter, *see, e.g.*, *Hartman v. Moore*, 547 U.S. 250, 257 n.5 (2006).

*Georgia*'s order of operations also makes sense. It permits us to avoid constitutional questions where we can. *See Ashwander v. TVA*, 297 U.S. 288, 346–47 (1936) (Brandeis, J., concurring). And it avoids the peril of resolving Title II's validity in the abstract and instead gauges the precise "class of cases" before us. *Lane*, 541 U.S. at 533; *see also Georgia*, 546 U.S. at 159. Whether Congress permissibly exercised its enforcement power under the Fourteenth Amendment turns not only on "the constitutional problem Congress faced" but also "the scope of the response Congress chose." *Allen*, 589 U.S. at 261. An assessment of the statute's application to the claimants and government entity at hand facilitates the last inquiry.

We reverse.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 24-1855

Y.A., a minor by Next Friend, Ibrahim Alzandani; W.A., a minor by Next Friend, Nadhem Alnajar; A.M., a minor by Next Friend, Abraham Muzib,

    Plaintiffs - Appellees,

v.

HAMTRAMCK PUBLIC SCHOOLS, et al.,

    Defendants,

MICHIGAN DEPARTMENT OF EDUCATION,

    Defendant - Appellant.

**FILED**
May 22, 2025
KELLY L. STEPHENS, Clerk

Before: SUTTON, Chief Judge; BATCHELDER and RITZ, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's denial of the State of Michigan's motion to dismiss is REVERSED.

**ENTERED BY ORDER OF THE COURT**

*Kelly L. Stephens*

Kelly L. Stephens, Clerk